24-2684

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

◆◆

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee,*

—v.—

SAM IKKURTY and JAFIA LLC,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
NO. 1:22-CV-02465
HONORABLE MARY M. ROWLAND

## BRIEF FOR DEFENDANTS-APPELLANTS SAM IKKURTY AND JAFIA LLC AND REQUIRED SHORT APPENDIX

JASON P. GOTTLIEB
MICHAEL MIX
MORRISON COHEN LLP
909 Third Avenue, 27th Floor
New York, New York 10022
(212) 735-8600

*Attorneys for Defendants-Appellants*
*Sam Ikkurty and Jafia LLC*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2684

Short Caption: CFTC v. Sam Ikkurty, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Appellants Sam Ikkurty and Jafia LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Glozman Law; Seward & Kissel LLP; Salvatore Prescott Porter & Porter;

Norton Rose Fulbright US LLP; Nishay K. Sanan, Esq.

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

None

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jason Gottlieb     Date: 9/27/2024

Attorney's Printed Name: Jason Gottlieb

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☑     No ☐

Address: Morrison Cohen LLP

909 Third Avenue, New York, NY 10022

Phone Number: 212-735-8600     Fax Number:

E-Mail Address: jgottlieb@morrisoncohen.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2684

Short Caption: CFTC v. Sam Ikkurty, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Appellants Sam Ikkurty, Jafia LLC

 (The only new information on this form is the undersigned's representation of Appellants in this matter)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Glozman Law; Seward & Kissel LLP; Salvatore Prescott Porter & Porter;

 Norton Rose Fulbright US LLP; Nishay K. Sanan, Esq.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

       None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Michael Mix          Date: 9/27/2024

Attorney's Printed Name:  Michael Mix

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address:  Morrison Cohen LLP

 909 Third Avenue, New York, NY 10022

Phone Number: 212-735-8600          Fax Number:

E-Mail Address: mmix@morrisoncohen.com

rev. 12/19 AK

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a), Defendant-Appellant Jafia, LLC (the only Appellant that is a corporate entity) states that it has no parent corporation and no publicly-held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ............................................................................................. iii

TABLE OF AUTHORITIES ............................................................................................. vi

REQUEST FOR ORAL ARGUMENT .............................................................................. xi

JURISDICTIONAL STATEMENT .................................................................................... 1

ISSUES PRESENTED FOR REVIEW ............................................................................. 2

PRELIMINARY STATEMENT ......................................................................................... 2

STATEMENT OF THE CASE ........................................................................................... 6

SUMMARY OF ARGUMENT ........................................................................................ 16

ARGUMENT ................................................................................................................... 18

    I.   Standard of Review and Applicable Procedural Law .......................................... 18

    II.  The CEA's Unambiguous Definition of "Commodity" Is Limited to Services, Rights, and Interests For Which Futures Contracts Exist .......................................... 19

        A.  Clear Statutory Language Must Be Interpreted Pursuant to Its Terms .............. 19

        B.  The CEA's Definition of "Commodity" Is Clear ............................................. 20

        C.  The CFTC's Claims Rise and Fall with the Definition of "Commodity" ........... 20

    III. The District Court Erred By Granting Summary Judgment for the CFTC on the Claim For Deceptive Scheme or Contrivances Pursuant to 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) ..... 22

        A.  The District Court Erred in Finding that OHM and Klima Are Commodities .................. 23

           1.  Under the Plain Language of 7 U.S.C. § 1a(9), OHM and Klima Are Not Commodities ....................................................................................................... 23

           2.  The Non-Binding Cases Relied Upon by the District Court Are Either Incorrectly Decided or Inapposite ...................................................................... 24

           3.  The District Court's Decision Has No Limiting Principle, and Would Thus Lead to Absurd Results ............................................................................................... 28

B.  It Was Error to Find that WBTC Was a Commodity..................................................31

C.  It Was Error to Find Commodities Fraud With Respect to ETH.........................32

IV. The District Court Erred By Granting Summary Judgment for the CFTC on the Claim For
Failure to Register as a CPO Under 7 U.S.C. § 6m(1) ...........................................33

V.  The District Court Erred By Granting Summary Judgment for the CFTC on the Claim For
Fraud by a CPO Pursuant to 7 U.S.C. § 6o(1)(A)-(B)...........................................38

CONCLUSION..................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page**

*Bagwe v. Sedgwick Claims Mgmt. Servs.*,
   811 F.3d 866 (7th Cir. 2016) ................................................................. 18

*Bland v. Fiatallis N. Am., Inc.*,
   401 F.3d 779 (7th Cir. 2005) ................................................................. 35

*Bost v. Ill. State Bd. Of Elections*,
   114 F.4th 634 (7th Cir. 2024) ................................................................. 27

*CFTC v. Equity Fin. Grp. LLC*,
   572 F.3d 150 (3d Cir. 2009) ............................................................. 36, 37

*CFTC v. Laino Grp. Ltd.*,
   2021 WL 4059385 (S.D. Tex. June 30, 2021) ........................................ 28

*CFTC v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) .............................................. 23, 28

*CFTC v. My Big Coin Pay, Inc.*,
   334 F. Supp. 3d 492 (D. Mass. 2018) .............................................. 23, 29

*CFTC v. Weinberg*,
   287 F. Supp. 2d 1100 (C.D. Cal. 2003) ................................................. 36

*CFTC v. Wilkinson*,
   2016 WL 8256406 (N.D. Ill. Nov. 22, 2016) ......................................... 36

*Doe v. Smith*,
   470 F.3d 331 (7th Cir. 2006) ................................................................. 24

*Food Marketing Institute v. Argus Leader Media*,
   588 U.S. 427 (2019) ............................................................................... 19

*Groff v. DeJoy*,
   600 U.S. 447 (2023) ............................................................................... 19

*In re Witkowski*,
   16 F.3d 739 (7th Cir. 1994) ................................................................... 20

*Jenkins v. Heintz*,
   25 F.3d 536 (7th Cir. 1994) ................................................................... 20

*Jimenez v. Quarterman*,
    555 U.S. 113 (2009) ................................................................... 19

*Lawson v. Sun Microsystems, Inc.*,
    791 F.3d 754 (7th Cir. 2015) .................................................... 35

*Lopez v. Dean Witter Reynolds, Inc.*,
    805 F.2d 880 (9th Cir. 1986) .................................................... 37

*Matthews v. Milwaukee Area Local Postal Workers Union*,
    *AFL-CIO*, 495 F.3d 438 (7th Cir. 2007) ................................. 18

*McNeill v. U.S.*,
    563 U.S. 816 (2011) ................................................................... 30

*Nat'l Ass'n of Manufacturers v. Department of Defense*,
    583 U.S. 109 (2018) ................................................................... 19

*Peerless Network, Inc. v. MCI Communications Servs., Inc.*,
    917 F.3d 538 (7th Cir. 2019) .................................................... 18

*Risley v. Universal Navigation Inc.*,
    690 F. Supp. 3d 195 (S.D.N.Y. 2023) ................................ 26, 27

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) ....................................................................... 24

*SEC v. Coinbase, Inc.*,
    2024 U.S. Dist. LEXIS 56994 (S.D.N.Y. Mar. 27, 2024) ........ 26

*Smith v. Zachary*,
    255 F.3d 446 (7th Cir. 2001) .................................................... 30

*Springer v. Durflinger*,
    518 F.3d 479 (7th Cir. 2008) .................................................... 19

*Turkiye Halk Bankasi A.S. v. U.S.*,
    598 U.S. 264 (2023) ................................................................... 31

*U.S. v. Berkos*,
    543 F.3d 392 (7th Cir. 2008) .............................................. 19, 24

*U.S. v. Brooks*,
    681 F.3d 678 (5th Cir. 2012) .................................................... 25

*U.S. v. Futch,*
   278 F. App'x 387 (5th Cir. 2008) ................................................... 25

*U.S. v. Patel,*
   778 F.3d 607 (7th Cir. 2015) ................................................. 18, 19

*U.S. v. Reed,*
   2022 WL 597180 (S.D.N.Y. Feb. 28, 2022) ................................... 28

*U.S. v. Sanders,*
   909 F.3d 895 (7th Cir. 2018) ......................................................... 18

*U.S. v. Valencia,*
   2003 U.S. Dist. LEXIS 15264 (S.D. Tex. Aug. 25, 2003) ................ 25

*U.S. v. Wilkinson,*
   986 F.3d 740 (7th Cir. 2021) ......................................................... 36

**Statutes**

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

28 U.S.C. § 1345 ................................................................................... 1

7 U.S.C. § 1a(10)(A) ...................................................................... 21, 33

7 U.S.C. § 1a(11)(A)(i) ........................................................................ 21

7 U.S.C. § 1a(9) ................................................................. 2, 20, 23, 24

7 U.S.C. § 2(a)(1)(A) ........................................................................... 33

7 U.S.C. § 6m(1) .......................................................................... passim

7 U.S.C. § 6o(1)(A) ..................................................................... passim

7 U.S.C. § 6o(1)(B) ..................................................................... passim

7 U.S.C. § 9(1) ............................................................................. passim

**Regulations**

17 C.F.R. § 1.3 ................................................................................... 21

17 C.F.R. § 180.1(a) .................................................................................................... passim

17 C.F.R. § 230.506(b) ................................................................................................... 9

**Rules**

Fed. R. App. P. 26 ....................................................................................................... 1, 2

Fed. R. App. P. 28 ....................................................................................................... 6, 16

Fed. R. App. P. 4(a)(1)(B) ............................................................................................ 1

Fed. R. Civ. P. 12 ....................................................................................................... 14

Fed. R. Civ. P. 59(e) ..................................................................................................... 2

Fed. R. Civ. P. 60 ......................................................................................................... 2

**Other Authorities**

Alex Lielacher, *What Is A Governance Token? A Beginner's Guide*, Crypto.News (July 24, 2022),
   https://crypto.news/learn/what-is-a-governance-token/ ................................................. 27

Corey Barchat, *What are Ethereum Gas Fees? ETH Fees Explained*, MoonPay (Jul. 7, 2022),
   https://www.moonpay.com/learn/defi/what-are-ethereum-gas-fees ................................... 32

Ian McGinley, *Enforcement by Enforcement: The CFTC's Actions in the Derivatives markets for Digital Assets*," CFTC (Sept. 11, 2023),
   https://www.cftc.gov/PressRoom/SpeechesTestimony/opamcginley1 ........................... 33

Jazmin Goodwin, *What is an NFT? Non-fungible tokens explained*, CNN Business (Nov. 10, 2021),
   https://www.cnn.com/2021/03/17/business/what-is-nft-meaning-fe-series/index.html ................... 27

Leeor Shimron, *Amazon.eth, Starbucks.bitcoin, Coke.dao? Crypto Domain Names Are The Next Big NFT Craze*, Forbes (Sept. 10, 2022),
   https://www.forbes.com/sites/leeorshimron/2022/09/10/amazoneth-starbucksbitcoin-cokedao-crypto-domain-names-are-the-next-big-nft-craze/?sh=4cc5e866b1dd ........................... 27

*Live Cattle Futures and Options*, CME Group
   https://www.cmegroup.com/markets/agriculture/livestock/live-cattle.html (last visited Nov. 4, 2024) ......................................................................................................................... 4

*Private Placements – Rule 506(b)*, Securities and Exchange Commission,
   https://www.ecfr.gov/current/title-17/chapter-II/part-230#230.506 (last visited Nov. 4, 2024) ......... 9

Roy Gaurav, *How The Gaming Industry Uses Crypto?*, CoinMarketCap (Jan. 2022), https://coinmarketcap.com/alexandria/article/how-the-gaming-industry-uses-crypto ......................28

*Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Relating to Bitcoin Fraud*, CFTC (Mar. 8, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement030822 ..............................33

Tomio Geron, *Why Stablecoins Stand Out in the Cryptocurrency World*, The Wall Street Journal (June 10, 2019), https://www.wsj.com/articles/why-stablecoins-stand-out-in-the-cryptocurrency-world-11560218460 .................................................................................................27

*Trade Litecoin Futures Contracts*, Kraken https://www.kraken.com/features/futures/litecoin (last visited Nov. 4, 2024) ...........................................................................................................28

*What Are Liquidity Pools?*, Gemini (Nov. 30, 2021), https://www.gemini.com/cryptopedia/what-is-a-liquidity-pool-crypto-market-liquidity ..............................................................................27

*What Is Wrapped Bitcoin*, CoinMarketCap, https://coinmarketcap.com/academy/article/what-is-wrapped-bitcoin (last visited Nov. 4, 2024) ......................................................................32

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Fed. R. App. P. 34(a) and Circuit Rule 34(f), Defendants-Appellants respectfully request oral argument. Oral argument will assist the Court in deciding this appeal, which involves important legal issues (of national first impression at the Court of Appeals level) involving the interpretation of the terms "commodity" and "commodity pool" under the Commodity Exchange Act for certain digital assets. Oral argument will enable the parties to address these issues adequately and respond to the Court's questions.

## JURISDICTIONAL STATEMENT

Pursuant to Fed. R. App. P. 26(a)(4)(A) and Circuit Rule 28, the basis for the District Court's subject-matter jurisdiction was the existence of a federal question.  Specifically, Plaintiff-Appellee Commodity Futures Trading Commission's ("CFTC") complaint asserted that the District Court had jurisdiction over the action under 28 U.S.C. § 1331 and 1345.  The relevant federal statute is the Commodity Exchange Act, 7 U.S.C. §§ 1-26 (the "CEA").  The CFTC's complaint contained three causes of action, each arising under the CEA.  The first cause of action was for failure to register as a commodity pool operator pursuant to 7 U.S.C. § 6m(1).  The second cause of action was for fraud by a commodity pool operator pursuant to 7 U.S.C. § 6o(1)(A)-(B).  The third cause of action was for deceptive scheme or contrivances pursuant to 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  Defendant-Appellant Jafia LLC ("Jafia") is the only corporate entity in this appeal.  It is a Florida limited liability company with its principal place of business in Florida.

Pursuant to Fed. R. App. P. 26(a)(4)(B), the basis for this Court's jurisdiction is 28 U.S.C. § 1291, as this is an appeal from a final decision of the District Court.  The date of entry of the judgment sought to be reviewed is July 22, 2024 (the "Judgment").  There was no motion for a new trial or alteration of the Judgment or any other motion claimed to toll the time within which to appeal.  The filing date of the notice of appeal was September 19, 2024.

Pursuant to Fed. R. App. P. 26(a)(4)(C), this appeal was timely filed.  The date of entry of the Judgment sought to be reviewed is July 22, 2024, and pursuant to Fed. R. App. P. 4(a)(1)(B), Defendants-Appellants Sam Ikkurty ("Ikkurty") and Jafia (collectively, "Defendants") had sixty days to file a notice of appeal because one of the parties is a United States agency.  The filing date of the notice of appeal was September 19, 2024.

1

Pursuant to Fed. R. App. P. 26(a)(4)(D), this appeal is from a final judgment that disposes all of the parties' claims.[1]

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred in granting the CFTC's motion for summary judgment (and correspondingly denying Defendants' motion for summary judgment), based on an erroneous interpretation of the definition of "commodity" as stated in the Commodity Exchange Act, 7 U.S.C. § 1a(9).

2.      Whether the District Court erred in granting the CFTC's motion for summary judgment (and correspondingly denying Defendants' motion for summary judgment) on the CFTC's first two causes of action, based on an erroneous interpretation of the term "commodity pool" as stated in the Commodity Exchange Act, 7 U.S.C. § 6m(1).

## PRELIMINARY STATEMENT

The regulatory authority of the CFTC is defined by statute. The CFTC is not some freelance sheriff in the Wild West, who can exercise jurisdictional authority as it pleases over any "commodities" – *i.e.*, any things. The Commodities Exchange Act contains a critical limit on the CFTC's authority. The CEA defines "commodity" (in relevant part) as "goods and articles ... and all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9) (emphasis added). In other words, to be a commodity regulated by the CFTC, there has to be a futures contract involved. Where there is none – where the good

---

[1]      Subsequent to the filing of the Notice of Appeal, the district court amended the underlying judgment, even though there had been no motion explicitly made under Fed. R. Civ. P. 59(e) or Fed. R. Civ. P. 60. The Clerk's office informed the office of the undersigned that the amended judgment would not impact the appeal and no amendment to the Notice of Appeal was necessary, as Defendants are not challenging anything that was changed between the original judgment and the amended judgment.

is just a good, with no contracts for future delivery, derivatives, options, or other CFTC-regulation hook in sight – then the CFTC does not have jurisdiction to prosecute an enforcement action.

In this case, the CFTC engaged in a unilateral, unwarranted, and atextual expansion of its jurisdictional reach, by asserting that certain digital assets are "commodities" as defined under the CEA, even though there were and are no contracts for future delivery for those digital assets, as the CEA requires. The District Court agreed with the CFTC's reasoning, based on a "category" test that is a judicial creation, divorced from the statutory language of the CEA. In essence, the District Court held that because <u>some</u> digital assets have contracts for future delivery, then <u>all</u> digital assets, categorically, are regulated by the CFTC, because they are exchanged in a separate market for uniform quality and value – regardless of whether or not that particular digital asset has a futures contract.

Put simply, that is not what the statute says. If the District Court's opinion were the law of the land, then the CFTC would have unbounded and unbridled authority over every digital asset. And because digital assets, at heart, are just software, the CFTC could assert authority over all items in that same "software" category. Anything digital could be considered a "commodity." The game Tetris, or a version of Microsoft Word, could be considered a CFTC-regulated commodity because Tetris, Word, and Bitcoin ("BTC") are all software, each exchanged in their own markets for uniform quality and value.

It gets worse. If the District Court's "category theory" were law, the CFTC would have authority over all sort of goods and services over which it historically has never been involved, or thought to regulate, as long as those goods could be placed in the same "category" as a good that

has a futures contract. Cattle futures are traded on the Chicago Mercantile Exchange.[2] Cattle are mammals. Can the CFTC bring an enforcement action against a local pet store for sales of kittens (also mammals) who were falsely sold as being spayed? Such an interpretation would fly in the face of the plain text, intent, and original meaning of the CEA, and represent an unprecedented expansion of federal power, by an agency whose traditional jurisdiction has never been understood that broadly.

That District Court's gateway jurisdictional error in this case ultimately led to summary judgment in favor of the CFTC on all three of the CFTC's causes of action and denying Defendants' motion for summary judgment.

Defendants raised funds from investors for two funds, Rose City Income Fund LP ("Fund I") and Rose City Income Fund II LP ("Fund II," and each a "Fund" and together with Fund I, the "Funds"). Jafia was the general partner of both Funds. The documents governing the Funds gave Jafia broad powers to make investments in a number of different instruments, but the principal intention of the Funds was to invest in digital assets.

The CFTC alleged that Defendants advertised that the Funds would invest in digital assets and return profits, but instead misappropriated investor funds. The CFTC brought three claims against Defendants (and another defendant who settled with the CFTC): failure to register as a commodity pool operator (a "CPO") under 7 U.S.C. § 6m(1), fraud by a CPO under 7 U.S.C. § 6o(1)(A)-(B), and deceptive scheme or contrivances under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a). The District Court granted the CFTC's motion for summary judgment, and denied the Defendants' motion for summary judgment on all counts.

---

[2]    *See    Live    Cattle    Futures    and    Options*,    CME    Group https://www.cmegroup.com/markets/agriculture/livestock/live-cattle.html (last visited Nov. 4, 2024).

The undisputed record shows, and the District Court found, that the Funds purchased four digital asset tokens: "OHM," "Klima," and a small amount of wrapped Bitcoin ("WBTC") and Ether ("ETH"), the latter of which was not for investment, but for "transactional convenience." No futures contracts for OHM, Klima, or WBTC exist, and the CFTC has not argued that any futures contracts exist for those digital assets. Instead, the District Court reasoned that those digital assets are commodities because they share characteristics with <u>other</u> digital assets (namely, BTC) for which futures contracts are traded.

The District Court violated multiple cardinal rules of statutory construction. It interpreted the CEA in a way that contradicts the plain language of the law, and read words into the statute that don't exist. The definition of "commodity" under the CEA is clear: a good, service, right, or interest is a commodity if contracts for future delivery are "dealt in" that thing – not if there are contracts for future delivery for <u>something else</u> in some same perceived class or category.

At heart, because the Funds did not invest in commodities, it was error to find that Defendants committed commodities fraud, and error to not grant summary judgment in favor of Defendants.

The District Court also erred in holding that Defendants unlawfully failed to register as CPOs and committed fraud by a CPO. It is undisputed that the Funds did not invest in any futures or other derivatives, which is required to invoke the CFTC's jurisdiction on a registration charge. Instead, the District Court cherry-picked language from the Funds' documents saying that Jafia <u>may</u> invest in derivatives on behalf of the Funds, and concluded that Defendants marketed to investors that they <u>would</u> trade derivatives. That is not what the documents say. And failing to read the Funds' documents as an integrated whole, as required under basic rules of contractual

interpretation, the District Court improperly failed to give any weight to the disclaimers in the documents stating that the Funds would <u>not</u> be commodity pools.

The District Court also erred by finding that Defendants' Crypto Savings Note ("CSN") – another product offered by Defendants – constituted a commodity pool. Defendants advertised that only 8% of investor funds would be invested in "put option protection," but no puts were ever purchased and the investor materials did not specify whether those put options were for commodities. Moreover, the CSN was a promissory note, intended to pay an annual 18% return to investors, and so the CSN did not provide for investors to share pro rata in the pool's profits and losses, an essential characteristic of a commodity pool.

At the outset of the litigation, after an *ex parte* hearing, the District Court ordered a complete freeze of Defendants' assets and ordered a receiver to take possession of those assets. The asset freeze and receiver remain in place to this day, which have completely hamstrung Ikkurty's ability to lead a normal life. He cannot even buy groceries or pay rent with his own money, thanks to the jurisdictional overreach of the CFTC. Since the CFTC never should have been able to bring this case in the first place, the asset freeze and the receiver were improper, compounding the District Court's error.

In sum, the CFTC brought this case beyond the jurisdictional strictures of the CEA. The District Court erred in granting summary judgment for the CFTC and should be reversed.

## <u>STATEMENT OF THE CASE</u>

Pursuant to Fed. R. App. P. 28(a)(6), Defendants provide the following concise statement of the case relevant to the issues submitted for review, including the relevant procedural history and identifying the rulings presented for review.

**Defendants Establish the Funds**

Ikkurty established Ikkurty Capital LLC ("Ikkurty Capital") in 2017, doing business under the name Fund I.  A457 ¶ 1.[3]  Ikkurty is the founder and general partner of Mysivana LLC, a limited partner in Ikkurty Capital.  A458 ¶ 2.  Ikkurty also established Jafia in 2006.  A458 ¶ 3.  Jafia was the general partner of Fund I and later was the general partner of Fund II, a fund established in 2020.  A458 ¶ 3.  Ikkurty established Seneca Ventures LLC in 2021 to collect funds from smaller individual investors for Fund II.  A458 ¶ 5.

The Funds were established as limited partnerships, under Delaware law.  A461 ¶ 18.  Jafia served as general partner and investors in the Funds were limited partners.  *Id.*  Incoming Fund investors were issued limited partnership interests in exchange for amounts contributed to the Funds.  *Id.*

Each fund had a Private Placement Memorandum ("PPM"),[4] a Limited Partnership Agreement ("LPA"), and a Subscription Agreement.  A458 ¶ 7.  Each fund participant received copies of such documents prior to investing.  *Id.*  The PPMs set forth the investment objectives and strategies for the Funds, disclosed risks of investing in the Funds, and described the performance and management fees applicable to Fund accounts.  A459 ¶ 9.  The LPAs were the agreements governing the limited partnership established for the purposes of managing the Funds.  A460 ¶ 13.  The LPAs provided that "[t]he Partnership [*i.e.*, the Funds] shall be managed by the General Partner [Jafia], which shall have the sole discretion of making investments on behalf of the Partnership."  A460 ¶ 14; A280 § 3.01; A312 § 3.01.  The Subscription Agreements

---

[3]     "A__" refers to the Separate Appendix submitted with this brief.
[4]     The PPM for Fund I is referred to herein as "PPM I."  The PPM for Fund II is referred to herein as "PPM II."

documented the terms of the investors' purchases of limited partnership interests in the Funds. A461 ¶ 16.

For Fund I, Jafia was assisted by Cole-Frieman & Mallon LLP, a law firm experienced in fund formation. A459 ¶ 8. The Fund II documents were drafted by specialists at Seward & Kissel LLP ("Seward"), a reputable law firm that routinely handles the establishment of investment funds for its clients and is "an industry leader in the hedge space and represents a … very large percentage of new startup managers in the hedge fund industry." A459 ¶ 8; A473 ¶ 46. The specific Seward attorney who drafted the Fund II documents, David Nangle, was an experienced legal practitioner in hedge fund formation and registration and assisted Mr. Ikkurty in establishing the Funds. A473 ¶ 46. Mr. Nangle testified that "[i]t is my understanding that the vehicle did not trade commodity interest [sic]. And as a result, it would not have triggered a registration obligation for the general partner." A142 at 17-20.

Ikkurty oversaw Fund operations with the assistance of Ravishankar Avadhanam,[5] as well as third-party administrators Tower Fund Services (for Fund I) and Intertrust Group (for Fund II). A462 ¶ 20.

The PPMs for both Funds state that investors generally were intended to be accredited. A159 § 1 (each limited partner would have to represent and warrant "that it is an 'accredited investor' as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act"); A246 § 8 ("Interests will generally be sold only to qualified investors who are 'accredited investors' as such term is defined in Rule 501 of Regulation D of the Securities Act"). Likewise,

---

[5]    Mr. Avadhanam was a defendant, but was dismissed from the case under a consent order between the CFTC and him, and accordingly is not an appellant here. SA1 n.1. "SA__" refers to the Required Short Appendix submitted with this brief pursuant to Circuit Rule 30.

the Subscription Agreements required investors to represent and warrant that they were accredited. A348 § 2(f); A370 § 2.A.

Fund II filed a Form D with the SEC, stating that the limited partnership interests offered by Fund II were securities and that the offering was exempt from registration with the SEC under Rule 506(b).[6]  A259-64.  Rule 506(b) of Regulation D is a "safe harbor" that allows companies to sell securities to an unlimited number of accredited investors, without registering with the SEC, as long as the issuer does not generally solicit or advertise the securities and does not sell the securities to more than thirty-five non-accredited investors.  *See* 17 C.F.R. § 230.506(b).  *See also Private Placements – Rule 506(b)*, Securities and Exchange Commission, https://www.ecfr.gov/current/title-17/chapter-II/part-230#230.506 (last visited Nov. 4, 2024).

## The Funds Invested in Certain Digital Assets

The PPMs for the funds stated that the Funds would invest in a "diversified portfolio of blockchain assets."[7]  A168 § 3.

Specifically, PPM I stated:

> The creation of Bitcoin has led to the emergence of a new digital asset class in which scarcity is based on mathematical properties.  Through cryptographic verification and a game-theoretic equilibrium, blockchain-based digital assets can be created, issued, and transmitted using software.  The Fund will invest in digital assets based on the fundamental technological promise of the underlying protocol, with mid to long term positions.  As blockchain technology expands, the Fund seeks to achieve maximum returns for investors by constructing a diversified portfolio of these digital assets.

---

[6]     The CFTC does not dispute that Defendants filed a Form D with the SEC.  A461 ¶ 17. Ikkurty has explained that when the CFTC came to his home in Spring 2022, the CFTC appeared unaware of the fact that Defendants had filed a Form D.  A270 ¶ 23.

[7]     It is undisputed that a "blockchain is a network database reflecting transactions in cryptocurrencies, digital assets, or tokens and containing a public, verified record of transactions made on the blockchain."  A464 ¶ 28.

*Id.*

Similarly, PPM II stated:

> The Fund seeks to achieve superior returns for investors by constructing a diversified portfolio of blockchain assets. Through cryptographic verification and a game-theoretic equilibrium, blockchain-based digital assets can be created, issued, and transmitted using software. It is anticipated that the Fund will invest in digital currencies, cryptoassets, cryptocurrencies, decentralized application tokens and protocol tokens, blockchain based assets and other cryptofinance and digital assets that currently exist, or may exist in the future (collectively, "Digital Assets"). The Fund will invest in Digital Assets based on the fundamental technological promise of the underlying protocol, with mid to long term positions. The Fund will also seek to create income through loans of such Digital Assets for "staking" purposes. In particular, it is currently anticipated that the Fund will invest majority of the tokens in proof-of-stake mining, with the objective of generating ongoing regular income.

A222 § 3. The LPAs granted Jafia broad powers to "direct the formulation of investment policies and strategies for the Partnership" and "purchase, hold, sell, sell short, cover, and otherwise deal in" a variety of financial instruments, on the funds' behalf. A280 § 3.02; A313 § 3.02.

The Fund documents – again, written by sophisticated counsel – were replete with statements that the Funds would not invest in commodities. For example, PPM I states: "THE FUND DOES NOT CURRENTLY INTEND TO TRADE PRODUCTS THAT ARE REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION. IN THE EVENT THE FUND IN THE FUTURE DECIDES TO TRADE SUCH PRODUCTS, THE GENERAL PARTNER WILL FILE AN APPROPRIATE EXEMPTION OR REGISTER AS A COMMODITY POOL OPERATOR WITH THE CFTC." A152 (capitalization in original). PPM I also stated that Fund I "invests primarily in digital currencies which are not currently regulated by U.S. federal and state governments, or self-regulatory organizations. … Currently, neither the CFTC or SEC has formally asserted regulatory authority over digital currencies." A173 § 7. PPM I added that while digital assets are not commodities, they may, in the future, "fall within the

definition of a commodity," in which case "the General Partner may be required to register as a commodity pool operator and to register the Fund as a commodity pool with the CFTC…" *Id.*

Likewise, PPM II stated that the "Fund <u>may</u> utilize leverage in pursuing its investment objective, both through the use of derivatives and traditional borrowing. The Fund's investments in derivatives and other commodity interests will be limited such that the General Partner will remain exempt from registering as a commodity pool operator." A222 § 3 (emphasis added). PPM II also stated that certain digital assets may be deemed to be commodities in the future. A226-27 § 7. PPM II further asserted that "[t]he CFTC has determined that at least <u>some</u> cryptocurrencies, such as Bitcoin, fall within the definition of a 'commodity' under the [CEA]. … to the extent that certain Digital Assets themselves are deemed to be futures, swap or retain foreign exchange contracts pursuant to subsequent rulemaking by the CFTC, the Fund and/or the General Partner may be required to comply with additional regulation under the CEA." A227 § 7 (emphasis added).

While the documents for the Funds permitted the Funds potentially to invest in digital asset futures and derivatives, it is undisputed that the Funds did not actually trade in any futures, options, or swaps relating to digital assets or tokens. A465 ¶ 33. The CFTC also does not contest Defendants' contention below that "[a]ll Fund investments were made as spot-market transactions, meaning that the Funds' purchases and sales were followed by immediate (or near-immediate) delivery of the relevant assets. The Funds' investments were settled contemporaneously or near contemporaneously on the relevant blockchains. In spot-market transactions, assets are purchased and received contemporaneously or near-contemporaneously with the purchases." A466 ¶ 34 (internal citations omitted). The CFTC further conceded that the "Funds did not make any investments of digital assets or tokens for future delivery, or on a conditional basis dependent on

11

market events," and the "Funds' holdings never included 'digital asset futures.'" A466-67 ¶¶ 35, 37. "None of the Funds' investments were dependent, conditional, or contingent on market events" and the "Funds did not invest in puts, calls, caps, floors, collars, options, or transactions dependent on future events. A467-68 ¶ 38 (internal citations omitted). "None of the Funds' holdings are known in the industry as swaps or were otherwise marketed to Fund investors as swaps. The holdings held their value independently as digital assets reflected on a public blockchain." *Id.*

The undisputed record illustrates that the Funds invested in four specific digital assets: OHM, Klima, and a much smaller amount of WBTC and ETH[8] (investments in WBTC and ETH did not exceed ten percent of fund assets). A466 ¶ 36; A476-77 ¶ 52. Almost 90% of the Fund I's funds were invested in OHM. A443 ¶ 45. The ETH that was purchased by the Funds was "generally purchased … with US dollars, then for transactional convenience used … to purchase other digital assets and tokens pursuant to the Funds' investment strategy. All such transactions were straightforward purchases or sales, with no forward-looking conditional component." A466 ¶ 36.

## The CFTC Files the Complaint and Obtains an Asset Freeze and a Receiver

The CFTC filed the Complaint in the District Court on May 10, 2022. A43-62. The Complaint generally alleges that Defendants solicited and accepted investments for investors to participate in the Funds, but "did not trade digital assets or commodity interests with participants' funds and return profits as promised; instead they misappropriated participants' funds." A43-44 ¶ 1.

---

[8]     ETH is referred to as "Ethereum" in some of the District Court record documents. For convenience, this brief uses "Ethereum" as the name of the pertinent blockchain, and "ETH" as the native token that is used to power that blockchain.

The Complaint alleged three causes of action: (1) failure to register as a CPO under 7 U.S.C. § 6m(1) (Section 4m(1) of the CEA); (2) fraud by a CPO in violation of 7 U.S.C. § 6o(1)(A)-(B) (Section 4o(1)(A)-(B) of the CEA); and (3) a deceptive scheme or contrivance under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (Section 6(c)(1) of the CEA and Regulation 180.1). A54-58 ¶¶ 51-72.

The same day that the CFTC filed the Complaint, the CFTC filed a Motion for an *Ex Parte* Statutory Restraining Order, Appointment of a Temporary Receiver, and Preliminary Injunction. On May 11, 2022, the District Court *ex parte* froze all of Defendants' assets and ordered that any banks or financial institutions holding Defendants' assets or property shall prohibit Defendants from withdrawing their assets. A63-72. The District Court also appointed a temporary receiver, with broad powers to, *inter alia*, take control of Defendants' assets. A74. Two months later, on July 18, 2022, the parties entered a consent order that, *inter alia*, continued the full asset freeze and receivership. A73-86. Ikkurty explained to the District Court that "[a]s a result of the CFTC's allegations, I have lost my residence, my personal and business accounts were frozen, and my management of the Funds was turned over to a Court-appointed receiver." A271 ¶ 25.

**In Discovery, the CFTC Fails to Identify the Relevant Digital Assets**

The CFTC's complaint only identified BTC and ETH as commodities (without explicitly saying whether the Funds invested in them), but does not point to any other digital assets in which the Funds invested. A57 ¶ 66. In fact, when the CFTC moved for summary judgment, it no longer argued that the Funds invested in BTC (and, as the Court ultimately acknowledged, the Funds actually transacted in WBTC).

In discovery, the CFTC was unable to identify any specific commodity interests in which the Funds invested. A469 ¶ 40. Instead, the CFTC pointed to fund documents stating that "Jafia

had discretion to invest in commodity interests" and statements in marketing materials.  *Id.*

Similarly, when asked in discovery for the basis for claiming that Defendants were commodity

pool operators, the CFTC pointed to language in the Fund documents and other documents about

what Defendants <u>may</u> do.  In responding to a request to admit that Fund II never held any

commodity interests, the CFTC responded that "it neither admits or denies the Request as it lacks

sufficient knowledge or information, and the information it knows or can readily obtain is

insufficient to admit or deny this Request."  A406-07.  Similarly, in response to a request to admit

that the CFTC "had no evidence that [Fund II] held commodity interest before filing this lawsuit,"

the CFTC responded that it "neither admits nor denies the Request as it lacks sufficient knowledge

or information, and the information it knows or can readily obtain is insufficient to admit or deny

this Request."  A411-12.  In response to an interrogatory asking the CFTC to "[i]dentify all

commodity interests ever held by [Fund II]," the CFTC refused to answer.  A417.

## The District Court Grants the CFTC's Motion for Summary Judgment

On October 16, 2023, the CFTC moved for summary judgment on its three claims.  A487-

88.  The same day, Ikkurty and Jafia moved for summary judgment.  A111-13.  Ikkurty and Jafia's

motion also sought to dismiss the three claims under Fed. R. Civ. P. 12(b)(1) for lack of subject

matter jurisdiction, and for judgment on the pleadings on the third cause of action under Fed. R.

Civ. P. 12(c).  *Id.*

On July 1, 2024, the District Court granted the CFTC's summary judgment motion and

denied Defendants' motion.  SA1-25.  As relevant to the instant appeal, the District Court held that

"Defendants transacted in commodities covered by the CEA."  SA10.  The District Court

recognized that the Funds purchased WBTC, ETH, OHM, and Klima, but did not point to any

record evidence that there were any futures contracts for WBTC, OHM, and or Klima.  SA6-7, 10-12.

The District Court cited out-of-circuit district court cases for the proposition that digital assets constituted "commodities" under the CEA.  SA10-11.  In granting summary judgment in favor of the CFTC on the third cause of action (which the District Court addressed first), the District Court explained that "cryptocurrencies share a 'core characteristic' with 'other commodities whose derivatives are regulated by the CFTC,' namely, that they are 'exchanged in a market for a uniform quality and value.'"  SA10-11.  The District Court rejected Defendants' argument that WBTC is not BTC because "the 'in connection with' requirement of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 is 'construed broadly.'"  SA11.  The District Court further found that OHM and Klima were "Commodities;" it explained that "non-Bitcoin virtual currency is a commodity because the CEA only requires the existence of futures trading within a certain class (e.g. 'natural gas') in order for all items within that class (e.g. 'West Coast' natural gas) to be considered commodities."  SA11 (internal quotation marks omitted).

The District Court next granted summary judgment in favor of the CFTC on the first two causes of action.  The District Court held that to be held liable for failure to register as a CPO and for CPO-related fraud, it was not relevant whether Defendants "*actually* traded commodity interests."  SA20 (emphasis in original).  The District Court explained that "the CFTC need not prove that Defendants traded in commodities (although they did prove that here).  Rather, the question is whether the Defendant solicited funds for the purpose of trading in *commodity* interests."  SA21 (emphasis in original).  The District Court found that because certain Fund documents contained language authorizing the Funds "to invest in commodity interests," and because Ikkurty created a "crypto savings note" to invest in "put option protection" on digital

currencies, then Defendants solicited funds to invest in commodities "and therefore qualified as CPOs." SA21-22.

On July 22, 2024 the District Court entered the Judgment in favor of the CFTC and against Ikkurty and Jafia on the three counts in the Complaint. SA26-34. The Judgment contained, *inter alia*, a permanent injunction against Ikkurty and Jafia, ordered restitution in the amount of $83,757,249, ordered disgorgement in the amount of $36,967,285, orders a civil monetary penalty of $110,901,855, ordered Ikkurty to pay $13,817,000 as a sanction, and ordered Ikkurty to pay an additional $254,000 as another sanction (which will increase by $1,000 per day). SA27-32. On October 16, 2024, the District Court issued an Amended Judgment decreasing the $13,817,000 sanction to $6,908,500, increasing the other sanction from $254,000 to $295,000 but eliminating the $1,000 per day increase.[9] SA35-43. The complete asset freeze has not been lifted, meaning that Mr. Ikkurty is currently literally unable to spend any of his own money on anything, even basic needs like groceries or rent.

On September 19, 2024, Ikkurty and Jafia filed the Notice of Appeal. A481.

## SUMMARY OF ARGUMENT

Pursuant to Fed. R. App. P. 28(a)(7), Defendants provide the following summary of their argument.

The District Court incorrectly granted the CFTC's motion for summary judgment and denied Defendants' motion for summary judgment.

The CFTC's three claims all concern "commodities" as that term is defined in the CEA. If the CFTC cannot establish that Defendants invested in commodities, then all three causes of action fail and summary judgment should have been granted for Defendants.

---

[9]     As noted above, the Amended Judgment fundamentally changes nothing about this appeal, which is why Defendants did not file an amended Notice of Appeal.

The CEA defines a "commodity" as, in relevant part, "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9) (emphasis added).

The Funds primarily invested in two digital assets, OHM and Klima, for which there is no record evidence of any contracts for future delivery.  The Funds invested a small amount in WBTC – a token on the Ethereum blockchain with its value pegged to BTC – for which there also is no record evidence of any contracts for future delivery.  The Funds further acquired a small amount of ETH, but as the undisputed record shows, only for "transactional convenience," *i.e.*, it was easier to acquire tokens like OHM and Klima using ETH than by using fiat currency.

None of these digital assets are "commodities," as that term is defined in the CEA. Accordingly, the District Court erred, by finding that those digital assets are commodities because they share characteristics with BTC, a completely different digital asset for which there are futures contracts.

Nothing in the CEA provides that a given item that does not have futures contracts is a commodity if it is "similar" to a different commodity that does.  The District Court's decision violates numerous staple canons of statutory interpretation:  courts should not deviate from the plain language of the statute; courts should not add language to the statute that is not there; courts should not interpret a statute in a way that renders certain words meaningless; and as the saying goes, Congress does not hide elephants in mouseholes.  The District Court's decision has no limiting principle, and would lead to absurd results.  All sorts of items could be considered commodities just because they fall into the same "general category" – however broadly that may be defined – as some other commodity.

The District Court also erred in finding that Defendants were unregistered CPOs, and committed fraud by a CPO. It is undisputed that the Funds did not trade in any futures contracts or other derivatives. Instead, the District Court found that the Funds were commodity pools because the offering documents gave Jafia the power to purchase derivatives. That was error because the District Court ignored that the language in question was conditional, and also ignored other provisions in those contracts that demonstrate that the Funds did not collect money for the purpose of investing in derivatives. The District Court thus failed to read the documents as integrated wholes. The District Court also incorrectly held that the CSN offered by Defendants was a commodity pool; it is undisputed that it was a promissory note, intended to pay interest, no matter the underlying investment.

## **ARGUMENT**

## I.    **Standard of Review and Applicable Procedural Law**

This Court "review[s] questions of statutory interpretation … de novo." *U.S. v. Sanders*, 909 F.3d 895, 899 (7th Cir. 2018). *See also U.S. v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015) (same) (citation omitted).

In particular, this Court "review[s] grants of summary judgment *de novo*," *Peerless Network, Inc. v. MCI Communications Servs., Inc.*, 917 F.3d 538, 545 (7th Cir. 2019), and in doing so "constru[es] the record in the light most favorable to" the non-moving party. *Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 879 (7th Cir. 2016).

Summary judgment under Fed. R. Civ. P. 56 "is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Matthews v. Milwaukee Area Local Postal Workers Union*, *AFL-CIO*, 495 F.3d 438, 441 (7th Cir. 2007) (citation omitted). Summary judgment "is the put up or shut up moment in a lawsuit, when

a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation and quotation marks omitted).

## II.     The CEA's Unambiguous Definition of "Commodity" Is Limited to Services, Rights, and Interests For Which Futures Contracts Exist

### A.     Clear Statutory Language Must Be Interpreted Pursuant to Its Terms

The Supreme Court has explained that "with any question of statutory interpretation, [the] analysis begins with the plain language of the statute.  It is well established that, when the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citation omitted); *see also Groff v. DeJoy*, 600 U.S. 447, 468 (2023) ("as we have stressed over and over again in recent years, statutory interpretation must begin with, and ultimately heed, what a statute actually says") (cleaned up); *Nat'l Ass'n of Manufacturers v. Department of Defense*, 583 U.S. 109, 127 (2018) ("Because the plain language of [the relevant statute] is unambiguous, our inquiry begins with the statutory text, and ends there as well.") (citations and internal quotation marks omitted); *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination and ordinary meaning and structure of the law itself.  Where, as here, that examination yields a clear answer, judges must stop.") (internal citations omitted).

The Seventh Circuit, of course, adheres to these principles.  *See U.S. v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015) ("When interpreting the meaning of undefined statutory terms, the cardinal rule is that words used in statutes must be given their ordinary and plain meaning.") (citation and quotation marks omitted); *U.S. v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) ("Statutory interpretation begins with the plain language of the statute.  We assume that the legislative purpose of the statute is expressed by the ordinary meaning of the words used.  Absent

clearly expressed Congressional intent to the contrary, the plain language should be conclusive.")
(internal citations and quotation marks omitted); *Jenkins v. Heintz*, 25 F.3d 536, 539 (7th Cir.
1994) ("We must faithfully apply the law as Congress drafted it.  We should not disregard plain
statutory language in order to impose on the statute what we may consider a more reasonable
meaning.") (citation omitted); *In re Witkowski*, 16 F.3d 739, 745 (7th Cir. 1994) ("courts cannot
re-write statutes").

### B.      The CEA's Definition of "Commodity" Is Clear

This appeal turns on whether certain digital assets are regulated "commodities" under the
CEA.  The CEA defines "commodity" as:

> wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill
> feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops,
> fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil,
> and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans,
> soybean meal, livestock, livestock products, and frozen concentrated orange
> juice, and all other <u>goods and articles</u>, except onions (as provided by section
> 13–1 of this title) and motion picture box office receipts (or any index,
> measure, value, or data related to such receipts), <u>and all services, rights, and
> interests</u> (except motion picture box office receipts, or any index, measure,
> value or data related to such receipts) <u>in which contracts for future delivery
> are presently or in the future dealt in</u>.

7 U.S.C. § 1a(9) (emphasis added).

Thus, under the unambiguous language of the statute, if a particular product does not fall
into one of the many enumerated products (and the digital assets at issue here certainly do not),
then it only qualifies as a "commodity" if it is a "good," "article," "service," "right," or "interest"
… "in which contracts for future delivery are presently or in the future dealt in."

### C.      The CFTC's Claims Rise and Fall with the Definition of "Commodity"

The definition of "commodity" is crucial to all three causes of action in the Complaint.
The first cause of action is for failure to register as a commodity pool operator under 7 U.S.C.

§ 6m(1), and the second cause of action is for fraud by a commodity pool operator under 7 U.S.C. §6o(1)(A)-(B).

A "commodity pool operator" is any person "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in <u>commodity</u> interests…" 7 U.S.C. § 1a(11)(A)(i) (emphasis added). And the term "commodity pool" is defined as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in <u>commodity</u> interests…" 7 U.S.C. § 1a(10)(A) (emphasis added).[10]

Accordingly, the term "commodity pool operator" rises and falls on the definition of "commodity." If a person is not pooling investor funds for the purposes of trading in "commodities," that person, by definition, is not a "commodity pool operator" and is not operating a "commodity pool." Relatedly, if a person is not a commodity pool operator," that person plainly is not in violation of 7 U.S.C. § 6m(1)[11] or 7 U.S.C. 6o(1)(A)-(B).[12]

---

[10]    The Term "commodity interest" is not defined in the CEA but is defined in the relevant regulations as: "(1) Any contract for the purchase or sale of a commodity for future delivery; (2) any contract, agreement or transaction subject to a Commission regulation under section 4c or 19 of the Act; (3) Any contract, agreement or transaction subject to Commission jurisdiction under section 2(c)(2) of the Act; and (4) Any swap as defined in the Act, by the Commission, or jointly by the Commission and the Securities and Exchange Commission." 17 C.F.R. § 1.3.

[11]    7 U.S.C. § 6m(1) states that "[i]t shall be unlawful for any … commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such … commodity pool operator").

[12]    7 U.S.C. § 6o(1) states that "[i]t shall be unlawful for a … commodity pool operator or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or directly—(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage

The third cause of action is for violation of 7 U.S.C. § 9(1) and associated Regulation 180.1.  7 U.S.C. § 9(1) makes it unlawful "for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any … contract of sale of any <u>commodity</u> in interstate commerce … any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate" (emphasis added).  Regulation 180.1(a) states, in relevant part, that it is "unlawful for any person, directly or indirectly, in connection with any … contract or sale of any <u>commodity</u> in interstate commerce … to intentionally or recklessly:  (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) [m]ake, or attempt to make, any untrue or misleading statement of material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."  Thus, if a person was not involved in the contract or sale of any "commodity," that person cannot be in violation of 7 U.S.C. § 9(1) or Regulation 180.1.

## III.    **The District Court Erred By Granting Summary Judgment for the CFTC on the Claim For Deceptive Scheme or Contrivances Pursuant to 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)**

Here, although the CFTC originally alleged in the Complaint that the Funds invested in BTC and ETH, discovery revealed that the Funds actually traded in the digital asset tokens OHM, Klima, WBTC and ETH.  The District Court erred in finding that OHM, Klima, and WBTC are commodities, or that ETH was traded as a commodity, and consequently erred in granting

---

in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

summary judgment on behalf of the CFTC on the third cause of action (which the District Court addressed first).

### A.     The District Court Erred in Finding that OHM and Klima Are Commodities

> 1.     Under the Plain Language of 7 U.S.C. § 1a(9), OHM and Klima Are Not Commodities

The CFTC has not argued – and the District Court did not find – that there exist any "contracts for future delivery" for OHM and Klima.  Under the plain language of 7 U.S.C. § 1a(9), OHM and Klima thus are not commodities under the CEA.  That should have ended the analysis and provided the definitive basis to deny the CFTC's summary judgment motion and to grant the Defendants' summary judgment motion.

Instead, the District Court concluded that OHM and Klima are commodities (and within the CFTC's antifraud purview)[13] because "cryptocurrencies share a 'core characteristic' with other commodities whose derivatives are regulated by the CFTC, namely, that they are exchanged in a market for a uniform quality and value."  SA10-11.  Citing a handful of decisions from other district courts outside the Seventh Circuit, the District Court opined that digital assets other than BTC (for which futures are traded) are nevertheless commodities because "the CEA only requires the existence of futures trading within a certain class (e.g., "natural gas") in order for all items within that class (e.g. "West Coast" natural gas) to be considered commodities."  SA11 (*quoting CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018)).  In other words, the District Court found that because futures contracts exist for <u>some</u> limited number digital assets, like BTC, then <u>all</u> digital assets are commodities, even those digital assets like OHM and Klima

---

[13]     While the CFTC generally does not have jurisdiction over spot markets, the CFTC has the authority to bring enforcement actions involving fraud or manipulation involving commodities. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 227 (E.D.N.Y. 2018).

for which there are no futures contracts. That conclusion was impermissibly broad, and divorced from the plain statutory text.

As noted above, the relevant language of 7 U.S.C. § 1a(9) provides that a commodity includes a "service[], right[], [or] interest[] … in which contracts for future delivery are presently or in the future dealt in." The District Court – and the *My Big Coin* case it principally relied upon – effectively amended that statutory language to include a service, right, or interest <u>in the same class or category</u> as another service, right, or interest in which contracts for future delivery are presently or in the future dealt in. According to the District Court, if an item is in the same class or category, or shares the same characteristics, as a commodity, then that item also is a commodity. But that is not what the CEA says.

The District Court flouted "fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts. To do so is not a construction of a statute, but, in effect, an enlargement of it by the court." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (internal citations, quotation marks, and brackets omitted). *See also Doe v. Smith*, 470 F.3d 331, 353-54 (7th Cir. 2006) (courts "are obligated not to read additional language into the very specific statutory elements of legislation … simply to accomplish a desired result.").

The District Court also failed to heed the canon that "[w]e avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless." *U.S. v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (citation omitted). The District Court's decision rendered the phrase "in which contracts for future delivery are presently or in the future dealt in" meaningless.

> 2. The Non-Binding Cases Relied Upon by the District Court Are Either <u>Incorrectly Decided or Inapposite</u>

As noted above, the District Court relied on the *My Big Coin* decision from the District of Massachusetts, SA11, which in turn cited approvingly to a string of cases from the Fifth Circuit

and the district courts therein where certain types of natural gas were deemed to be commodities. Those gas-related cases are inapposite, and should not have been used by *My Big Coin* or by the District Court as justification for finding that all digital assets are commodities.  To put it plainly, the *My Big Coin* court got it wrong, making the same error that the District Court here made.

In those natural gas cases, the defendants attempted to argue that because only natural gas traded at Henry Hub (a gas distribution hub in Louisiana) was the subject of futures contracts, spot transactions for natural gas that did not pass through Henry Hub were not commodities.  Multiple courts rejected those defendants' arguments, principally, because all natural gas is fungible and potentially <u>could</u> flow through Henry Hub.  Specifically, in *U.S. v. Brooks*, 681 F.3d 678, 694-95 (5th Cir. 2012), the Fifth Circuit reasoned that "the record shows that natural gas may be moved from any location to Henry Hub through the national pipeline system.  Thus, it would be peculiar that natural gas at another hub is not a commodity, but suddenly becomes a commodity solely on the basis that it passes through Henry Hub, and ceases to be a commodity once it moves onto some other locale.  While the price of that commodity may fluctuate with its location, and the forces of supply and demand at that location, the actual nature of the 'good' does not change."

Similarly, in *U.S. v. Futch*, 278 F. App'x 387, 395 (5th Cir. 2008), the Fifth Circuit found that natural gas delivered at "Transco Zone 6" rather than Henry Hub was nevertheless a commodity because "Henry Hub is the nexus of several major natural gas pipelines.  The Henry Hub clause in the NYMEX futures contracts merely specifies the location for gas delivery and does not in any way limit the type of commodity in question, natural gas."

In *U.S. v. Valencia*, 2003 U.S. Dist. LEXIS 15264, at *26-27 (S.D. Tex. Aug. 25, 2003), the U.S. District Court for the Southern District of Texas rejected the defendant's argument that

"West Coast gas" was not a commodity, because "[n]atural gas is fungible" and "has been traded on NYMEX since 1990."

Digital assets are fundamentally different from natural gas, and it was error for *My Big Coin* – and in turn, the District Court here – to rely on the natural gas cases in the Fifth Circuit to support the holding that all digital assets are commodities. Unlike natural gas, which is one chemical substance that flows in different places, each digital asset is fundamentally distinct from other digital assets. Different types of digital asset tokens are not fungible for each other. Digital assets are software, "computer code entries on 'blockchain' technology that record their owners' rights to access applications or services on a network." *SEC v. Coinbase, Inc.*, 2024 U.S. Dist. LEXIS 56994, at *10-11 (S.D.N.Y. Mar. 27, 2024). "Those who wish to trade digital assets may do so on a centralized exchange that "allows customers to buy, sell, and spend crypto…for consideration, including U.S. dollars, other fiat currencies, or other crypto-assets." *Id.* at *14 (quotation omitted). Or they may do so via peer-to-peer transactions, which enable "the sending, receiving, and swapping of crypto-assets, among other decentralized application functions, without using intermediaries..." *Id.* at *16. "[T]here are over 25,000 digital assets in circulation." *Id.* at *13.

Those different tokens differ from each other in several material ways. They are not fungible or interchangeable for each other, as units of natural gas might be. As software, the code underlying each token is different. Additionally, "[e]ach blockchain has its own 'native token,' *i.e.*, a digital asset designed to interact directly with the blockchain and ensure the proper function of the blockchain's protocol." *Coinbase*, 2024 U.S. Dist. LEXIS 56994, at *11. For example, ETH is the native digital asset of the Ethereum blockchain. *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 202 (S.D.N.Y. 2023). Certain blockchains, such as the Ethereum blockchain,

"allow[] for smart contract tokens to be created" on that particular blockchain and can "be created by anyone with a basic understanding of [the blockchain] and are traded on the … blockchain." *Id.* at 203.

Digital assets also can be used in different ways.[14] Some tokens allow users to participate in community governance, such that a participant can vote on a proposal for a given project, or even create one.[15] Other tokens allow users to collectively own some asset like a domain name.[16] Some tokens are "stablecoins," pegged to the value of some other assets like fiat currency.[17] Some tokens represent digital embodiments of art, music, videos, or other media, and can convey intellectual property rights in a host of ways, with various encoded limits.[18] Other tokens can serve as a "receipt" for tokens provided to a smart contract or "liquidity pool."[19] Other digital assets

---

[14]     This Court can take judicial notice of internet sources as long as it is "not subject to reasonable dispute." *Bost v. Ill. State Bd. Of Elections*, 114 F.4th 634, 642 n.2 (7th Cir. 2024). The basic facts about digital assets described herein are not subject to reasonable dispute.

[15]     *See* Alex Lielacher, *What Is A Governance Token? A Beginner's Guide*, Crypto.News (July 24, 2022), https://crypto.news/learn/what-is-a-governance-token/.

[16]     *See* Leeor Shimron, *Amazon.eth, Starbucks.bitcoin, Coke.dao? Crypto Domain Names Are The Next Big NFT Craze*, Forbes (Sept. 10, 2022), https://www.forbes.com/sites/leeorshimron/2022/09/10/amazoneth-starbucksbitcoin-cokedao-crypto-domain-names-are-the-next-big-nft-craze/?sh=4cc5e866b1dd.

[17]     *See* Tomio Geron, *Why Stablecoins Stand Out in the Cryptocurrency World*, The Wall Street Journal (June 10, 2019), https://www.wsj.com/articles/why-stablecoins-stand-out-in-the-cryptocurrency-world-11560218460.

[18]     Jazmin Goodwin, *What is an NFT? Non-fungible tokens explained*, CNN Business (Nov. 10, 2021), https://www.cnn.com/2021/03/17/business/what-is-nft-meaning-fe-series/index.html.

[19]     *See What Are Liquidity Pools?*, Gemini (Nov. 30, 2021), https://www.gemini.com/cryptopedia/what-is-a-liquidity-pool-crypto-market-liquidity.

allow users to attain access to specific features in video games.[20]  Each of the thousands of digital asset tokens are fundamentally different from each other, distinguishing them from natural gas.

The other cases relied upon by the District Court (none of which were decided at the Circuit Court level) were either incorrectly decided, or did not address the precise issue of whether digital assets are commodities even if there are no futures contracts for those assets.  SA10-11.  In *CFTC v. Laino Grp. Ltd.*, 2021 WL 4059385, at *6 (S.D. Tex. June 30, 2021), the court determined that BTC, ETH, and Litecoin were commodities, but futures contracts exist for all three of those tokens.[21]  The *Laino* court did not address any tokens for which there were no traded futures contracts.  Similarly, in *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 229 (E.D.N.Y. 2018), the court determined that BTC and Litecoin were commodities.  And in *U.S. v. Reed*, 2022 WL 597180, at *3-4 (S.D.N.Y. Feb. 28, 2022), the court held that BTC was a commodity.  While those decisions contain generalized language – for example, *McDonnell* asserts that "virtual currencies" "fall well-within the common definition of 'commodity' as well as the CEA's definition of 'commodities'" and *Reed* states that "cryptocurrencies fall within the definition of commodities" – in those cases there was no specific determination of whether a particular digital asset <u>without</u> an associated futures contract could be a commodity.

3.    The District Court's Decision Has No Limiting Principle, and Would Thus Lead to Absurd Results

The *My Big Coin* district court, like the District Court here, fell into the "category theory" trap.  In *My Big Coin*, the district court held that the CEA "defines 'commodity' generally and categorically, 'not by type, grade, quality, brand, producer, manufacturer, or form.'  For example,

---

[20]    *See* Roy Gaurav, *How The Gaming Industry Uses Crypto?*, CoinMarketCap (Jan. 2022), https://coinmarketcap.com/alexandria/article/how-the-gaming-industry-uses-crypto.

[21]    *See    Trade    Litecoin    Futures    Contracts*,    Kraken https://www.kraken.com/features/futures/litecoin (last visited Nov. 4, 2024).

the Act classifies 'livestock' as a commodity without enumerating which particular species are the subject of futures trading.  Thus, as [CFTC] urges, Congress' approach to defining 'commodity' signals an intent that courts focus on categories—not specific items—when determining whether the 'dealt in' requirement is met." *My Big Coin*, 334 F. Supp. 3d at 497; SA10-11 ("cryptocurrencies share a 'core characteristic' with 'other commodities whose derivatives are regulated by the CFTC,' namely, that they are 'exchanged in a market for a uniform quality and value'").

The District Court's "category theory" has no limiting principle:  anything that "shares a core characteristic" with any good or service that had a future would then be a CFTC-regulated commodity as well.  Because some digital assets have futures, the District Court reasoned, any digital asset was a CFTC-regulated commodity.

Different digital assets, even different cryptocurrency tokens, are not the same.  They may share a "core characteristic" of both being software, or both being digital assets, or both being exchanged in a market.  But the same is true for a great deal of other software, and indeed a host of other digital assets.  Microsoft Excel, the video game Tetris, digital songs on Apple iTunes or Spotify, videos on YouTube – all of these are digital assets that are "exchanged in a market for a uniform quality and value," and under the District Court's broad "category theory," the CFTC is now the regulator for all of these goods or services.

The conclusion that digital assets like OHM and Klima are CFTC-regulated commodities because they share some characteristics with BTC is equally incongruous.  Both are digital assets, but BTC has futures, and OHM and Klima do not – and that is why the CFTC lacks authority over OHM and Klima.  In missing the limiting principle plainly contained in the statutory text, the District Court used a rule with no limiting principle whatsoever.

The District Court's view that all digital assets are commodities under the CEA because futures are traded for some digital assets would cause absurdity, and of course, in interpreting a statute, "absurd results are to be avoided." *McNeill v. U.S.*, 563 U.S. 816, 822 (2011) (citation and brackets omitted). Even outside the realm of digital assets, the District Court's holding could lead to all sorts of items that are exchanged in markets becoming labeled as commodities under the CEA because they fall into the same category as a recognized commodity that has a traded futures product. Some absurd examples would include:

- Cats being deemed CFTC-regulated commodities because there are cattle futures, and cattle and cats are both mammals;

- Oxygen being deemed a CFTC-regulated commodity because there are gold futures, and oxygen and gold are both elements;

- Mountain Dew being deemed a CFTC-regulated commodity because there are coffee futures, and Mountain Dew and coffee are both caffeinated drinks;

- Evian water bottles being deemed a CFTC-regulated commodity because there are snowfall futures, and snowfall is just frozen crystalline water; or

- Real estate of all types – houses, condos, co-ops, and land – being deemed a CFTC-regulated commodity because there are real estate-related futures.

If these examples seem silly or far-fetched, it is because nobody would think, not for a moment, that these everyday goods are CFTC-regulated commodities under the CEA. *Cf. Smith v. Zachary*, 255 F.3d 446, 452 (7th Cir. 2001) (cautioning against statutory interpretation exposed by sister circuit that "is traveling down a slippery slope"). The CFTC does not have, and should not have, authority to bring an enforcement action against the local pet store for sales of unspayed kittens, a hospital supplier for mislabeling medical oxygen tanks, the corner store for sales of stale

soda, bottled water distributors for shipping the wrong water brand, or a real estate agent for exaggerating the square footage of an apartment. But all of these absurd results flow naturally from the District Court's "core characteristic" error.

If Congress had sought to include in the definition of "commodity" items sharing a "core characteristic" with or in the same category or class as another commodity, "the subject undoubtedly would have surfaced somewhere in [the statute's] text." *See Turkiye Halk Bankasi A.S. v. U.S.*, 598 U.S. 264, 274 (2023). Failure to cabin the CFTC's authority to the statutory text would give the CFTC unbounded authority over all digital assets – indeed, all software – as well as anything that could have a "core characteristic" with some other commodity that is a "good" or "service." But, "Congress typically does not hide elephants in mouseholes." *Id.* at 274 (citation and quotation marks omitted).

It is self-evident that when Section 1(a)(9) of the CEA was enacted, its drafters did not envision software as falling under its purview, and nobody would have intended the CFTC to be the primary regulator of software. But even setting aside the anachronistic absurdities, Congress clearly did not intend for the CFTC to be the freelance regulator for all goods and services.

In sum, it was error to find that OHM and Klima are commodities,[22] when the law and the undisputed evidence compels the opposite conclusion.

## B.     It Was Error to Find that WBTC Was a Commodity

For the same reason, the District Court erred in finding that WBTC was a commodity. WBTC is not BTC. The District Court noted that WBTC is "a digital token pegged to the value

---

[22]     The District Court's error includes its conclusion that Defendants committed commodities fraud by investing in OHM and Klima through the CSNs and the related Carbon Offset Program. SA17-19. And as explained in greater detail *infra*, there is no evidence in the record that the vague reference that 8% of CSN founds would be invested in "put option protection" concerned commodity options. SA18.

of [BTC]." SA11.  Specifically, WBTC "represent[s]" BTC on the Ethereum blockchain.  A466 ¶ 36.[23]

The District Court did not point to or cite any evidence that there are contracts for future delivery of WBTC.  No such evidence exists in the record.  Thus, just like OHM and Klima, it was error for the District Court to find that WBTC is a commodity.

### C.    It Was Error to Find Commodities Fraud With Respect to ETH

The undisputed record before the District Court illustrated that the Funds invested in a small percentage of Fund assets into ETH, but only for "transactional convenience."[24]  A466 ¶ 36. As explained above, the Funds purchased ETH with U.S. dollars, and then used that ETH to make spot transactions in other digital assets, without any forward-looking component.  *Id.*  It thus is undisputed that the Funds did not invest in ETH.

Accordingly, even if there may be some ETH futures, in this instance the ETH transactions were incidental to any alleged fraud.  The District Court did not even address or grapple with the fact that the Funds did not invest in ETH.  To find Defendants liable for commodities fraud solely based on the fact that the Funds used ETH for transactional convenience would be equivalent to finding a defendant liable for commodities fraud regarding some non-commodity goods solely

---

[23]    *See also What Is Wrapped Bitcoin*, CoinMarketCap, https://coinmarketcap.com/academy/article/what-is-wrapped-bitcoin (last visited Nov. 4, 2024) ("WBTC is an ERC-20 token that's backed on a 1:1 basis with Bitcoin").

[24]    While the record is sparse on this point, ETH is used on the Ethereum blockchain for "gas fees," to pay the transaction costs of a transaction such as purchasing OHM or Klima on the Ethereum blockchain.  Corey Barchat, *What are Ethereum Gas Fees? ETH Fees Explained*, MoonPay (Jul. 7, 2022), https://www.moonpay.com/learn/defi/what-are-ethereum-gas-fees. Because such gas fees must be paid in ETH anyway, it would be convenient to make purchase on the Ethereum blockchain in ETH, requiring a purchaser to use U.S. dollars to buy ETH, and then use the ETH to purchase the other digital assets.

because he used gasoline (a commodity) to drive his car to the store to buy those goods.  The District Court did not cite – and we are not aware of – legal authority for such a claim.

## IV.     The District Court Erred By Granting Summary Judgment for the CFTC on the Claim For Failure to Register as a CPO Under 7 U.S.C. § 6m(1)

Because, as explained above, the Funds did not invest in "commodities" under the CEA, it was error for the District Court to find that Defendants operated a "commodity pool" as defined in 7 U.S.C. § 1a(10) and to find Defendants liable for failure to register as a CPO.  SA19-22.

This claim fails for the additional reason that, outside of claims for fraud and manipulation, the CFTC only has jurisdiction to regulate the futures and derivatives market for commodities, not the underlying commodities themselves.  *See* 7 U.S.C. § 2(a)(1)(A).  This limitation includes digital assets.  As former CFTC Commissioner Dawn D. Stump has explained, "[t]he CFTC does not regulate Bitcoin (or any other cash digital asset transactions). … the CFTC regulates derivatives (*e.g.*, futures contracts, options, swaps) associated with underlying commodities, but not the underlying commodities themselves."  *See Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Relating to Bitcoin Fraud*, CFTC (Mar. 8, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement030822.     CFTC Enforcement Director Ian McGinley agrees:  "The CFTC does not have regulatory authority over the spot market for digital asset commodities.  Our authority in the spot market is limited to prosecuting fraud and manipulation."  Ian McGinley, *Enforcement by Enforcement: The CFTC's Actions in the Derivatives markets for Digital Assets*," CFTC (Sept. 11, 2023), https://www.cftc.gov/PressRoom/SpeechesTestimony/opamcginley1.

Here, as noted above, the undisputed evidence shows that the Funds did not invest in any futures contracts or any other derivatives.

The District Court found that even though the Funds did not invest in any derivatives, Defendants nevertheless operated an unregistered "commodity pool" because they had the potential to invest in commodity derivatives.  SA20-22.  The District Court's conclusion is unsupported by the facts or the law.

To support its conclusion, the District Court improperly cherry-picked small portions of Fund II's disclosures, without referencing or considering other disclosures that disproved the CFTC's claim that Defendants ran a CPO.  SA21.  The District Court cited to Fund II's LPA, which gave Jafia the power (but not the obligation) to transact in "commodities, commodity contracts commodity futures, financial futures (including index 24 futures) and options … forward foreign currency exchange contracts, … derivatives [or] swap contracts."  SA21 (brackets and ellipses in original).  But the District Court ignored the other powers given to Jafia in Fund II's LPA, including to transact in "Digital Assets and financial instruments of any sort and rights therein" and to "loan its Digital Assets to other market participants and engage in 'staking' of Digital Assets" (without reference to any commodity or any derivative).  A313 § 3.02(a)-(b).  The LPA also states that the "purpose" of Fund II was to "invest, hold and trade in digital currencies, cryptoassets, cryptocurrencies, decentralized application tokens and protocol tokens, blockchain based assets and other cryptofinance and digital assets that currently exist or may exist in the future … and other financial instruments of any name and nature which exist now or are hereafter created and rights and options relating thereto."  A311 § 1.03.  The LPA does not say that the purpose of Fund II is to transact in commodities.

The District Court next pointed to the PPM for Fund II, which states that Fund II may trade in digital asset derivatives at some point.  SA21.  But PPM II contained a disclaimer (not mentioned by the District Court) that the "Fund's investments in derivatives and other commodity interests

will be limited such that the General Partner will remain exempt from registering as a commodity pool operator."  A222 § 3.  PPM II further asserted that "[t]he CFTC has determined that at least <u>some</u> cryptocurrencies, such as Bitcoin, fall within the definition of a 'commodity' under the [CEA]. … To the extent that certain Digital Assets themselves are deemed to be futures, swap or retail foreign exchange contracts pursuant to subsequent rulemaking by the CFTC, the Fund and/or the General Partner <u>may</u> be required to comply with additional regulation under the CEA."  A227 § 7 (emphasis added).

And, as the District Court noted, PPM I states:  "THE FUND DOES NOT CURRENTLY INTEND TO TRADE PRODUCTS THAT ARE REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION.   IN THE EVENT THE FUND IN THE FUTURE DECIDES TO TRADE SUCH PRODUCTS, THE GENERAL PARTNER WILL FILE AN APPROPRIATE EXEMPTION OR REGISTER AS A COMMODITY POOL OPERATOR WITH THE CFTC."  SA21 (capitalization in original).

Thus, it was error for the District Court to conclude as a matter of law that there were no material issues of fact as to whether Defendants "solicited funds for the purpose of trading in commodity interests" in light of these contractual provisions.  SA21.  By basing the decision on certain portions of the Funds documents without looking at other provisions, the District Court violated the canon that "a document should be read as a whole with all its parts given effect." *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (citation omitted).  *See also Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 762 (7th Cir. 2015) ("Contractual phrases are not read in isolation; rather the contract must be read as a whole") (citations omitted).

The cases relied upon by the District Court are distinguishable.  SA20-21.  In determining that there is no "actual trading requirement" to constitute a commodity pool, the District Court

principally relied upon *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 156 (3d Cir. 2009). SA20-21. But in that case – decided after a bench trial, not at summary judgment – the Third Circuit found that the defendants acted as commodity pool operators even though they did not execute commodity futures transactions themselves but instead pooled funds into a feeder fund to invest into another fund, which in turn executed transactions. The *Equity Fin.* court did not hold, as the District Court did, that merely disseminating fund documents providing for the possibility of investing in commodities was sufficient as a matter of law to be a commodity pool operator.

The District Court also relied on *U.S. v. Wilkinson*, 986 F.3d 740 (7th Cir. 2021), SA20, but that case concerned the sentencing of a defendant who had already pleaded guilty to mail fraud and wire fraud. In *Wilkinson*, this Court determined that the defendant qualified as a commodity pool operator (and thus should receive a harsher sentence) even though he did not invest in commodities and instead took investors' money to perpetuate a Ponzi scheme. To support that conclusion, this Court in *Wilkinson* pointed to some of the statements made in the defendant's marketing materials that the defendant's funds would trade futures and options, but those statements were conclusive, as opposed to the conditional, permissive language, with disclaimers, found in the Fund documents here. Moreover, unlike the defendant in *Wilkinson*, the Defendants here did invest in instruments – the digital assets discussed above – that are not commodities.[25]

---

[25]     The District Court also cited two district court cases that are equally inapplicable, SA20-21; both are default judgments against defendants who told investors they would invest in commodities but pocketed the investments, as opposed to here where the Defendants' documents contained disclaimers and conditional language, and where it is uncontested that Defendants invested in non-commodity digital assets. *In CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1103 (C.D. Cal. 2003), the court granted a motion for a default judgment on the grounds that the defendant falsely represented to investors that he needed money to complete an "already profitable commodity futures trade," and that "the transaction was a good way of making money without the investor having to trade commodity futures himself." In *CFTC v. Wilkinson*, 2016 WL 8256406, at *2 (N.D. Ill. Nov. 22, 2016), a related case to this Court's *Wilkinson* case described above, the district court granted a motion for a default judgment on the grounds that the defendant falsely told

36

The District Court's conclusion that the CSN offered by Defendants constituted an unregistered commodity pool was error for a different reason.  SA22.  As the District Court acknowledged, Ikkurty "advertised that 80% of contributions to CSNs … would be invested in 'stable proof of stake' tokens, and that purchasers would receive interest payments of 18% per year.  Instead, Ikkurty wound up investing the bulk of CSN funds into cryptocurrencies OHM and Klima. … He also advertised that he would use an additional 8% of CSN funds to buy 'put option protection,' but did not do so."  SA7 (internal citations committed).  The District Court found that Defendants "qualified as CPOs" because they advertised that they would invest 8% of CSN funds in "'put option protection' on digital currencies."  SA22.  The District Court erred because there is no undisputed evidence showing that the CSNs were operated for the "purpose of trading in commodity interests."  7 U.S.C. § 1a(10).  The District Court apparently assumed that the vague term "put option protection," SA22, referred to commodity options.  But the District Court cited no record evidence to corroborate that assumption (and there is none).  The District Court also cited to no record evidence (and also there is none) that the referenced "proof-of-stake digital asset tokens" were digital assets that qualify as commodities.  To the contrary, the CSN funds were invested in OHM and Klima, which, as explained above, are not commodities under the CEA. SA22 n.5.

The District Court's conclusion that the CSN constituted a commodity pool further was error because another key characteristic of a commodity pool, according to *Equity Fin. Grp.*, is that "participants share pro rata in accrued profits or losses from the commodity futures trading." 572 F.3d at 158.  In *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 884 (9th Cir. 1986), cited

---

investors "that their funds would be used to trade options and futures contracts, when in fact Wilkinson misappropriated all or a significant portion of the funds."

in *Equity Fin. Grp.*, the Ninth Circuit found that the defendants had not operated a commodity because, even though the investment vehicle "possessed some of the requirements which have been deemed necessary to constitute a commodity pool," "not all accounts shared a pro rata profit or loss." Likewise, here, the investors did not share a pro rata profits or loss; as noted by the District Court, the CSN was a straight promissory note paying interest of 18% per year. SA7. Whether or not Defendants actually invested in put options after receiving funds from CSN purchasers is completely divorced from the promised return. The CSN thus does not share the key characteristics of a commodity pool (and thus Defendants are not CPOs) as described in the case law.

## V.    The District Court Erred By Granting Summary Judgment for the CFTC on the Claim For Fraud by a CPO Pursuant to 7 U.S.C. § 6o(1)(A)-(B)

For the same reasons the District Court erred in granting summary judgment for the CFTC on the first and third causes of action, the District Court erred in granting summary judgment for the CFTC on the second cause of action, for fraud by a CPO.

The District Court found that "[a]s the Court has already determined the CFTC established these elements for a violation of Section 6(c)(1) and Regulation 180.1 (Count III), the Court likewise grants summary judgment in favor of the CFTC as to Count II." SA23.

The District Court erred because, as explained above, the Funds (and the CSNs) were not commodity pools and therefore Defendants were not CPOs. Because Defendants were not CPOs, they could not have been found liable for fraud by a CPO. Moreover, because the District Court's grant of summary judgment in favor of the CFTC on the third cause of action was in error, it was further error for the District Court to use that conclusion, without more, to grant summary judgment in favor of the CFTC on the second cause of action.

## **CONCLUSION**

For the reasons set forth above, this Court should reverse the summary judgment decision below and the resulting Judgment, and order the District Court to grant summary judgment in favor of Defendants on all three causes of action, as well as to grant an award of attorneys' fees and costs.

Dated: New York, New York
     November 4, 2024         MORRISON COHEN LLP


         By: /s/ *Jason Gottlieb*
            Jason Gottlieb
            Michael Mix
            909 Third Avenue
            New York, New York 10022
            (212) 735-8600
            jgottlieb@morrisoncohen.com
            mmix@morrisoncohen.com

            *Attorneys for Appellants Sam Ikkurty and Jafia LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 37(a)(B) and Circuit Rule 32(c) because this brief contains 12,311 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface of 12 points or larger using Microsoft Word 2021 in Times New Roman font.

Dated: November 4, 2024                     */s/ Jason Gottlieb*
                                            Jason Gottlieb

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and 30(b) are included in the appendix filed with this brief.

Dated: November 4, 2024

_/s/ Jason Gottlieb_
Jason Gottlieb

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 4th day of November, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the appeal are registered CM/ECF users and will be served by the CM/ECF system.

Dated: November 4, 2024                    */s/ Jason Gottlieb*
                                                            Jason Gottlieb

**REQUIRED SHORT APPENDIX**

## TABLE OF CONTENTS

PAGE

Memorandum Opinion and Order of the Honorable Mary M. Rowland,
  dated July 1, 2024 .................................................. SA1

Final Judgment, dated July 22, 2024 ................................. SA26

Amended Final Judgment, dated October 16, 2024 ..................... SA35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

SAM IKKURTY A/K/A SREENIV ASI
RAO, RAVISHANKAR AVADHANAM,
JAFIA LLC,

Defendants,

IKKURTY CAPITAL, LLC D/B/A
ROSE CITY INCOME FUND, ROSE
CITY INCOME FUND II LLP, AND
SENECA VENTURES, LLC,

Relief Defendants

Case No. 22-cv-02465

Judge Mary M. Rowland

### <u>MEMORANDUM OPINION AND ORDER</u>

The Commodity Futures Trading Commission (CFTC) accuses Defendants Sam
Ikkurty, Ravishankar Avadhanam,[1] and Jafia LLC of civil violations of the
Commodity Exchange Act (CEA). The CFTC seeks summary judgment and the
payment of restitution and disgorgement. Defendants Ikkurty and Jafia cross-move
for summary judgment. [267] [270] For the reasons stated below, the CFTC's motion
for summary judgment [267] is granted. Defendants' motion for summary judgment
and motion to dismiss is denied. [270].

---

[1] The case was dismissed as to Avadhanam on August 4, 2023, pursuant to an agreed consent order
reached between the CFTC and Avadhanam. [201-203].

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*.

When cross-motions for summary judgment are filed, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was filed. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chi.*, 657 F.3d 433, 439 (7th Cir. 2011). *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## BACKGROUND[2]

### I.     Ikkurty Forms RCIF I and RCIF II

Ikkurty founded Jafia LLC in 2006 and is the company's sole officer, president, and registered agent. DSOF ¶ 3. In 2017, Ikkurty established Ikkurty Capital LLC and began to do business as Rose City Income Fund I (RCIF I). *Id.* ¶ 1. Ikkurty, through Jafia, served as the general partner for RCIF I, and later, in 2021, RCIF II. *Id.* ¶ 3. Ikkurty has not registered himself nor any of his business ventures with the CFTC. *Id.* ¶ 6.

Both RCIF I and RCIF II operated as limited partnerships, and Ikkurty referred to them as "crypto hedge funds." PSOF ¶ 2. Ikkurty had limited experience investing

---

[2] These facts are taken from Plaintiff CFTC's Rule 56.1 statements of fact [269] (PSOF), Defendants' statement of facts [272] (DSOF), Defendants' response to Plaintiff's statement of facts [339] (DRSOF), Plaintiff's response to Defendants' statement of facts, [343] (PRSOF), Defendants' statement of additional facts [340] (DSAF), and Plaintiff's response to Defendants' statement of additional facts (PRSAF) [353]. The facts are undisputed unless otherwise noted.

3

in cryptocurrencies before launching RCIF I: he bought 25-50 bitcoins for himself before his account was hacked in 2017. *Id.* ¶ 4. *Id.*; DSROF ¶ 4-5.

Three documents set out operative terms and conditions for the two funds: (1) a Private Placement Memorandum, a marketing document, (PPM), (2) a Limited Partnership Agreement, a contract between the general partner and the limited partners, (LPA), and (3) a Subscription Agreement and Valuation Policy. PSOF ¶¶ 6, 10. Ikkurty retained law firm Seward & Kissel to draft the documents for RCIF II. *Id.* Ikkurty also retained third-party vendor Intertrust Corporate and Fund Services LLC to act as fund administrator, though it had never administered a digital asset fund before. *Id.* ¶ 13. Lastly, Ikkurty told prospective participants that RCIF retained Richey May & Co. to audit the fund. *Id.* ¶ 14.

## II.  Ikkurty's Communications with Prospective and Current Participants

Ikkurty recruited RCIF II participants through weekly webinars and trade shows. *Id.* ¶¶ 17-18. He told participants that the goal of RCIF II was to "earn income with exposure to crypto assets." *Id.* ¶ 21. RCIF marketing materials including the PPM, the fund website, and PowerPoint presentations prepared by Ikkurty promised participants a "steady distribution of 15% [annual income] per year," generated by fees on "digital tollbooths" and "proof of stake mining." PSOF ¶¶ 15-16, 22-23, 25. The PPM incorporated this promise for "period payments of net profit." *Id.* ¶ 24.

Ikkurty's presentations also advertised the alleged success of RCIF I as a reason for recruits to invest in RCIF II. *Id.* ¶ 31. Ikkurty calculated RCIF I's favorable historical returns using an Excel spreadsheet. *Id.* ¶ 32. He now admits that he

overstated many of the monthly figures that he input into his spreadsheet and later the PowerPoints. *Id.* This resulted in incorrect marketing statements. *Id.* For example, Ikkurty advertised to potential participants that $100 invested in RCIF I at its inception would have grown through October 2021 by 2,708%, to $2,808.44. *Id.* ¶ 39. CFTC fact witness Heather Dasso calculated that using accurate return records, $100 invested in RCIF I fund inception would have grown through October 2021 by 759%, to just $859. *Id.* Ikkurty does not admit that the CFTC's calculations are correct but affirms that he input incorrect numbers for many months. *Id.* ¶¶ 39-40. Ikkurty, per his own testimony, has "no idea" how or why he did so. *Id.* ¶ 40. Additionally, Ikkurty failed to update either his spreadsheet or the marketing PowerPoint to reflect heavy losses sustained by RCIF I from November 2021 through March 2022. *Id.* ¶¶ 41-42. In that period, the fund lost 98.99% of its aggregate returns. *Id.* ¶ 41. Still, Ikkurty continued to use the PowerPoint presentations reporting returns through October 2021. *Id.* ¶ 42.

Ikkurty told potential RCIF II investors that he would invest 65% of the fund in "stable proof-of-stake tokens." *Id.* ¶ 44. He also represented to them that he had proficient knowledge and skill to manage trading. *Id.* Ikkurty told prospective fund participants that trading Bitcoin allowed him to retire in 2017, though he worked as a subcontractor thereafter. *Id.* ¶¶ 47-48. Ikkurty solicited and accepted more than $44 million dollars from participants to participate in RCIF II. *Id.* ¶ 49.

RCIF II investors Keni Patel and Shawn Lemerise gave deposition testimony that each of these representations by Ikkurty was important to their investment in the

fund. Both believed that the 15% annual income they received came from the fund's "net profits," *id.* ¶ 50, crediting Ikkurty's assertion that he would create cryptocurrency "tollbooths." *Id.* ¶ 51. Ikkurty's statements about RCIF I's purported success influenced both Patel and Lemerise to believe that earlier participants' balances "increased tremendously over time." *Id.* ¶¶ 53. Both investors also believed Ikkurty had achieved success trading cryptocurrencies based on his knowledge and skill, and both invested in RCIF II in part because of this. *Id.* ¶¶ 55-56.

### III.    The Fund's Performance and RCIF Collapse

Ikkurty made investment decisions for RCIF II based solely on his own "qualitative judgment." PSOF ¶¶ 46, 59. He put almost 90% of RCIF investments into a cryptocurrency called OHM. *Id.* ¶ 45. Ikkurty admits that OHM was not stable in 2021 through early 2022. *Id.* He also invested RCIF II funds into cryptocurrency Ethereum, as well as WBTC, a digital asset that represented the value of Bitcoin. DSOF ¶ 36.

In the end, Defendants did not return any net profits to participants. PSOF ¶ 28. Defendants instead redistributed later investors' contributions to earlier investors. *Id.* ¶¶ 29-30. Defendants' counsel ultimately revised the PPM to remove the description of monthly distributions as "net profit," but Ikkurty decided not to inform fund participants of this change. *Id.* ¶¶ 8-9, 15, 61.

Jafia developed two additional instruments for participants to invest in: a crypto savings note (CSN) and a carbon offset bond (COB). Both instruments functioned as promissory notes requiring Jafia to make monthly interest payments to the participant and repay the principal in full at the end of the term. *Id.* ¶ 62. The main

6

difference between these two products was that COBs were advertised as collateralized securities, while CSNs were not supported by collateral. *Id.* ¶ 63. Ikkurty advertised that 80% of contributions to CSNs and COBs would be invested in "stable proof of stake" tokens, *id.* ¶ 64, and that purchasers would receive interest payments of 18% per year. *Id.* ¶ 63. Instead, Ikkurty wound up investing the bulk of CSN funds into cryptocurrencies OHM and Klima. *Id.* ¶ 64. He offered the same digital wallet address as collateral for dozens of COB purchasers. *Id.* ¶ 67-68. He also advertised that he would use an additional 8% of CSN funds to buy "put option protection," but did not do so. *Id.* ¶ 65.

RCIF I began to lose value rapidly in November 2021. *Id.* ¶ 41. In December 2021, Ikkurty offered RCIF I participants buyouts or COBs. In total, Jafia paid $29,075,645.65 in cash and COBs to RCIF I participants for stakes that would have been worth $7,682,406.80 if the participants had been required to cash out at the prices at the end of the month. *Id.* ¶ 72. The CFTC alleges that Ikkurty provided buyouts to participants based on the value of their positions in October and November, not December 2021 when the buyouts took place. *Id.* ¶ 70. The CFTC also alleges that Ikkurty used COB interest payment funds to pay for the buyouts. *Id.* ¶ 72.

At the time that Jafia's accounts were frozen, the principal payments for $6,036,500 in CSNs and $20,080,255 in COBs remained outstanding, though Jafia only held $5.9 million in assets. *Id.* ¶ 73. An expert witness hired by Defendants reviewed the fund accounts and identified millions of dollars in digital asset and

token holdings. DSOF ¶ 57. RCIF I participants who remained in the fund until its end in March 2022 contributed a total of $9,573,705 that was not returned to them. *Id.* ¶ 75. RCIF II participants who remained in that fund through its end in April 2022 contributed a total of $48,066,789 that was not returned to them in the form of distributions or withdrawals. *Id.*

## ANALYSIS

The CFTC and Defendants cross-move for summary judgment on the complaint's three counts: failure to register as a commodity pool operator (Count I), fraud by a commodity pool operator (Count II), and a deceptive scheme or contrivance (Count III). The parties' cross-motions are mirror images of each other – that is, Defendants' arguments against the CFTC's motion for summary judgment also constitute their arguments for summary judgment and vice versa. The Court will first address Defendants' contention that the Court lacks subject matter jurisdiction. Then, the Court will turn to the parties' respective arguments for summary judgment on each count.

### I.      This Court Has Subject-Matter Jurisdiction

As an antecedent to their argument for summary judgment, Defendants move to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) or 12(c). Defendants contend that they did not trade in "commodity interests," nor in contracts for the sale of "commodities." As such, Defendants argue, their conduct is not subject to regulation by the CFTC, and this Court thus lacks subject matter jurisdiction.

There is no question that this Court has subject matter jurisdiction. The CFTC brought the pending claims under the Commodity Exchanges Act, giving this Court

8

federal question jurisdiction. 28 U.S.C. § 1331. "[J]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Rather, the district court retains jurisdiction when a cause of action will succeed if "the laws of the United States are given one construction and will be defeated if they are given another." *Id.*

Such is the case here. Defendants move to dismiss based on their preferred interpretation of the CEA—for example, whether Defendants traded commodities covered by the Act, or whether they acted as commodity pool operators. These arguments are better read as challenges to the scope, or "jurisdiction," of the CFTC, not this Court.

Arguments that the CFTC's claims are devoid of legal merit should be brought under Rule 12(b)(6), not Rule 12(b)(1). *See CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1222, n.2 (9th Cir. 2009); *see also CFTC v. Brockbank*, No. 2:00-CV-622 TS, 2006 WL 223835 (D. Utah Jan. 30, 2006), at *2-*3 ("The question instead is whether the claims are so completely devoid of merit as to not involve a federal controversy – a standard akin to the Rule 12(b)(6) standard."). The Court will address substantive legal questions of the CFTC's "jurisdiction" as they pertain to each count. But as an initial matter, this Court affirms its subject-matter jurisdiction over this case.

## II.     Count III: Fraud in Connection with Trade of Commodities

In Count III, the CFTC charges Defendants under the CEA's anti-fraud provision. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1, 17 C.F.R. §

180.1 (2015), make it unlawful for any person to intentionally or recklessly employ, or attempt to use or employ any manipulative device, scheme, or artifice to defraud in connection with a "contract of sale . . . of any commodity in interstate commerce." The CFTC alleges that Defendants defrauded fund participants by making material misrepresentations and/or misappropriating customer funds. Defendants dispute the materiality of Ikkurty's statements, as well as the scienter element.

### a. Defendants transacted in commodities covered by the CEA

At the outset, Defendants argue that they cannot be held liable under the CEA because they did not engage in the sale of a covered commodity. In its complaint, the CFTC identified two cryptocurrencies, Bitcoin and Erethreum, as commodities that Defendants invested in. Through discovery, the CFTC also identified two additional cryptocurrencies, OHM and Klima. Defendants argue that the CFTC's statutory authority does not extend to any cryptocurrencies.

The CEA defines commodities as "all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Courts roundly recognize cryptocurrencies as falling under this broad definition. *CFTC v. Laino Grp. Ltd.,* No. 4:20-CV-03317, 2021 WL 4059385, at *6 (S.D. Tex. June 30, 2021) (collecting cases); *CFTC v. McDonnell,* 287 F.Supp.3d 213, 229 (E.D.N.Y. 2018). This is because cryptocurrencies share a "core characteristic" with "other commodities whose derivatives are regulated by the CFTC," namely, that they are "exchanged in a market for a uniform quality and

value." *United States v. Reed,* No. 20-CR-500, 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (quoting *McDonnell,* 287 F.Supp.3d at 228) (affirming CFTC jurisdiction over spot trade commodity fraud in cryptocurrency). These factual similarities, as well as the plain language of statutory and regulatory guidelines, allow the CFTC to expand its jurisdiction from ""future" contracts for commodities to "spot trade commodity fraud." *Id.* at 229. Defendants thus had sufficient notice that trading in virtual currencies subjects them to regulation by the CFTC.

Defendants object for a few reasons. First, they did not invest in Bitcoin itself, but "wrapped Bitcoin," a digital token pegged to the value of Bitcoin. DSOF ¶ 36. Defendants also point out that their investments in wrapped Bitcoin and Erethreum made up a "relatively small percentage of their holdings." *Id.* These arguments are unavailing, as the "in connection with" requirement of 7 U.S.C. § 9(1) and 17 C.F.R.§ 180.1 is "construed broadly." *CFTC v. Notus LLC,* 22-CV-20291, 2024 WL 1717486, at *10 (S.D. Fla. Apr. 22, 2024). Moreover, it is undisputed that Defendants invested a substantial amount of customer funds into OHM and Klima, two non-Bitcoin virtual currencies that qualify as commodities. PSOF ¶¶ 45, 64; *See CFTC v. My Big Coin Pay, Inc.,* 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (finding non-Bitcoin virtual currency is a commodity because "the CEA only requires the existence of futures trading within a certain class (e.g. "natural gas") in order for all items within that class (e.g. "West Coast" natural gas) to be considered commodities."). Considering the above circumstances, the Court finds that there is no genuine dispute that

11

Defendants transacted in cryptocurrencies that qualify as commodities under the CEA.

### b. Defendants made material misrepresentations of fact to fund participants

To prove its claim for commodities fraud on a misrepresentation theory under 7 U.S.C. § 9(1) and 17 C.F.R.§ 180.1, the CFTC must show (a) Defendants made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; (c) the misrepresentation or omission was material; and (d) was made in connection with a contract of sale for a commodity in interstate commerce. *CFTC v. Long Leaf Trading Grp., Inc.,* No. 20 C 03758, 2022 WL 2967452, at *5 (N.D. Ill. July 27, 2022), judgment entered, No. 20-CV-3758, 2023 WL 3170062 (N.D. Ill. Mar. 29, 2023) (quoting *CFTC v. Caniff,* 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020)).

To prove scienter, the CFTC must show that Defendants acted intentionally or recklessly. *Notus,* 2024 WL 1717486, at *8 (quoting *CFTC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002)) (discussing scienter in the context of 7 U.S.C. § 6b claims, which apply the same standard); *see also CFTC v. Kraft Foods Grp., Inc.,* 153 F.Supp.3d 996, 1007 (N.D. Ill. 2015) (discussing scienter in the context of fraud claims under Section 10(b) of the Exchange Act and adopting standard for analogous CEA provisions). Scienter can also be established by proof of "highly unreasonable omissions or misrepresentations that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *R.J. Fitzgerald,* 310 F.3d at 1328 (cleaned up). The CFTC need not prove

"an evil motive or intent to injure the customer." *Cange v. Stotler & Co.,* 826 F.2d 581, 589 (7th Cir. 1987).

A statement is material if it is substantially likely that a reasonable investor would consider the issue important to making an investment decision. *CFTC v. Kratville,* 796 F.3d 873, 895 (8th Cir. 2015). "Proof of customer reliance is not required." *Long Leaf,* 2022 WL 2967452, at *5 (citing *Slusser v. CFTC,* 210 F.3d 783, 785-86 (7th Cir. 2000)). Finally, as for the "in connection with" requirement, "[a]ctionable misrepresentations include those made to customers when soliciting their funds." *CFTC v. Driver,* 877 F.Supp.2d 968, 978 (C.D. Cal. 2012) (quoting *CFTC v. Rosenberg,* 85 F.Supp.2d 424, 447-48 (D.N.J.2000)).

The CFTC presents evidence of four categories of misrepresentations made by Ikkurty on behalf of Defendants: misstatements as to (1) the RCIF I fund performance; (2) the fund's distribution of net profits, (3) Ikkurty's investment methodology (or lack thereof), and (4) Ikkurty's background and experience.

### i. RCIF I historical performance

It is undisputed that Ikkurty recruited RCIF II participants with PowerPoint presentations that contained false representations about the historical performance of RCIF I. *See* PSOF ¶¶ 31-43. Defendants dispute the materiality of these misstatements, arguing that RCIF II participants understood that historical returns were not guarantees of future performance. *See* DRSOF ¶ 54 (citing participants' deposition testimony that they understood crypto assets could be volatile). However, participants' general understanding of crypto markets cannot balance out Ikkurty's

13

hyper-specific statements about the fund's past performance. *See R.J. Fitzgerald & Co.,* 310 F.3d at 1330 (finding general disclosure of risk does not "preclude liability under the CEA where the overall message is clearly and objectively misleading or deceptive"). Failure to fully disclose previous customers' losses is a material omission. "A reasonable investor would want to know that the person or firm to whom she is entrusting her money has a history of losing customers' investments." *Long Leaf,* 2022 WL 2967452, at *5. And contrary to Defendants' arguments, inaccurate reporting can influence customers' expectations of future profit. *See CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. 1149, 1159 (S.D.N.Y. 1979) (defendants' inaccurate profit projections constituted fraud); *CFTC v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 917 (S.D.N.Y. 1977) (salesman's incorrect statement that "no . . . customer ever lost money on his investment" was fraudulent).

Defendants also contend that Ikkurty lacked the requisite mental state. He offers no alternative explanation, though, for how he could have repeatedly made false factual statements. As the owner and principal investor for RCIF I, Ikkurty had knowledge of the fund's true performance. PSOF ¶ 59. His failure to disclose losses sustained by RCIF I investors is a paradigmatic "highly unreasonable omission[] or misrepresentation[] that present[s] a danger of misleading [customers]" that Ikkurty had every reason to know about. *R.J. Fitzgerald,* 310 F.3d at 1328; *accord Long Leaf Trading Grp.,* 2022 WL 2967452, at *6 (finding fund CEO exhibited reckless disregard for the truth by omitting poor fund performance to current and potential customers); *CFTC v. Commonwealth Fin. Grp., Inc.,* 874 F.Supp. 1345, 1354 (S.D.

14

Fla. 1994) (same). In his desire to recruit customers, Ikkurty obfuscated and inflated past performance. There can be no genuine dispute that Ikkurty did so willingly. As a matter of law, the Court finds that Defendants acted at least recklessly in advertising false historical returns.

### ii. RCIF II returns of "net profit" to participants

The next misrepresentation alleged by the CFTC is that Defendants marketed RCIF II to participants as if they would receive "net profits," when Defendants only redistributed participants' funds. The facts of this misrepresentation are undisputed and show that Defendants ran something akin to a Ponzi scheme, unbeknownst to fund participants. *Perkins v. Haines,* 661 F.3d 623, 625 n.1 (11th Cir. 2011). ("The essence of a Ponzi Scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts."); *accord Bosco v. Serhant,* 836 F.2d 271, 274 (7th Cir. 1987). Any reasonable investor would want to know that their monthly dividends was not real income, but only constituted other participants' investments. And as Ikkurty admits he knew that investors did not receive "net profits," the Court finds the scienter element can be reasonably inferred as well. *See S.E.C. v. Payne,* 1:00-CV-1265-JMS-TAB, 2011 WL 693604, at *3 (S.D. Ind. Feb. 18, 2011) (in securities context, defendant's "principal role in the Ponzi scheme and his admission that he engaged in these acts knowingly shows a high degree of scienter").

### iii. Use of RCIF II funds and investment risk

15

The CFTC also presents undisputed evidence that Defendants built an investment portfolio that was much more volatile than advertised to participants. It is undisputed that Ikkurty told potential investors that 65% of RCIF II funds would be put into "stable proof-of-stake tokens." PSOF ¶ 44. Defendants instead invested 90% of RCIF II funds in OHM, a cryptocurrency that Ikkurty admitted was not stable in 2021 and early 2022. *Id.* ¶ 45. Ikkurty made similar misrepresentations regarding CSN purchasers, *id.* ¶ 64, and he failed to inform COB purchasers that he pledged the *same* digital wallet as collateral to dozens of purchasers. *Id.* ¶ 68. Downplaying risks associated with customers' investments is a material misrepresentation. "[A] reasonable investor would want to know . . . the risk associated with that investment." *CFTC v. Rolando,* 589 F. Supp. 2d 159, 170 (D. Conn. 2008). Considering Ikkurty's knowledge and control over RCIF II investments, there can be no serious dispute over scienter.

### iv. Ikkurty's background and experience

Finally, the CFTC provides undisputed evidence that Ikkurty portrayed himself as a seasoned, skilled trader in cryptocurrency, PSOF ¶ 4-5; 47-48, when he actually had limited experience trading Bitcoin and other digital assets. Misrepresenting one's investment experience and skill to customers is fraudulent as a matter of law. *See, e.g., McDonnell,* 332 F. Supp. at 718; *CFTC v. Allied Markets LLC,* 371 F. Supp. 3d 1035, 1048 (M.D. Fla. 2019). This, too, qualifies as a material misrepresentation.

The CFTC has presented sufficient evidence that Defendants violated 7 U.S.C. § 9(1) and Regulation 180.1(a). Ikkurty on behalf of Jafia, made misrepresentations,

and those misrepresentations were material, made with scienter, and in connection with contracts for the sale of commodities covered by the CEA. This warrants a finding of summary judgment in favor of the CFTC on Count III.

### c. The CFTC has established that Defendants misappropriated funds through the Carbon Offset Program.

The CFTC also proceeds on a separate theory of fraud under the CEA, arguing that it is undisputed that Defendants misappropriated funds from CSN and COB purchasers to distribute inflated returns to RCIF I participants. "[S]oliciting or obtaining funds from investors for trading, then failing to trade the funds while using them for personal and business expenses, is misappropriation." *Driver,* 877 F.Supp.2d at 978 (quoting *CFTC v. Emerald Worldwide Holdings, Inc.,* No. CV-03–8339AHM, 2005 WL 1130588, at *7 (C.D.Cal. Apr. 19, 2005)). The misappropriation of funds solicited for trading is "willful and blatant fraudulent activity" that violates the CEA. *Weinberg,* 287 F.Supp.2d at 1106.

It is undisputed that in November 2021, the value of RCIF I collapsed by 99% with massive losses of nearly 54% in December 2021 and 97% in January 2022. SOF ¶ 41. In the natural course, RCIF I participants would have lost their investments. Instead, the documents establish that Ikkurty offered RCIF I participants "buyouts" from Jafia at the pre-crash values for their RCIF I investments, or alternatively, offered to give them COBs in those same pre-crash values. SOF ¶ 70. Significantly, these buyouts took place after the RCIF I losses occurred but prior to Defendants' monthly statements. According to the records, "Jafia paid $29,075,645.65 in cash and COBs to RCIF I participants for RCIF I stakes that would have been worth $7,682,406.80 if

17

the participants had been required to cash out at the prices at the end of the month." PSOF ¶ 72.

It is also undisputed that Ikkurty and Jafia entered into agreements or promissory notes with crypto savings note (CSN) and carbon offset bond (COB) participants where those participants paid for the CSN or COB up front and Jafia promised to pay 18% interest per annum, for a period of years, at which time Jafia would repay the principal. PSOF ¶¶ 62, 63. Ikkurty advertised that 80% of contributions would go into "stable proof of stake tokens." *Id.*, at ¶ 64. Ikkurty also advertised that he would use 8% of the CSN funds to buy "put option protection". *Id.*, at ¶ 65. He did not do either of these things. *Id.*

The CFTC relies on emails Ikkurty sent to two RCIF I participants. One on January 13, 2022, explained that "December was very bad where RCIF 1 dropped by more than 45%," and offered to "cash out [his] position on a high note" based on the November 30 statement—a value much higher. SOF ¶ 70.[3] That was good for that participant, but that money had to come from somewhere—Ikkurty used Jafia funds to give the investor the earlier (and higher) value. That is a classic Ponzi move.

The whole numbers also support the CFTC's position. Defendants paid $29 million to RCIF I participants for stakes that were worth only $7.7 million. SOF ¶ 72. That left Jafia with insufficient funds to pay the CSN and COB participants the $26 million, combined, they were owed plus 18% interest. SOF ¶ 73. Then when the CFTC

---

[3] Ikkurty does not dispute this fact but objects to the CFTC's reliance on an email from Ikkurty to an RCIF I investor offering them an option to cash out in the form of COB at greatly inflated value. [339] at ¶ 70. The Court may consider the email as a non-hearsay statement under FRE 801(d)(2), an opposing party's statement.

filed this litigation, Jafia only had $5.9 million in total assets. *Id.* That is a classic Ponzi scheme.

The facts are not disputed. The CFTC has presented sufficient evidence that Defendants violated 7 U.S.C. § 9(1) and Regulation 180.1(a). Ikkurty on behalf of Jafia, made misrepresentations, and those misrepresentations were material, made with scienter, and in connection with contracts for the sale of commodities covered by the CEA. The CFTC's motion for summary judgment on Count III is granted. Defendants' motion for summary judgment is denied.

### III.    Counts I and II: CPO failure to register and CPO fraud.

In Counts I and II, the CFTC alleges that Defendants acted as commodity pool operators (CPOs). Count I charges Defendants with failure to register as CPOs, in violation of Section 4m(1) of 7 U.S.C. § 6(m)(1), while Count II charges Defendants with fraud by a CPO, in violation of Section 4o(1)(A)-(B) of 7 U.S.C. § 6o(1)(A)-(B).

Defendants move for summary judgment on both counts on the basis that they did not act as CPOs because they did not (1) actually trade (2) covered commodities. The CFTC argues for summary judgment because the relevant statutory provisions require proof of solicitation of funds (as opposed to actual training) for the purpose of trading *commodity interests* (not commodities). The Court agrees with the CFTC's interpretation and finds that the CFTC has met its burden.

### a.  There are no disputed facts that Defendants acted as a CPO.

It is undisputed that Defendants did not file for an exemption from CPO registration, PSOF ¶ 77. Section 1a(11) of the CEA defines a "commodity pool operator" (CPO) as "any person—(i) engaged in a business that is of the nature of a

19

commodity pool . . . or similar form of enterprise and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property ... for the purpose of trading in *commodity interests*, including any—(I) commodity for future delivery, security futures product, or swap . . ." 7 U.S.C. § 1a(11) (emphasis added). A commodity pool is similarly defined as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." *Id.* § 1a(10)(A).

Courts agree that the "plain language of [the statute] requires only that the entity be engaged in a business of the proper form, and it solicit, accept, or receive funds for the purpose of trading." *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 156 (3d Cir. 2009) (emphasis added). There is no actual trading requirement. *Id.*; *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021). "The specific provisions governing commodity pool operators are directed toward regulating activities involving the solicitation of funds" for commodity future transactions. *Equity Fin. Grp.*, 572 F.3d at 157. The CFTC must show there is no genuine dispute of material fact that Defendants *solicited funds*, not traded commodities. It is undisputed that Ikkurty solicited millions of dollars' worth of funds for investment.

Again, whether Defendants *actually* traded commodity interests is not of import. The CFTC has successfully brought CPO-related claims against defendants who solicited funds for the purpose of trading commodity interests, but never followed through on those trades. *See, e.g., CFTC v. Wilkinson*, No. 16-CV-6734, 2016 WL 8256406 (N.D. Ill. Nov. 22, 2016); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1108 (C.D.

Cal. 2003); *Equity Fin. Grp.*, 572 F.3d at 156-59. After all, the "remedial purposes of the statute would be thwarted if the operator of a fund could avoid the regulatory scheme simply by investing in another pool rather than trading." *Id.* at 158.

Next, the CFTC need not prove that Defendants traded in commodities (although they did prove that here). Rather, the question is whether the Defendant solicited funds for the purpose of trading in *commodity interests*. First, the CFTC cites to RCIF II's governing documents, namely the Private Placement Memorandum (PPM) and the Limited Partnership Agreement (LPA). Both documents contain language that allow RCIF II to invest in commodity interests. The LPA authorized Jafia, as the general partner in RCIF II, to "purchase, hold, sell, sell short and otherwise deal in commodities, commodity contracts, commodity futures, financial futures (including index 24 futures) and options . . . forward foreign currency exchange contracts, . . . derivatives, [or] swap contracts[.]" PSOF ¶ 11. The PPM similarly authorized investments in commodity interests and disclosed risks related to trading future derivatives, swaps, and options. *Id.* ¶ 12. The PPM also included a caveat regarding commodity interests:

> THE FUND DOES NOT CURRENTLY INTEND TO TRADE PRODUCTS THAT ARE REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION ("CFTC"). IN THE EVENT THE FUND IN THE FUTURE DECIDES TO TRADE SUCH PRODUCTS, THE GENERAL PARTNER WILL FILE AN APPROPRIATE EXEMPTION OR REGISTER AS A COMMODITY POOL OPERATOR WITH THE CFTC.

DSOF ¶ 39.

It is undisputed that Ikkurty created a financial product called a "crypto savings note" (CSN) and advertised to potential buyers that he would use 8% of CSN funds to invest in "put option protection" on digital currencies. PSOF ¶¶64-65. A put option involving a commodity is a *commodity interest* covered by 7 U.S.C. § 1a(11). *See CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1155 (S.D.N.Y. 1979). [4]

The language of these documents and Ikkurty's solicitation of funds to be used to invest in commodity interests are undisputed. This evidence establishes that Defendants solicited funds "for the purpose of trading in commodity interests" and therefore qualified as CPOs. When Ikkurty told investors that would invest in put option, he promised to invest in a commodity interest. At that point the Defendants were required to register as a CPO.[5] No rational jury could determine that Defendants were not required to register as a CPO. The Court therefore grants the CFTC's motion for summary judgment on Count I and denies Defendants' motion for summary judgment on Count I.

### b. The CFTC has established that Defendants committed CPO fraud.

Section 4o(1) of the Act, prohibits any CPO from using any means of interstate commerce to: (A) defraud any client or participant or prospective client or participant; or, (B) engage in any transaction, practice or course of business which operates as a

---

[4] It is further undisputed that Ikkurty did not use CSN funds to purchase said put options with funds from CSN investors. PSOF ¶ 65. This establishes Count III, committing CPO fraud.

[5] Further, the Court has determined that the two non-Bitcoin virtual currencies, OHM and Klima, qualify as commodities. *See supra* at 11. Defendants' arguments that the CFTC has failed to establish that they traded in any commodities is not well taken.

fraud or deceit upon any client or participant or prospective participant. 7 U.S.C. §6o(1). Section (A) required proof of scienter. The elements of Section 4o(1)(A) are coextensive with the elements of Section 6(c)(1) and Regulation 180.1(a), discussed previously. Each requires proof of: (1) a misrepresentation that is (2) material and (3) made with scienter. *See Kraft Foods,* 153 F. Supp. 3d at 1014 ("Under Regulation 180.1, the level of scienter required to plead a cause of action for manipulation is 'intentionally or recklessly.'"); *see CFTC v. Driver,* 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) ("The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact . . . violate section 4o(1)(A)-(B) of the Act.").

As the Court has already determined the CFTC established these elements for a violation of Section 6 (c)(1) and Regulation 180.1 (Count III), the Court likewise grants summary judgment in favor of the CFTC as to Count II.

## IV.    Restitution and Disgorgement

The CFTC seeks equitable remedies against Defendants ordering restitution and disgorgement, jointly and severally.[6] Under 7 U.S.C. § 13a-1(d)(3), the Court may impose equitable remedies including "(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation." Because the CFTC

---

[6] Defendants do not dispute the amounts asserted by the CFTC. Instead, they "request the Court to allow separate briefing on the issues of restitution and disgorgement if they become relevant." [338] at 22. The Court declines to set further briefing. The briefing in this case was already delayed when Defendants obtained new counsel [318, 324]. No further delays are warranted. Particularly as Mr. Ikkurty is currently under an order of contempt. [299].

has established that Defendants have violated at least one provision of the CEA, the Court will proceed to assess the equitable remedies.

Obtaining restitution relief ordinarily requires proof of investors' individual reliance. *Driver*, 877 F.Supp.2d at 980. Yet where there are "consistent material misstatements or omissions in the context of a fraudulent scheme, the Court can assume reliance of the Defendants' customers on Defendants' fraud even though they did not testify." *McDonnell*, 332 F.Supp.2d at 720; *CFTC v. Ross*, 2014 WL 6704572. "A controlling person who knowingly induces the acts constituting a violation may be held liable to the same extent as the violating entity." *Long Leaf*, 2022 WL 2967452, at *9-10 (citing § 13c(b)).

The evidence clearly shows that Ikkurty was a controlling person of Jafia and personally participated in the acts that make up the CEA violation. He is therefore jointly and severally liable for Jafia's violations during his tenure as owner. *See* § 13c(b). Defendants do not dispute the total amount of RCIF I, RCIF II, CSN, and COB participant losses. As the undisputed evidence establishes that customer losses resulted in part from fraudulent omissions, the Court orders restitution in the amount of customer losses—$83,757,249—during Ikkurty's tenure ($83,757,249, inclusive of paid commissions) is proper. *See Long Leaf*, 2022 WL 2967452, at *9-10.

Defendants must also disgorge their collected commissions during the same period. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020). Defendants do not dispute that these gains total $36,967,285. PSOF ¶ 76. The amount owed in disgorgement shall be offset by any sums paid toward restitution.

Finally, the CFTC is entitled to summary judgment and disgorgement against the "relief defendants". The relief defendants in this matter, RCIF I, RCIF II and Seneca Venture all possess ill-gotten gains to which they have no legitimate claim. The Relief Defendants are also ordered to disgorge $36,967,285.

## CONCLUSION

For the stated reasons, the CFTC's motion for summary judgment [267] is granted with respect to Counts I, II and III. Defendants' motion for summary judgment and motion to dismiss is denied. [270].

E N T E R:

Dated: July 1, 2024

_____

MARY M. ROWLAND

United States District Judge

25

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**JAFIA LLC, SAM IKKURTY A/K/A SREENIVAS I RAO, AND RAVISHANKAR AVADHANAM,**<br><br>Defendants,<br><br>**IKKURTY CAPITAL, LLC D/B/A ROSE CITY INCOME FUND I, ROSE CITY INCOME FUND II LP, SENECA VENTURES, LLC,**<br><br>Relief Defendants. | Case No.: 22-cv-2465<br><br>Judge Rowland |

## FINAL JUDGMENT

Final judgment is hereby ENTERED in favor of Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") and against Defendants Sam Ikkurty a/k/a Sreenivas I Rao and Jafia LLC (collectively, "Defendants"), on all counts. Judgment of disgorgement is also entered in favor of the CFTC and against Relief Defendants Ikkurty Capital LLC d/b/a Rose City Income Fund I, Rose City Income Fund II LP, and Seneca Ventures, LLC (collectively, "Relief Defendants"). The Court's judgments as to liability, restitution, and disgorgement against Defendants and Relief Defendants were previously entered on the CFTC's summary judgment motion. (ECF No. 369.)

It is hereby ORDERED AND ADJUDGED as follows:

## I.  PERMANENT INJUNCTION

1.     Defendants, along with their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, are permanently enjoined and prohibited from directly or indirectly:

    a.    Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1a(40));

    b.    Entering into any transaction involving "commodity interests" (as that term is defined in CFTC Regulation 1.3, 17 C.F.R. § 1.3) or digital assets, for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

    c.    Having any commodity interests or digital assets traded on any Defendant's behalf;

    d.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets;

    e.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests or digital assets;

    f.    Applying for registration or claiming exemption from registration with the Commission in any capacity;

    g.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9); and

    h.    Engaging in the type of conduct described in the Complaint (ECF No. 1), in violation of 7 U.S.C. §§ 6m(1), 6o(1)(A)-(B), 9(1) and 17 C.F.R. § 180.1(a).

## II.  MONETARY RELIEF

### A.     RESTITUTION

2.     Defendants, as well as any successors thereof, shall make full restitution to every person who has sustained loses proximately caused by Defendants' violations of the Act and Regulations as described in the Complaint, including post-judgment interest, ("Restitution Obligation") jointly and severally in the amount of $83,757,249.

2

3.      To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, Defendants shall pay the Restitution Obligation to the Receiver appointed by the Court in this matter.

4.      Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Order to the Receiver in the name "Rose City Fund Receivership" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to Receiver James L. Kopecky, 120 N LaSalle Street Suite 2000; Chicago, IL 60602 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

5.      The procedure for distribution of the Restitution Obligation by the Receiver shall be separately determined by the Court.

6.      If, upon the termination of the Receivership Estate, Defendants have failed to fulfill their Restitution Obligation, the Court hereby appoints the National Futures Association as Monitor ("Monitor").  The Monitor shall collect restitution payments from Defendants and make distributions as set forth below.  Because the Monitor is acting as an officer of the Court in performing these services, it shall not be liable for any action or inaction arising from its appointment as Monitor, other than actions involving fraud.

7.      The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' pool participants identified by the Receiver or may defer distribution until such time as the Monitor

3

deems appropriate.  In the event that the amount of Restitution Obligation payments to the

Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost

of making a distribution to eligible pool participants is impractical, the Monitor may, in its

discretion, treat such restitution payments as civil monetary penalty payments, which the

Monitor shall forward to the CFTC following the instructions for civil monetary penalty

payments set forth in Part C below.

8.     Defendants shall cooperate with the Monitor as appropriate to provide such

information as the Monitor deems necessary and appropriate to identify Defendants' customers

whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of

any Restitution Obligation payments.  Defendants shall execute any documents necessary to

release funds that they in any repository, bank, investment or other financial institution, wherever

located, in order to make partial or total payment toward the Restitution Obligation.

9.     The Monitor shall provide the Commission at the beginning of each calendar year

with a report detailing the disbursement of funds to Defendants' customers during the previous

year.  The Monitor shall transmit this report under a cover letter that identifies the name and

docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading

Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

10.     The amounts payable to each customer shall not limit the ability of any customer

from proving that a greater amount is owed from any Defendant or any other person or entity,

and nothing herein shall be construed in any way to limit or abridge the rights of any customer

that exist under state or common law.

11.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of

Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this

Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

12.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Receiver (or if the Receivership Estate has been terminated, to the Monitor) for disbursement in accordance with the procedures set forth above.

**B.    DISGORGEMENT**

13.     Defendants and Relief Defendants, as well as any third-party transferee and/or successors thereof, shall disgorge all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described in the Complaint, including post-judgment interest, ("Disgorgement Obligation") jointly and severally in the amount of $36,967,285.

14.     Any amount owed in disgorgement shall be offset by any sums paid by Defendants toward restitution.  Any amount owed in disgorgement by any Defendant or Relief Defendant shall be offset by any sums paid by another Defendant or Relief Defendant with whom they are jointly and severally liable.

**C.    CIVIL MONETARY PENALTY**

15.     Defendants, as well as any successors thereof, shall pay a civil monetary penalty ("CMP Obligation") jointly and severally in the amount of $110,901,855.  The CMP Obligation is immediately due and owing, but only after Defendants' Restitution Obligation and

Disgorgement Obligation have been satisfied should any payments be applied to satisfy any portion of the CMP Obligation.

16.     Any CMP Obligation owed by either Defendant shall be offset by any sums paid towards the CMP Obligation by another Defendant with whom they are jointly and severally liable.

17.     Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order to the Commodity Futures Trading Commission.  If payment is to be made other than by electronic funds transfer, then the payment shall be sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> 9-amz-ar-cftc@faa.gov

18.     If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**D.     CONTEMPT SANCTIONS**

19.     Defendant Sam Ikkurty shall pay a fine equal to the value of the digital assets he transferred out of the Receiver's wallets ("Contempt Obligation"), in the amount of $13,817,000,

or else cause the digital assets to be returned to the Receiver's wallets, as set forth in ECF No. 300.

20.     Additionally, Defendant Sam Ikkurty shall pay an additional fine ("Daily Fine Obligation") in the amount of $254,000 for his non-compliance with the Court's prior order as set forth in ECF No. 300. The Daily Fine Obligation will increase by $1,000 per day after entry of this Final Judgment.

21.     The Contempt Obligation and Daily Fine Obligation are immediately due and owing, but only after Defendants' Restitution Obligation and Disgorgement Obligation have been satisfied should any payments be applied to satisfy any portion of the Contempt Obligation or Daily Fine Obligation.

22.     The Contempt Obligation and Daily Fine Obligation shall be paid to the Receiver in the same manner as described in Part A, above, of this Final Judgment.

**E.     REPAYMENT OF ADVANCED PROFESSIONALS' FEES**

23.     Defendant Sam Ikkurty shall repay the attorneys' fees and other professional fees advanced on his behalf ("Fee Repayment Obligation") consistent with his promise to do so (ECF No. 97) in the amount of $884,788, reflecting the fees that were authorized to be paid from the Receivership Estate on his behalf pursuant to ECF Nos. 95, 153, 181, and 255.

24.     The Fee Repayment Obligation is immediately due and owing, but only after Defendants' Restitution Obligation and Disgorgement Obligation have been satisfied should any payments be applied to satisfy any portion of the Fee Repayment Obligation.

25.     The Fee Repayment Obligation shall be paid to the Receiver in the same manner as described in Part A, above, of this Final Judgment.

### III.  OTHER PROVISIONS

26.     Partial Satisfaction:  Acceptance by the Commission, Receiver, or Monitor of any partial payment of any Defendants' Restitution Obligation, Disgorgement Obligation, CMP Obligation, Contempt Obligation, Daily Fine Obligation, or Fee Repayment Obligation shall not be deemed a waiver of Defendants' obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

27.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

28.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

29.     Any person or entity with control of digital assets that were deposited to Rhino.fi from digital wallet 0x5252cbe75605c3fc67190d693acaab4ceeae8490 and/or digital wallet 0x363e69ddf62af85b93ae3f00bfe7e27696a334f2 shall, to the extent they have the technical ability, transfer those digital assets to the following digital wallet controlled by Receiver James Kopecky:  0x70cf1bbB81bd157EA2f7485F37418cc4A723A969.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this

FINAL JUDGMENT forthwith and without further notice.


Dated: July 22, 2024                    ENTERED:


                                        _____
                                        MARY M. ROWLAND
                                        United States District Judge

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>       Plaintiff,<br><br>v.<br><br>**JAFIA LLC, SAM IKKURTY A/K/A SREENIVAS I RAO, AND RAVISHANKAR AVADHANAM,**<br><br>       Defendants,<br><br>**IKKURTY CAPITAL, LLC D/B/A ROSE CITY INCOME FUND I, ROSE CITY INCOME FUND II LP, SENECA VENTURES, LLC,**<br><br>       Relief Defendants. | Case No.: 22-cv-2465<br><br>Judge Rowland |

## AMENDED FINAL JUDGMENT

Final judgment is hereby ENTERED in favor of Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") and against Defendants Sam Ikkurty a/k/a Sreenivas I Rao and Jafia LLC (collectively, "Defendants"), on all counts. Judgment of disgorgement is also entered in favor of the CFTC and against Relief Defendants Ikkurty Capital LLC d/b/a Rose City Income Fund I, Rose City Income Fund II LP, and Seneca Ventures, LLC (collectively, "Relief Defendants"). The Court's judgments as to liability, restitution, and disgorgement against Defendants and Relief Defendants were previously entered on the CFTC's summary judgment motion. (ECF No. 369.)

It is hereby ORDERED AND ADJUDGED as follows:

# I. PERMANENT INJUNCTION

1. Defendants, along with their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, are permanently enjoined and prohibited from directly or indirectly:

   a. Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1a(40));

   b. Entering into any transaction involving "commodity interests" (as that term is defined in CFTC Regulation 1.3, 17 C.F.R. § 1.3) or digital assets, for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

   c. Having any commodity interests or digital assets traded on any Defendant's behalf;

   d. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets;

   e. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests or digital assets;

   f. Applying for registration or claiming exemption from registration with the Commission in any capacity;

   g. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9); and

   h. Engaging in the type of conduct described in the Complaint (ECF No. 1), in violation of 7 U.S.C. §§ 6m(1), 6o(1)(A)-(B), 9(1) and 17 C.F.R. § 180.1(a).

## II. MONETARY RELIEF

### A.    RESTITUTION

2. Defendants, as well as any successors thereof, shall make full restitution to every person who has sustained loses proximately caused by Defendants' violations of the Act and Regulations as described in the Complaint, including post-judgment interest, ("Restitution Obligation") jointly and severally in the amount of $83,757,249.

2

3.    To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, Defendants shall pay the Restitution Obligation to the Receiver appointed by the Court in this matter.

4.    Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Order to the Receiver in the name "Rose City Fund Receivership" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to Receiver James L. Kopecky, 120 N LaSalle Street Suite 2000; Chicago, IL 60602 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

5.    The procedure for distribution of the Restitution Obligation by the Receiver shall be separately determined by the Court.

6.    If, upon the termination of the Receivership Estate, Defendants have failed to fulfill their Restitution Obligation, the Court hereby appoints the National Futures Association as Monitor ("Monitor").  The Monitor shall collect restitution payments from Defendants and make distributions as set forth below.  Because the Monitor is acting as an officer of the Court in performing these services, it shall not be liable for any action or inaction arising from its appointment as Monitor, other than actions involving fraud.

7.    The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' pool participants identified by the Receiver or may defer distribution until such time as the Monitor

deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible pool participants is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth in Part C below.

8.     Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  Defendants shall execute any documents necessary to release funds that they in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

9.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

10.     The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from any Defendant or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

11.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this

Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

12.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Receiver (or if the Receivership Estate has been terminated, to the Monitor) for disbursement in accordance with the procedures set forth above.

**B.      DISGORGEMENT**

13.     Defendants and Relief Defendants, as well as any third-party transferee and/or successors thereof, shall disgorge all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described in the Complaint, including post-judgment interest, ("Disgorgement Obligation") jointly and severally in the amount of $36,967,285.

14.     Any amount owed in disgorgement shall be offset by any sums paid by Defendants toward restitution.  Any amount owed in disgorgement by any Defendant or Relief Defendant shall be offset by any sums paid by another Defendant or Relief Defendant with whom they are jointly and severally liable.

**C.      CIVIL MONETARY PENALTY**

15.     Defendants, as well as any successors thereof, shall pay a civil monetary penalty ("CMP Obligation") jointly and severally in the amount of $110,901,855.  The CMP Obligation is immediately due and owing, but only after Defendants' Restitution Obligation and

Disgorgement Obligation have been satisfied should any payments be applied to satisfy any portion of the CMP Obligation.

16.    Any CMP Obligation owed by either Defendant shall be offset by any sums paid towards the CMP Obligation by another Defendant with whom they are jointly and severally liable.

17.    Defendants shall pay their CMP Obligation and any post-judgment interest, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order to the Commodity Futures Trading Commission.  If payment is to be made other than by electronic funds transfer, then the payment shall be sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> 6500 S. MacArthur Blvd.
> HQ Room 266
> Oklahoma City, OK 73169
> 9-amz-ar-cftc@faa.gov

18.    If payment by electronic funds transfer is chosen, Defendants shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions.  Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**D.    CONTEMPT SANCTIONS**

Defendant Sam Ikkurty shall pay a fine equal to the value of the digital assets he transferred out of the Receiver's wallets ("Contempt Obligation"), in the amount of $6,908,500, as set forth in ECF Nos. 300 and 402.

19.    Additionally, Defendant Sam Ikkurty shall pay an additional fine ("Daily Fine Obligation") in the amount of $295,000 for his non-compliance between November 7, 2023 and August 27, 2024 with the Court's prior order as set forth in ECF No. 300.

20.    The Contempt Obligation and Daily Fine Obligation are immediately due and owing, but only after Defendants' Restitution Obligation and Disgorgement Obligation have been satisfied should any payments be applied to satisfy any portion of the Contempt Obligation or Daily Fine Obligation.

21.    The Contempt Obligation and Daily Fine Obligation shall be paid to the Receiver in the same manner as described in Part A, above, of this Amended Final Judgment.

### E.    REPAYMENT OF ADVANCED PROFESSIONALS' FEES

22.    Defendant Sam Ikkurty shall repay the attorneys' fees and other professional fees advanced on his behalf ("Fee Repayment Obligation") consistent with his promise to do so (ECF No. 97) in the amount of $884,788, reflecting the fees that were authorized to be paid from the Receivership Estate on his behalf pursuant to ECF Nos. 95, 153, 181, and 255.

23.    The Fee Repayment Obligation is immediately due and owing, but only after Defendants' Restitution Obligation and Disgorgement Obligation have been satisfied should any payments be applied to satisfy any portion of the Fee Repayment Obligation.

24.    The Fee Repayment Obligation shall be paid to the Receiver in the same manner as described in Part A, above, of this Amended Final Judgment.

### III.  OTHER PROVISIONS

25.    Partial Satisfaction:  Acceptance by the Commission, Receiver, or Monitor of any partial payment of any Defendants' Restitution Obligation, Disgorgement Obligation, CMP Obligation, Contempt Obligation, Daily Fine Obligation, or Fee Repayment Obligation shall not be deemed a waiver of Defendants' obligation to make further payments pursuant to this Order,

or a waiver of the Commission's right to seek to compel payment of any remaining balance.

26.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

27.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this

AMENDED FINAL JUDGMENT forthwith and without further notice.


Dated: October 16, 2024          ENTERED:

_____
MARY M. ROWLAND
United States District Judge