No. 24-2684

# In The United States Court of Appeals For the Seventh Circuit

_____

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee*,

v.

SAM IKKURTY A/K/A SREENIVAS I RAO and JAFIA LLC

*Defendants-Appellants*.

_____

On Appeal from the United States District Court for the
Northern District of Illinois, No. 1:22-cv-02465 (Hon. Mary M. Rowland)

_____

BRIEF OF APPELLEE
COMMODITY FUTURES TRADING COMMISSION

_____

Robert A. Schwartz,
  *General Counsel*
Anne W. Stukes,
  *Deputy General Counsel*
Brigitte Weyls,
  *Senior Assistant General Counsel*
Commodity Futures Trading
Commission
77 West Jackson Blvd., Suite 800
Chicago, IL 60604
Email: bweyls@cftc.gov
Telephone: (312) 596-0547

# TABLE OF CONTENTS

GLOSSARY ............................................................................................... x

PRELIMINARY STATEMENT .................................................................. 1

JURISDICTIONAL STATEMENT ............................................................ 3

STATEMENT OF THE ISSUES ................................................................ 3

STATEMENT OF THE CASE .................................................................... 3

    I.   Legal Background ............................................................................ 3

        A.   The CFTC's Complaint ..................................................... 3

            1.   Count III ................................................................. 4

            2.   Count I and II ........................................................ 5

        B.   Relevant statutory definitions ........................................ 5

        C.   Factual background .......................................................... 7

            1.   Formation of the investment vehicles ................ 7

                a.   RCIF I and RCIF II .................................... 7

                b.   Crypto savings note (CSN) and carbon offset bond (COB)...... 10

            2.   Ikkurty and Jafia's material misrepresentations and omissions ... 11

                a.   False claims of Ikkurty's expertise trading digital asset commodities................ 11

                b.   Fabricated performance data for RCIF I ................ 11

                c.   Misrepresentation of commodity interest investment strategies ................ 12

                d.   Misrepresentation of distribution of profits............................. 13

            3.   Misappropriation of participant funds to pay earlier participants ................ 13

   II.  Relevant Procedural History ...................................................... 14

        A.   Motions for summary judgment ..................................... 14

        B.   District court's summary judgment ruling on appeal ............................. 15

            1.   Ruling on count III................................................. 15

            2.   Rulings on counts I and II ..................................... 18

            3.   Final judgment ...................................................... 20

SUMMARY OF THE ARGUMENT ........................................................ 20

STANDARD OF REVIEW ....................................................................... 23

ARGUMENT ............................................................................................. 23

I.  Ikkurty and Jafia Violated 7 U.S.C. § 9(1) and Regulation 180.1(a) Because Their Fraudulent Scheme Was "In Connection With" the Sale of a Commodity ........................................................................................ 23

    A.  Ikkurty and Jafia waived their argument concerning the definition of "commodity" by not raising it in the district court ................................... 24

    B.  Ikkurty and Jafia's fraudulent scheme was undeniably "in connection with" the sale of a commodity ................................................... 27

        1.  Ikkurty and Jafia promised participants they would use their funds to trade bitcoin, ether, and commodity interests ................. 29

        2.  Ikkurty and Jafia used participant funds to purchase ether .......... 30

        3.  Ikkurty and Jafia misappropriated participant funds ................... 31

II.  Ikkurty and Jafia Committed Fraud as Unregistered Commodity Pool Operators in Violation of the CEA Registration and Anti-Fraud Provisions ........................................................................................ 32

    A.  Ikkurty and Jafia operated as unregistered commodity pool operators in violation of 7 U.S.C. § 6m(1) ................................................... 32

        1.  *Wilkinson II* controls this appeal ..................................... 35

        2.  Application of *Wilkinson II* to this case ........................... 36

        3.  Ikkurty and Jafia's attempts to distinguish *Wilkinson II* fail ........ 38

        4.  There is no pro rata distribution requirement ................................ 39

        5.  Ikkurty and Jafia's other arguments are unsupported................... 41

    B.  Ikkurty and Jafia committed fraud as CPOs........................................... 43

III.  This Court Does Not Need to Reach the Issue of Whether the Definition of "Commodity" Encompasses OHM, Klima, and wrapped bitcoin to Affirm the District Court's Ruling ..................................................................... 44

    A.  The District Court's interpretation of "commodity" is correct ................ 46

        1.  The CEA's broad definition of "commodity" and remedial purposes........................................................................... 46

        2.  The plain meaning of the statutory text supports the court's interpretation of the definition of "commodity" ................................ 47

    B.  Federal case law correctly interprets the definition of "commodity"...... 49

    C.  Application of federal case law to OHM, Klima, and wrapped bitcoin... 52

CONCLUSION................................................................................ 53

## TABLE OF AUTHORITIES

Cases

*Bielski v. Coinbase, Inc.*,
  87 F.4th 1003 (9th Cir. 2023) ................................................. 51

*Bland v. Fiatallis N. Am., Inc.*,
  401 F.3d 779 (7th Cir. 2005).................................................. 43

*Bost v. Illinois State Board of Elections*,
  114 F.4th 634 (7th Cir. 2024) ................................................ 8

*Boyers v. Texaco Refining & Marketing, Inc.*,
  848 F.2d 809 (7th Cir. 1988)................................................. 26

*Broaddus v. Shields*,
  665 F.3d 846 (7th Cir. 2011)................................................. 24

*CFTC v. Allied Markets LLC*,
  371 F. Supp. 3d 1035 (M.D. Fla. 2019) ................................ 17

*CFTC v. Amerman*,
  645 F. App'x 938 (11th Cir. 2016........................................... 40

*CFTC v. Brockbank*, Civil No. 2:00-CV-622TS,
  2006 WL 223835 (D. Utah Jan. 20, 2006)............................. 41

*CFTC v. Driver*,
  877 F. Supp. 2d 968 (C.D. Cal. 2012),
  *aff'd sub nom. CFTC v. Driver*, 585 F. App'x. 366 (9th Cir. 2014)............. 16, 33, 44

*CFTC v. Ehrlich*, No. 23-CV-08962 (LAK),
  2024 WL 4008205 (S.D.N.Y. Aug. 29, 2024) ......................... 41

*CFTC v. Emini Experts, LLC*, No. 614CV1766,
  2016 WL 7666148 (M.D. Fla. Mar. 29, 2016)......................... 44

*CFTC v. Emini Experts, LLC*, No. 614CV1766,
  2016 WL 3098199 (M.D. Fla. June 3, 2016) .......................... 44

*CFTC v. Equity Financial Group LLC*,
  572 F.3d 150 (3d Cir. 2009) ............................... 19, 33, 40, 41, 42

*CFTC v. Global Precious Metals Trading Co.*, No. 1:13-cv-21709,
  2013 WL 5212237 (S.D. Fla. Sept. 12, 2023) ......................................... 31

*CFTC v. Hunter Wise Commodities, LLC*,
  21 F. Supp. 3d 1317 (S.D. Fla. 2014) ................................................... 27

*CFTC v. JBW Capital, LLC*,
  812 F.3d 98 (1st Cir. 2016) ................................................................. 28

*CFTC v. Kraft Foods Grp. Inc.*,
  153 F. Supp. 3d 996 (N.D. Ill. 2015) .................................................... 44

*CFTC v. Kratville*,
  796 F.3d 873 (8th Cir. 2015) ............................................................... 17

*CFTC v. Laino Grp. Ltd.*, No. 4:20-CV-03317,
  2021 WL 4059385 (S.D. Tex. June 30, 2021) .................................... 29, 47

*CFTC v. McAfee*, No. 21-cv-1919 (JGK),
  2022 WL 3969757 (S.D.N.Y. July 14, 2022) .......................................... 53

*CFTC v. Magee*, Civil Action No. 2:16-cv-00186-LA,
  2016 WL 5231834 (E.D. WI. June 15, 2016) .......................................... 44

*CFTC v. M25 Investments, Inc.*, No. 3-09-CV-1831-M,
  2010 WL 4269124 (N.D. Tex. Oct. 25, 2010) ........................................ 39

*CFTC v. McDonnell*,
  332 F. Supp. 3d 641 (E.D. N.Y. 2018) ......................................... 17, 27, 31

*CFTC v. McDonnell*,
  287 F. Supp. 3d 213 (E.D. N.Y. 2018) ........................................ 29, 47, 51

*CFTC v. Monex Credit Co.*,
  931 F.3d 966 (9th Cir. 2019) ............................................................... 28

*CFTC v. My Big Coin Pay, Inc.*,
  334 F. Supp. 3d 492 (D. Mass. 2018) ........................... 15, 16, 49, 50, 51

*CFTC v. Perkins*,
  385 F. App'x 251 (3d Cir. 2010) .......................................................... 41

*CFTC v. R.J. Fitzgerald & Co.*,
  310 F.3d 1321 (11th Cir. 2002) ...................................................... 18, 46

*CFTC v. Reynolds*, No. 1:19-05631-MKV,
2021 WL 796683 (S.D.N.Y. Mar. 2, 2021) ................................................ 29

*CFTC v. Southern Trust Metals, Inc.*,
894 F.3d 1313 (11th Cir. 2018) ................................................................ 23

*CFTC v. Spence*, No. 21-699,
2022 WL 18461447 (S.D.N.Y. Nov. 29, 2022) ........................................ 31

*CFTC v. Vartuli*,
228 F.3d 94 (2d Cir. 2000) ....................................................................... 28

*CFTC v. Weinberg*,
287 F. Supp. 2d 1100 (C.D. Cal. 2003) ............................................. 41, 42

*CFTC v. Wilkinson*, No. 16-cv-6738,
2016 WL 8256406 (N.D. Ill. Nov. 22, 2016) ..................................... 41, 42

*Circuit City Stores v. Adams*,
532 U.S. 105 (2001) .................................................................................. 49

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023) .................................................................................... 8

*Commodity Trend Service, Inc. v. CFTC*,
233 F.3d 981 (7th Cir. 2000) .................................................................... 44

*Connecticut National Bank v. Germain*,
503 U.S. 249 (1992) .................................................................................. 47

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018) .................................................................................. 40

*Driveline Sys., LLC v. Arctic Cat, Inc.*,
936 F.3d 576 (7th Cir. 2019) .................................................................... 23

*Food Marketing Institute v. Argus Leader Media*,
588 U.S. 427 (2019) ............................................................................ 47, 48

*Grayscale Investments, LLC v. SEC*,
82 F.4th 1239 (D.C. Cir. 2023) .................................................................. 8

*Grippo v. Perazzo*,
357 F.3d 1218 (11th Cir. 2004) ..................................................... 28, 31, 32

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ......................................................................... 47

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ......................................................................... 28

*Hirk v. Agri-Research Council, Inc.*,
  561 F.2d 96 (7th Cir. 1977) ............................................................. 29

*Hull v. Stoughton Trailers*,
  445 F.3d 949 (7th Cir. 2006) ........................................................... 45

*In re J.P. Jeanneret Assocs., Inc.*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011) ............................................... 28

*In re Southwest Airlines Voucher Litigation*,
  799 F.3d 701 (7th Cir. 2015) ........................................................... 23

*In re Witkowski*,
  16 F.3d 739 (7th Cir. 1994) ............................................................. 48

*In the Matter of Tether Holdings Limited, et al.*,
  CFTC Docket No. 22-04 (Oct. 15, 2021) ......................................... 53

*Investment Co. Institute v. CFTC*,
  891 F. Supp. 2d 162 (D.D.C. 2012) ................................................. 33

*Jimenez v. Quarterman*,
  555 U.S. 113 (2009) ......................................................................... 47

*Jenkins v. Heintz*,
  25 F.3d 536 (7th Cir. 1994),
  *aff'd*, 514 U.S. 291 (1995) ............................................................... 48

*Lawson v. Sun Microsystems, Inc.*,
  791 F.3d 754 (7th Cir. 2015) ........................................................... 43

*Loeb Industries, Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ..................................................... 12, 34

*Lopez v. Dean Witter Reynolds, Inc.*,
  805 F.2d 880 (9th Cir. 1986) .................................................... 39, 40

*Monieson v. CFTC*,
   996 F.2d 852 (7th Cir. 1993) ........................................................... 47

*National Association of Manufacturers v. DOD*,
   583 U.S. 109 (2018) ........................................................................ 47

*Pond v. Michelin North America, Inc.*,
   183 F. 3d 592 (7th Cir. 1999) ..................................................... 23, 25

*Risley v. Universal Navigation Inc.*,
   690 F. Supp. 3d 195 (S.D.N.Y. 2023) ........................................ 26, 52

*Ross v. Financial Asset Management System, Inc.*,
   74 F.4th 429 (7th Cir. 2023) ......................................................... 23

*R&W Technical Servs. Ltd. V. CFTC*,
   205 F.3d 165 (5th Cir. 2000) ...................................................... 28, 29

*Schneider National Leasing, Inc. v. United States*,
   11 F.4th 548 (7th Cir. 2021) ......................................................... 48

*SEC v. Lauer*,
   52 F.3d 667 (7th Cir. 1995) .......................................................... 30

*SEC v. Terraform Labs Pte. Ltd.*,
   708 F. Supp. 3d 450 (S.D. N.Y. 2023) ........................................ 52

*SEC v. Zandford*,
   535 U.S. 813 (2002) ........................................................................ 28

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ........................................................................ 26

*United States v. Berkos*,
   543 F.3d 392 (7th Cir. 2008) ......................................................... 48

*United States v. Brooks*,
   681 F.3d 678 (5th Cir. 2012) ......................................................... 52

*United States v. Foy*,
   50 F.4th 616 (7th Cir. 2022) ......................................................... 46

*United States v. Futch*,
   278 F. App'x 387 (5th Cir. 2008) ................................................. 52

*United States v. Patel*,
  778 F.3d 607 (7th Cir. 2015).................................................................. 48

*United States v. Wilkinson*,
  986 F.3d 740 (7th Cir. 2021)......................19, 32, 35, 36, 37, 38, 39, 43

*Williams v. Binance*,
  96 F.4th 129 (2d Cir. 2024)................................................................. 53

*Wolf v. Larson*,
  897 F.2d 1409, 7th Cir. 1990) ............................................................ 25

U.S. Code

Title 7
  Section 1a(9), CEA § 1a(9) ........................................ 5, 27, 46, 48, 50, 53
  Section 1a(10), CEA § 1a(10) ......................................... 6, 18, 34, 39, 40
  Section 1a(10)(A), CEA § 1a(10)(A) ............................................................ 6
  Section 1a(11), CEA § 1a(11) ...................................................... 5, 6, 19, 40
  Section 1a(11)(A), CEA § 1a(11)(A) ................................................... 6, 36
  Section 1a(11)(A)(1) ............................................................................... 40
  Section 5(b), CEA § 3(b) ........................................................................ 47
  Section 6b, CEA § 4b................................................................. 28, 29, 44
  Section 6b(a), CEA § 4b(a) .................................................................. 28
  Section 6m, CEA § 4m .............................................................................. 7
  Section 6m(1), CEA § 4m(1) ....................................................... passim
  Section 6o(1), CEA § 4o(1) .............................................................. 3, 44
  Section 6o(1)(A), CEA § 4o(1)(A) ................................. 4, 5, 20, 43, 44
  Section 6o(1)(B), CEA § 4o(1)(B) ................................. 4, 5, 20, 43, 44
  Section 9(1), CEA § 6(c)(1) ........................................................ passim
  Section 21(m), CEA § 17(m) ................................................................. 7

Title 18
  Section 2703 .......................................................................................... 48

Other Authorities

17 C.F.R. § 1.3, Regulation 1.3 ..........................................................5, 6

17 C.F.R. § 4.13, Regulation 4.13 .......................................................... 6

17 C.F.R. § 4.13(a), Regulation 4.13(a) .......................................... 7, 33

17 C.F.R. § 4.13(b), Regulation 4.13(b) ........................................................... 7

17 C.F.R. § 4.24, Regulation 4.24 ................................................................. 10

17 C.F.R. § 180.1(a), Regulation 180.1(a) ............................................... passim

Revisions of Commodity Pool Operator and Commodity Trading Advisor
Regulations, Delegation of Authority, 46 FR 26,004-01, 1981 WL 119592
(May 8, 1981) ............................................................................................. 6

Fed. R. Civ. P. 12(b)(1) ........................................................................... 14, 15

Fed. R. Civ. P 12(b)(6) ................................................................................. 15

Fed. R. Civ. P 12(c) ..................................................................................... 14

Fed. R. Crim. P. 41 ...................................................................................... 48

Synthetix, at https://synthetix.io/ (last visited Dec. 4, 2024) ...................... 8

## GLOSSARY

**Act or CEA** – Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

**BCT** – Base Carbon Tonne

**BTC** – Bitcoin

**CFTC or Commission** – Commodity Futures Trading Commission

**COB** – Carbon Offset Bond

**CPO** – Commodity Pool Operator

**CSN** – Crypto Savings Note

**ETHER** – Ethereum

**NFA** – National Futures Association

**RCIF I** – Rose City Income Fund I

**RCIF II** – Rose City Income Fund II, LP

**WBTC** – Wrapped Bitcoin

## PRELIMINARY STATEMENT

Appellants, Sam Ikkurty ("Ikkurty"), and his wholly owned company, Jafia LLC ("Jafia") (together "Appellants"), concede on appeal that they ran a Ponzi scheme and defrauded customers. Their sole argument for reversal is that they cannot be liable under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA" or "Act"), because they did not actually invest in commodities with the money they stole. Appellants are wrong. It is not true, as they claim, that "[t]his appeal turns on whether certain digital assets [OHM, Klima, and wrapped bitcoin] are regulated 'commodities.'" Instead, Appellants' liability hinges on whether they did any one of these three things: (i) represented that they would invest customers' money in digital asset commodities, including bitcoin and Ethereum ("ether"); (ii) purchased ether; and/or (iii) solicited participants to invest in commodity interests (i.e., futures, options, and swaps). It is undisputed that Appellants did all three of these things. It is also undisputed that bitcoin and ether are commodities within the meaning of the CEA, without reaching the status of other digital assets. For these reasons, this Court should affirm the judgment below.

Between January 2021 and May 2022 ("Relevant Period"), Appellants engaged in a fraudulent scheme in which they solicited, accepted, and pooled over $40 million dollars from at least 170 customers to participate in three investment vehicles: a "crypto hedge fund" named Rose City Income Fund II, LP ("RCIF II"), and two other "moderate return, low risk" investments, which they called a Crypto Savings Note ("CSN") and Carbon Offset Bond ("COB") (collectively, the "Notes").

Appellants executed their scheme by fabricating Ikkurty's alleged financial success from trading bitcoin; falsely claiming that his company's operation of another on-going crypto hedge fund named Rose City Income Fund I ("RCIF I") was yielding exorbitant returns; and misrepresenting that they would invest customers' money in bitcoin and ether, and commodity interests.

Instead of investing customer money as promised, Appellants used it (primarily) to pay off previous participants in their other fund, RCIF I. They also purchased "a small amount" of ether and wrapped bitcoin and put the majority of the remaining funds into two volatile digital asset commodities called OHM and Klima, including funds from investors in the Notes who were promised a "low risk" investment.

Appellants also committed registration violations under the CEA. They solicited customers for RCIF II and the CSN to trade "commodity interests" as that term is defined in the CEA. Under the CEA, anyone who solicits pooled investments in commodity interests must either register as a commodity pool operator ("CPO") with the Commodity Futures Trading Commission ("CFTC" or "Commission") or file for an exemption from registration. Appellants represented to RCIF II customers that they would file for an exemption from registration requirements as a CPO to engage in transactions involving "commodity interests" but failed to do so. By neither registering as a CPO nor obtaining an exemption, Appellants violated statutory and regulatory requirements.

The factual record in the district court is not in dispute and confirms the allegations in the CFTC's complaint. Appellants now seek to reverse the district

court's judgment, but their opening brief shows no error of law. The district court's grant of summary judgment to the CFTC should therefore be affirmed.[1]

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is both complete and correct.

## STATEMENT OF THE ISSUES

This is an appeal in a federal agency civil enforcement action. Appellants, Ikkurty and Jafia, appeal the district court's grant of summary judgment for the CFTC and against Appellants on all counts. Br. at 2. The issues on appeal are:

1.   Whether Appellants' fraudulent scheme was "in connection with" the sale of a commodity within the meaning of section 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2024), thereunder.

2.   Whether Appellants fell within the statutory definition of a commodity pool operator and were therefore subject to the registration and anti-fraud provisions of Sections 4m(1) and 4*o*(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6(m)(1), 6*o*(1), that apply to CPOs.

## STATEMENT OF THE CASE

### I.   Legal Background

### A.  The CFTC's complaint

On May 10, 2022, the CFTC filed a three-count complaint against the Appellants in the United States District Court for the Northern District of Illinois. The CFTC

---

[1] Citations to "A" and "SA" are to Appellants' appendix and short appendix, respectively. Citations to "Br." are to Appellants' opening brief. Citations to "CSA" are to the CFTC's supplemental appendix. Citations to "Dkt." are to the district court record below.

sought restitution, disgorgement, civil monetary penalties, and permanent injunctive relief for violations of 7 U.S.C. § 9(1) and its implementing regulation, 17 C.F.R. § 180.1(a), as well as 7 U.S.C. §§ 6m(1) and 6*o*(1)(A)-(B) during the Relevant Period. A43-45. The CFTC addresses these counts in the same order as the district court: count III, count I, and count II.

### 1. Count III

Count III alleged that Appellants committed fraud in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.l(a), which collectively prohibit, among other things, the use of "any manipulative or deceptive device or contrivance" in connection with "a contract of sale of any commodity in interstate commerce." 7 U.S.C. § 9(1). A56-58. The statute's implementing regulation prohibits using a "manipulative device," making an "untrue or misleading statement of material fact," or engaging in a fraudulent act in connection with any "contract of sale of any commodity in interstate commerce." 17 C.F.R. § 180.1(a). *Id.*

The complaint alleged that Appellants violated these provisions by misrepresenting and omitting material facts to RCIF II participants about the operation of RCIF II—including Ikkurty's background, RCIF I's historical performance, investment methodology, and distribution of profits—and misappropriating participant funds for Appellants' personal benefit in the manner of a Ponzi scheme. A55-56.

4

### 2. Counts I and II

Count I alleged that Appellants violated 7 U.S.C. § 6m(1), which makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO. The complaint alleged that Appellants acted as CPOs, as defined by 7 U.S.C. § 1a(11) and 17 C.F.R. § 1.3, by soliciting, accepting or receiving funds from others for the purpose of trading in commodity interests without registration with the CFTC. A54-55.

Count II alleged that Appellants committed fraud in violation of 7 U.S.C. § 6*o*(1)(A)-(B), which makes it unlawful for any CPO to (a) "employ any device, scheme, or artifice to defraud any client or participant or prospective" customer; or (b) "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any" customer or prospective customer. A55-56. The complaint alleged that Appellants violated these provisions based on the same material misrepresentations, omissions, and misappropriation alleged in count III. *Id.*

### B. Relevant statutory definitions

The CEA defines a commodity to include a list of various enumerated items "and all other goods and articles," except onions and box office receipts "and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9); CSA1. "Commodity interests" include contracts for the purchase or sale of a commodity for future delivery (or an option on such a contract), securities futures, swaps, commodity options, foreign currency, and

leveraged transactions. *See* 7 U.S.C. § 1a(11)(A); 17 C.F.R. § 1.3; CSA1. A "put option" is a type of commodity interest. *Id.*

The CEA defines a CPO as "any person engaged in a business that is of the nature of a commodity pool, investment trust . . . or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds . . . either directly or through capital contributions . . . for the purpose of trading in *commodity interests* . . . or who is registered with the Commission as a commodity pool operator." 7 U.S.C. § 1a(11) (emphasis added); CSA1. Similarly, a commodity pool is defined as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." 7 U.S.C. § 1a(10)(A); CSA1.

Importantly, the trading of commodity interests does not need to be the sole or primary purpose of an entity for it to qualify as a "commodity pool." *See* Revisions of Commodity Pool Operator and Commodity Trading Advisor Regulations; Delegation of Authority, 46 FR 26,004-01, 1981 WL 119592 (May 8, 1981). The CFTC has consistently rejected any requirement for a specific percentage of trading activity in commodity interests for an entity to be deemed a pool. *Id.* at 26,005. In other words, while a CPO may be exempt from *registration*, there is no *de minimis* exception from the definition of a commodity pool or CPO. Soliciting for trading in commodity interests—even as a limited purpose—suffices to bring an entity under the CEA's definition of a CPO. *See* 17 C.F.R. § 4.13; 7 U.S.C. § 1a(10); CSA1. An operator of a commodity pool must register with the CFTC or, if it qualifies, file for an exemption

6

with the National Futures Association ("NFA").[2] 7 U.S.C. § 6m; 17 C.F.R. § 4.13(a)-(b).

## C. Factual Background

The following facts are admitted or uncontested, as reflected in the Appellants' appendix containing their responses to the CFTC's statement of material facts in support of its motion for summary judgment and the Declaration of Appellant Ikkurty. A425; A265.

### 1. Formation of the investment vehicles

#### a. RCIF I and RCIF II

Appellants launched RCIF I in 2017 as a "crypto hedge fund." A426 ¶2. Appellants launched RCIF II in 2021 as a second "crypto hedge fund," presenting it as an opportunity to achieve similar returns as RCIF I through investments in bitcoin, ether, stable proof-of-stake tokens,[3] and commodity interests such as futures, options, and swaps. *Id.*; A431-32 ¶¶11-12; A434 ¶16; CSA16-28. During the Relevant Period, both Funds were actively operating; however, all fraudulent solicitations discussed below—including through regular webinars, trade show presentations, email, social media, the website, www.rosecityfund.com, and RCIF II's offering documents—were directed toward attracting participants to invest in RCIF II. A434-35 ¶¶16-19.

---

[2] The NFA is the self-regulatory organization for the futures industry, registered under 7 U.S.C. § 21 of the CEA. Most commodity professionals and firms conducting business with the public are required to obtain membership with the NFA. *See* 7 U.S.C. § 21(m).

[3] A proof-of-stake token is a cryptocurrency investors pledge to a blockchain to earn rewards through staking, while benefiting from its price stability for lower risk and predictable returns. *See generally* CSA38 at p. 262-64 (explaining how staking works).

In their written solicitation materials, Appellants claimed that RCIF II would generate consistent profits and pay a dividend of 15% by investing in bitcoin, ether, other digital assets, and commodity interests. A435-36 ¶¶21-23; CSA23; CSA28-30. Specifically, Appellants used marketing presentations that promised 65% of RCIF II contributions would be invested in "stable" proof-of-stake tokens; 15% in bitcoin to produce growth; 15% in "the next Bitcoin," including ether; and 5% in cash. A435-36 ¶22; CSA30. These same presentations listed Coinbase (a spot crypto exchange)[4] and Synthetix (a derivatives liquidity pool protocol providing the backbone for derivatives trading)[5] as RCIF II's brokerages. CSA30.

Appellants highlighted RCIF I's supposed ongoing track record, claiming it had achieved over 1,081% growth by Q3 2020 and 2,708% by late 2021. A440-42 ¶¶35-39; CSA16. These figures were entirely fabricated. *Id.* RCIF I suffered massive losses, including a -53% return in December 2021 and a -96.8% return in January 2022. A442 ¶41. Appellants concealed these losses from participants in RCIF I and prospective participants in RCIF II. A442 ¶42.

Appellants also used RCIF II's offering documents to solicit participants. RCIF II participants were required to sign a Subscription Agreement and Valuation Policy

---

[4] A spot market exchange involves the immediate sale and delivery of commodities whereas a derivatives exchange trades standardized contracts based on underlying assets, with settlement occurring at a specified future date. *See generally, Grayscale Invs., LLC v. SEC,* 82 F.4th 1239, 1243 (D.C. Cir. 2023) (distinguishing spot markets from futures markets).
[5] "Coinbase operates an online platform on which users can buy and sell cryptocurrencies . . . ." *Coinbase, Inc. v. Bielski,* 599 U.S. 736, 738 (2023). Synthetix's website states that it provides liquidity for permissionless derivatives like perpetual futures and options. *See* https://synthetix.io/ (last visited Dec. 4, 2024). This Court can take judicial notice of internet sources as long as it is "not subject to reasonable dispute." *Bost v. Ill. State Bd. Of Elections,* 114 F.4th 634, 642 n.2 (7th Cir. 2024).

("SAV"), in which they agreed to be bound by a limited partnership agreement ("LPA"). A267 ¶¶10-11; A429 ¶6; A431 ¶10. By signing the SAV, participants confirmed receipt of a Private Placement Memorandum ("PPM"). A117 ¶7; A267 ¶11.

The LPA granted Jafia "sole discretion of making investments on behalf of" RCIF II (A118 ¶14) and stated that the purpose of the fund was to "invest, hold and trade . . . cryptocurrencies." A311 § 1.03. The LPA explicitly authorized Jafia to trade commodities, as well as commodity interests, including "put and call options . . . commodity futures . . . [and] swap contracts . . . ." A313 § 3.02; A431-32 ¶11. Under the LPA, the partnership would serve as a fund to invest the assets of its partners in various digital assets "and other financial instruments of any name and nature which exist now or are hereafter created and rights and options relating thereto." A311 § 1.03.

The second page of the PPM said that Jafia would file a claim of exemption from registration as a CPO with the CFTC. A455-56 ¶77. The PPM further stated that Jafia may use leverage, including "through the use of derivatives" and that the fund "will utilize commodity interests," in such a way as to ensure that it could remain eligible for exemption from the registration requirement, as follows:

> AT ALL TIMES THE FUND WILL UTILIZE COMMODITY INTERESTS SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

A216; A432 ¶12. The PPM stated that because Jafia was a CPO exempt from registration, it would not provide investors with the same disclosures as a "registered CPO." A216; A455-56 ¶77. The PPM further provided: "The Fund's investment in derivatives and other commodity interests will be limited such that the General Partner will remain exempt from registering as a commodity pool operator." A222 ¶3. However, Appellants never filed for an exemption from registration as a CPO. A445-46 ¶77.

Finally, the PPM contained multiple risk disclosures that were unique to commodity interests entitled: *Digital Currency Derivatives Markets* (A235), *Derivatives* (A239), *Futures and Swaps* (A240), and *Options* (*Id.*).[6]

### b. Crypto savings note (CSN) and carbon offset bond (COB)

Appellants also offered two additional products—the CSN and COB. A450 ¶62; CSA28-31. In PowerPoints used to solicit participants in the Notes, Appellants described the CSN as an alternative to RCIF II with 80% of funds invested in "stable proof-of-stake tokens"; "12% held as cash reserves"; and 8% in "put options" to ensure the funds were "100% protected from any downside. A451-52 ¶¶64-66; CSA28. The CSN obligated Jafia to pay an 18% annual return. A450-51 ¶¶62-63; CSA31.

Similarly, the COB was presented to potential investors as a secure investment backed by the base carbon tonne ("BCT") digital asset, allegedly traceable to a

---

[6] *Cf.* 17 C.F.R. § 4.24 (containing list of required disclosures to be provided in a CPO's participant offering documents, including specific descriptive language indicating that the pool "may" trade certain CFTC regulated derivatives).

specific digital wallet address. A452 ¶¶67-68. Appellants assured investors in written solicitation materials that their investment would be "100% protected" against any losses. A451-52 ¶66. The COB also obligated Jafia to pay an 18% return. A450-51 ¶¶62-63. During the Relevant Period, Appellants accepted over $40 million dollars from participants to invest in RCIF II and the Notes. A445 ¶49. These funds were pooled into an RCIF II bank account. *Id.*

### 2. Ikkurty and Jafia's material misrepresentations and omissions

Appellants accept that the undisputed material facts establish that they made material misrepresentations and omissions and misappropriated participant funds with scienter. A433-455 ¶¶15-18, 21-48, 59, 71-74; *see* Br. at 2. The CFTC highlights certain facts that are most relevant to Appellants' argument that their fraudulent scheme did not involve the sale of a commodity or commodity interests.

#### a. False claims of Ikkurty's expertise trading digital asset commodities

In their written solicitation materials, Ikkurty falsely claimed that his own successful bitcoin trading allowed him to retire early. A444 ¶47. Ikkurty, however, never made a profit trading bitcoin; he purchased a handful of bitcoin, which he lost when his account was hacked. A427-28 ¶¶3-5; A444 ¶47. Ikkurty also did not retire; he continued to work after he made his last personal bitcoin trade. A445 ¶48.

#### b. Fabricated performance data for RCIF I

Appellants used fabricated returns for RCIF I to attract participants for RCIF II and the Notes. One PowerPoint falsely claimed RCIF I had achieved 1,081% growth through the third quarter of 2020. A440 ¶35; CSA6, CSA16. In another marketing

solicitation, Appellants claimed an investment of $100 in RCIF I grew to $2,808 by the fourth quarter of 2021. A440-41 ¶¶37-38.

Appellants also concealed RCIF I's massive losses in December 2021 and January 2022. A442 ¶¶41-42. In December 2021, RCIF I returned -53%. *Id.* The following month, its return was -96%. *Id.* Even after these losses, Appellants continued to use the same marketing materials that claimed RCIF I had returned more than 2,708%. A441 ¶39. Ikkurty admitted the returns in those materials did not represent RCIF I's actual returns. A442 ¶42.

### c. Misrepresentation of commodity interest investment strategies

During the Relevant Period, Appellants also assured participants that investments would be made according to specific strategies. For RCIF II, they promised to allocate 65% of funds to stable proof-of-stake tokens, 15% to bitcoin, and 15% to other digital assets, including ether. A435-36 ¶¶22, 25; CSA30. In fact, 90% of participant contributions were invested in OHM—an unstable digital asset commodity that lost 95% of its value in three months—and the majority of the remainder in digital asset commodities, including ether and wrapped bitcoin. A443 ¶45.

For the CSN, Appellants promised "zero" volatility with a guaranteed return of 18% by investing 80% of funds into "stable proof-of-stake tokens" hedged from downside risk using "put option"[7] protection. A451; A453 ¶¶64-65, 69; CSA28-31.

---

[7] A put option is a right to sell an asset at a certain price, thereby protecting the owner against a decline in the price. *See, e.g, Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 491 (7th Cir. 2002).

However, 90% of CSN funds were concentrated in volatile digital asset commodities such as OHM and Klima, which did not match the promised allocations, with the remainder invested in ether. A443 ¶45; A451 ¶64. Similarly, no put options were ever purchased to hedge risk for CSN participants. *Id.* COB investments were also not fully backed by BCT or traceable to specific wallet addresses as claimed. A452 ¶¶67-68.

### d. Misrepresentation of distribution of profits

Appellants also promised RCIF II participants a 15% annual return as dividends from RCIF II's "net profits." A450 ¶¶59-60. Instead, Appellants paid the 15% using participants' own contributions, without ever returning "net profits." *Id.*

### 3. Misappropriation of participant funds to pay earlier participants

Appellants used new participants' money from RCIF II and the Notes to pay off earlier participants in RCIF I and RCIF II. A453-54 ¶¶70-71. In December 2021 and January 2022, Appellants offered to buy out RCIF I participants at their November 2021 investment value. *Id.* Appellants paid participants in cash or COB funds in an amount that was equal to the value of their RCIF I investment value in November 2021. A454 ¶72. In total, Appellants paid $29,075,645.65 to RCIF I participants for positions worth only $7,682,406.80 at the time of the buyout. *Id.* To make these payments, Appellants misappropriated contributions from participants in the Notes. *Id.* Appellants also admit that they used new participant contributions in RCIF II to pay earlier participants in RCIF II. A453 ¶70.

## II.    Relevant Procedural History

### A. Motions for summary judgment

On October 16, 2023, the CFTC moved for summary judgment ("MSJ") against Appellants on all counts. A87-88. In support, the CFTC submitted a statement of facts ("SOF") and supporting evidentiary materials. A425-56. Appellants did not controvert the CFTC's SOF. *Id.* [8]

Appellants also filed a cross-motion for summary judgment on all three counts and sought dismissal of counts I and II for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and judgment on the pleadings on Count III under Fed. R. Civ. P. 12(c) ("cross-motion"). A111-12.

In opposing the CFTC's MSJ and in their cross-motion, Appellants advanced the same arguments. For counts I and II, Appellants argued that the "Funds"[9] investments were spot-market transactions involving non-commodities, relying on both Funds' documents. CSA42-46.

Regarding count III, Appellants contended they did not violate 7 U.S.C. § 9(1) and Regulation 180.1(a) because they purchased wrapped bitcoin and not bitcoin itself[10] and only a *de minimis* amount of ether. CSA46-48. They further asserted

---

[8] In October 2023, the district court found Ikkurty in contempt for withdrawing $13,817,000 in digital assets from the control of the court-appointed receiver, designated for the benefit of the victims. Dkt. 299; Dkt. 300 at 3. Ikkurty remains in contempt. Dkt. 402.

[9] Instead of addressing the fraud claims specific to RCIF II and the Notes as alleged in the CFTC's complaint, Appellants muddied the waters by conflating the operative documents for the Funds, pointing to statements in the operative documents for RCIF I. CSA45; CSA59.

[10] In the proceedings below, Appellants defined "wrapped bitcoin" as "a digital token representing bitcoin." A121-22 ¶36.

there is no legislative authority granting the CFTC the power to regulate crypto assets as commodities. CSA51-52. They never asserted the argument they now make on appeal, i.e. that a digital asset is not a commodity unless it is the underlying for an existing futures contract. CSA39-64.

### B. District court's summary judgment ruling on appeal

On July 1, 2024, the district court granted the CFTC's MSJ on all counts and denied Appellants' cross-motion. SA1. The court rejected Appellants' subject-matter jurisdictional arguments raised in their cross-motion, noting their challenge to the court's jurisdiction under Rule 12(b)(1) should have been presented as a challenge to the CFTC's claims under Rule 12(b)(6) because the arguments were about the reach of the CEA, not the court's jurisdiction. SA8-9.

#### 1. Ruling on count III

The district court began its analysis with count III, addressing allegations of fraud "in connection with" the sale of a commodity under 7 U.S.C. § 9(1) and Regulation 180.1(a).

First, the court examined whether the Appellants' cryptocurrency transactions qualified as "commodity" transactions. By reviewing the CEA's definition of commodity[11] and applying precedent, the court determined that cryptocurrencies, including OHM, Klima, and wrapped bitcoin, qualify as commodities. SA10. The court found they share key traits with other digital asset commodities that have CFTC-regulated derivatives, particularly in being traded in markets for uniform

---

[11] *See* Section I.B., *supra* (Relevant statutory definitions).

quality and value. SA10-11. Citing *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018), the court stressed that futures trading within a class of commodities—such as virtual currencies—renders all items within that class as commodities. SA11-12.

The court rejected Appellants' argument that none of their activities involved commodities. Appellants contended that their investments in wrapped bitcoin and ether, comprising only 10% of the RCIF II's investments, were not enough to violate the CEA. They also argued the CFTC had failed to show a link between their alleged misrepresentations and omissions and misappropriation and any contract involving the sale of a commodity. The court, however, consistent with established precedent, interpreted the "in connection with" requirement of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) broadly, holding that "[a]ctionable misrepresentations include those made to customers when soliciting their funds for purposes of the 'in connection with' requirement." SA13 (quoting *CFTC v. Driver*, 877 F.Supp.2d 968, 978 (C.D. Cal. 2012) (cleaned up).

As a result, the court found that the CEA reached Appellants' activities for purposes of alleging fraud in connection with the contract of sale of a commodity in interstate commerce. Furthermore, it held that the Appellants had sufficient notice of the CFTC's regulatory authority. SA11.

The court next examined whether Appellants made material misrepresentations and omissions about RCIF II, the Notes, and Ikkurty's background. The court found they did, citing undisputed evidence that Ikkurty, acting for Jafia, misrepresented

RCIF I's historical performance, net profit distribution, investment methodology of RCIF II and the Notes, and his own experience trading cryptocurrency. SA13-17.

The court held that omitting RCIF I's loss record was material, as a reasonable customer would consider such information important. SA13 (citing *CFTC v. Kratville*, 796 F.3d 873, 895 (8th Cir. 2015)). The court also found that general disclaimers could not negate Ikkurty's "hyper-specific" misrepresentations about RCIF I's past performance, which materially influenced participants' expectations of profits. SA13-14. The court emphasized that Ikkurty's misrepresentations of "net profits" were material, as no actual profits were distributed. SA15. Instead, Appellants operated a Ponzi scheme, using new funds to pay earlier participants. *Id.*

The court similarly found that Appellants' misrepresentations about how participants' funds would be invested were material, as 90% of RCIF II and CSN funds were invested in the volatile cryptocurrency OHM, despite promises of "stable proof-of-stake tokens." SA16. Additionally, Appellants failed to disclose to COB participants that the assets serving as supposed collateral were far insufficient to repay them because the same assets served as collateral for all participants. *Id.*

The court concluded that Ikkurty's misrepresentations about his trading experience were "fraudulent as a matter of law" and thus a material misrepresentation. *Id.* (citing *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 718 (E.D.N.Y. 2018); *CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035, 1048 (M.D. Fla. 2019)).

17

On scienter, the court found that Ikkurty's misrepresentations and omissions were so obviously misleading that they established scienter on summary judgment. SA16-17. It found that, as the owner and principal investor for RCIF I, Ikkurty knew its true performance and unreasonably omitted participant losses, an omission he "had every reason to know about." SA14 (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). The court further held that Ikkurty's scienter was indisputable given his knowledge and control over RCIF II's investments. SA16.

Relying largely on the same evidence just described, the district court also found that Ikkurty, acting on behalf of Jafia, misappropriated funds from purchasers of the Notes to pay inflated returns to RCIF I participants in violation of § 9(1) and Regulation 180.1(a). SA17-19.

## 2. Rulings on counts I and II

For count I, alleging failure to register as a CPO under 7 U.S.C. § 6m(1), the district court found that Appellants fell within the statutory definition of a CPO, stating it was undisputed that Appellants failed to file for an exemption from CPO registration. SA19-22. The court then analyzed the plain language of the definitions of commodity pool and CPO in 7 U.S.C. §§ 1a(10) and (11), respectively.[12] SA19-20. Based on these provisions and the undisputed facts establishing that the Funds' governing documents and Ikkurty's solicitation of participant funds clearly demonstrated they solicited, accepted, and pooled funds from participants for the

---

[12] *See* § I.B, *supra* (Relevant statutory definitions).

purpose of trading commodity interests, the court found they qualified as CPOs. SA19-22.[13]

The court rejected Appellants' argument that, to be a CPO, an entity must *trade* in commodity interests. SA20-21. Instead, it found that actual trading was irrelevant and, relying on established precedent, determined that the CFTC met its burden in demonstrating Appellants qualified as CPOs by soliciting, accepting, and pooling funds for trading in commodity interests. SA20 (citing *CFTC v. Equity Fin. Grp. LLC*, 572 F. 3d 150, 156 (3d Cir. 2009) and *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) ("Wilkinson II")).

The court also found that Appellants promised CSN buyers "put option protection" on digital currencies separately triggered Appellants' obligation to register as CPOs, because "put options" qualify as commodity interests under 7 U.S.C. § 1a(11). SA23.

The district court found liability under count II, fraud by a CPO in violation of 7 U.S.C. § 6*o*(1)(A)-(B), based on its previous findings just described above. SA22-23.

---

[13] *See* n. 8, *supra*. The district court analyzed the PPM for RCIF I while addressing arguments concerning the Relevant Period in the CFTC's complaint, which identified the PPM for RCIF II as the applicable document. SA19-22. Nonetheless, the PPM for RCIF II remains the relevant document, as the CFTC's complaint does not allege violations of the CEA in connection with the PPM for RCIF I. Any confusion in the record is ultimately immaterial, as explained in § II.A., *infra*, because the undisputed facts demonstrate that Appellants acted as unregistered CPOs in violation of 7 U.S.C. § 6m(1) by representing that they would trade a portion of RCIF II funds in commodity interests.

### 3. Final judgment

The district court enjoined Appellants from future violations of the CEA. SA27. It also ordered disgorgement from Appellants, jointly and severally, in the amount of $36,967,285 in ill-gotten gains of the scheme plus post-judgment interest and ordered Appellants to pay restitution of $83,757,249, jointly and severally. SA23-24. Finally, it ordered Appellants to pay a civil monetary penalty of $110,901,855, jointly and severally. SA30. A final amended judgment was entered on October 16, 2024. SA35. This appeal followed.

## SUMMARY OF THE ARGUMENT

Appellants conduct indisputably violated the CEA and its regulations, including the anti-fraud and registration provisions applicable to CPOs. Appellants cannot evade liability by arguing—for the first time on appeal—that OHM, Klima, and wrapped bitcoin do not qualify as commodities because they do not underlie futures contracts. This argument is waived.

It is undisputed that Appellants defrauded their customers through false claims about Ikkurty's purported financial success from trading bitcoin, fabricated performance metrics for their earlier fund (RCIF I), misrepresentations about investing participant funds in bitcoin, ether, other digital asset commodities, and commodity interests, and distributing profits. They misappropriated participant funds to pay earlier participants and used the majority of the remaining funds to purchase ether, OHM, Klima, and wrapped bitcoin. These actions coupled with their undisputed purchases of ether satisfy the "in connection with" requirement.

20

Appellants also violated the CEA by acting as unregistered CPOs. The undisputed facts show that Appellants solicited, accepted, and pooled participant funds for investment in RCIF II and the CSN to trade commodity interests (i.e., futures, options, and swaps), and they said so in RCIF II and CSN offering documents. Their own solicitation materials for RCIF II—such as their PPM and LPA—explicitly stated they would file for a CPO exemption with the CFTC and trade no more than 5% of participant funds in such products. Similarly, Appellants marketed the CSN by promising purchasers zero downside risk, purportedly achieved through hedging with commodity interests, such as put options. These disclosures confirm that Appellants solicited, accepted, and pooled customer funds for RCIF II and the CSN to trade commodity interests as CPOs subject to the CEA.

Whether Appellants executed trades in commodity interests or guaranteed that they would do so is beside the point—they acted as CPOs through their solicitations. Controlling precedent for this Court establishes that soliciting funds, at least in part, for the purpose of trading commodity interests satisfies the definition of a CPO, regardless of whether trades were executed. By any measure, Appellants' conduct falls squarely within the CEA's framework for CPO registration. Appellants also engaged in fraud as CPOs, as evidenced by their undisputed material misrepresentations, omissions, and misappropriation of participant funds.

Appellants further attempt to evade liability by arguing—for the first time on appeal—that OHM, Klima, and wrapped bitcoin do not qualify as commodities

because they do not underlie futures contracts. This argument is both waived and irrelevant. This Court need not reach this issue because the district court's judgment is independently supported by its finding that Appellants' fraudulent scheme was "in connection" with bitcoin and ether (because Appellants fraudulently induced customers by promising to invest in both) and ether (by purchasing it with fraudulently induced customer funds). Bitcoin and ether are both undisputedly commodities under the CEA. Appellants' promises to invest in these assets, coupled with their purchases of ether and misappropriation of participant funds contributed for purposes of investing in digital asset commodities and commodity interests, more than suffice to affirm the district court's ruling.

Even if this Court chooses to address the classification of OHM, Klima, and wrapped bitcoin, the district court's judgment remains correct. The CEA defines commodities broadly, encompassing tradable digital assets regardless of whether they underlie futures contracts. Federal courts have repeatedly affirmed this correct interpretation, recognizing assets like bitcoin, ether, Litecoin, and other "altcoins" as commodities under the CEA. By this standard, OHM, Klima, and wrapped bitcoin are no exception.

Appellants' fraudulent scheme and failure to register as CPOs fall squarely within the CEA's regulatory framework. The district court's judgment should be affirmed in its entirety.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment.
*Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). Questions
of law, including statutory interpretation are reviewed *de novo. In re Sw. Airlines
Voucher Litig.*, 799 F.3d 701, 707 (7th Cir. 2015). This Court may refuse to consider
an appellant's argument that was not presented first to the district court. *Pond v.
Michelin N. Am., Inc.*, 183 F.3d 592, 597-98 (7th Cir. 1999). Summary judgment
may be affirmed on any ground that is supported in the record and adequately
presented in the trial court. *Ross v. Fin. Asset Mgmt. Sys., Inc.*, 74 F.4th 429, 433
(7th Cir. 2023).

## ARGUMENT

### I.   Ikkurty and Jafia Violated 7 U.S.C. § 9(1) and Regulation 180.1(a) Because Their Fraudulent Scheme Was "In Connection With" the Sale of a Commodity

The district court correctly found that Appellants violated 7 U.S.C. § 9(1)
("§ 9(1)") and Regulation 180.1(a). Under these provisions, the CFTC had to
demonstrate that Appellants (1) made material misrepresentations or omissions,
issued false statements, or misappropriated customer funds; (2) with scienter; and
(3) in connection with the sale of a commodity in interstate commerce. *See CFTC v.
S. Trust Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018).

Appellants claim that the CFTC did not establish the third element because they
"primarily invested" in digital assets that are not commodities, and their purchases
and sales of the commodity ether were "incidental to any fraud." Br. at 17, 32.

Appellants claim that OHM, Klima, and wrapped bitcoin cannot be commodities under the CEA because they do not underlie a futures contract. Br. at 22-32. Appellants are wrong for multiple reasons.

First, Appellants waived their argument that OHM, Klima, and wrapped bitcoin are not commodities because they do not underlie a futures contract. Second, Appellants' fraud was "in connection with" the sale of a "commodity" because they fraudulently solicited participants for RCIF II with material misrepresentations and omissions about their intent to invest in bitcoin, ether, and commodity interests, and they misappropriated participant funds with scienter. Third, Appellants' fraud was "in connection with" their purchase and sale of ether. Appellants do not dispute that they used money from participants to buy at least one commodity (ether). They claim, immaterially, they did not trade ether "as a commodity" or "for investment" purposes (Br. at 22, 5), but this is no defense.

## A. Ikkurty and Jafia waived their argument concerning the definition of "commodity" by not raising it in the district court

On appeal, the Appellants argue for the first time that OHM, Klima, and wrapped bitcoin do not qualify as commodities under the CEA because they do not currently underlie a futures contract. Br. at 17; CSA39-64. Appellants theorize that they therefore cannot be liable under the CEA. Appellants waived this argument because they never argued before the district court that OHM, Klima, or wrapped bitcoin are not commodities. *See, e.g., Broaddus v. Shields*, 665 F.3d 846, 853 (7th Cir. 2011).

In their cross-motion before the district court, Appellants accepted that wrapped bitcoin was legally the same as bitcoin and a commodity. CSA45-47. Their only argument to avoid liability under § 9(1) and Regulation 180.1(a) in count III was that their fraudulent scheme was not sufficiently connected to any sales of bitcoin or ether. CSA46. Specifically, Appellants argued that their Ponzi scheme was "not tied directly to a scheme or artifice to defraud in connection with a WBTC or ETH transaction." CSA47; *see also id.* ("The alleged misappropriation from one account to another had nothing to do with a WBTC or ETH contract."). Appellants also argued that their fabricated performance numbers were not "in connection with" commodity trades because those returns reflected "Fund performance *as a whole*, not specifically for WBTC or ETH, which made up a small portion of the Funds' value . . . ." *Id.* In their opposition to the CFTC's MSJ, they argued that their false statements were not material and the undisputed facts did not establish scienter. CSA60-64. They said nothing about the "in-connection with" requirement or which digital assets were or were not commodities. They never argued that OHM, Klima, and wrapped bitcoin could not be commodities because they do not underlie a futures contract. CSA40-64.

Appellants cannot shift to this new argument for this first time on appeal. Under Seventh Circuit precedent, arguments not presented at the trial court level are waived on appeal. *See Pond,* 183 F.3d at 597. Similarly, underdeveloped and conclusory arguments are also waived on appeal. *Id.; see also Wolf v. Larson*, 897 F.2d 1409, 1413 n.3 (7th Cir. 1990) (holding plaintiff waived issue of whether a

"mutually explicit understanding" existed regarding her employment where she failed to raise argument in summary judgment motion and made an "oblique suggestion" of understanding in her response to defendants' motion for summary judgment).

Appellants' strategic decision below unquestionably affected the record before this Court. Had Appellants asserted that a digital asset must underlie a futures contract to be a commodity in their cross-motion or in opposition to the CFTC's motion, the CFTC could have included additional evidence in its opposition and reply. *See Boyers v. Texaco Refin. & Mktg., Inc.*, 848 F.2d 809, 812 (7th Cir. 1988) quoting *Singleton v. Wulff,* 428 U.S. 106, 120 (1976) (waiver rule ensures parties "have the opportunity to offer all the evidence they believe relevant to the issues" and are "not surprised on appeal" by "issues upon which they have had no opportunity to introduce evidence.") For example, the CFTC would have had the opportunity to demonstrate in detail that wrapped bitcoin is simply bitcoin that is delivered through the Ethereum Blockchain rather than Bitcoin's native Blockchain and therefore indistinguishable in its characteristics as a digital asset commodity. *See, e.g, Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 217 n.12 (S.D.N.Y. 2023) ("[w]rapped tokens are tokenized versions of cryptocurrencies that may exist on other blockchains and are pegged to the value of the original coin."). Both assets trade at the same prices and are accepted interchangeably.

Appellants now want to benefit from the absence of evidence on this point and others. For example, if Appellants had argued below that supposed lack of futures

trading excluded digital assets from the definition of "commodity," the CFTC could have presented evidence that several other digital assets Appellants traded *do* underlie futures contracts. This is exactly why Appellants cannot make new arguments on appeal. As discussed *infra* in Section III, Appellants' statutory argument also fails because the district court correctly applied the definition of "commodity" in 7 U.S.C. § 1a(9) to the facts of this case.

## B. Ikkurty and Jafia's fraudulent scheme was undeniably "in connection with" the sale of a commodity

The undisputed facts demonstrate that Appellants' fraudulent scheme satisfies the "in connection with" requirement under § 9(1) and Regulation 180.1(a). This requirement is met based on Appellants' undisputed material misrepresentations and omissions in their solicitations of RCIF II participants, including marketing that fund as investing in bitcoin and ether, which Appellants agree are commodities under the CEA. Br. at 11, 32. The very act of soliciting funds under the guise of investing in two commodities—bitcoin and ether—satisfies the "in connection with" the sale of a commodity requirement under § 9(1) and Regulation 180.1(a). *See, e.g.,* *CFTC v. McDonnell*, 332 F. Supp. 3d. 641, 722 (E.D.N.Y. 2018) (finding material misrepresentations tied to commodities, regardless of whether actual trading occurs, satisfy the "in connection with" requirement); *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347-48 (S.D. Fla. 2014) (finding "in connection with" requirement met where defendants falsely told customers they purchased precious metals on their behalf). This is true, even if it were assumed, for

27

purposes of argument, that OHM, Klima, and wrapped bitcoin are not commodities within the meaning of the CEA.

Courts interpret the "in connection with" requirement broadly to encompass conduct involving fraudulent solicitations. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (holding "in connection with" requirement in § 10(b) and Rule 10b-5 "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.") (cleaned up). *Cf. Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004) ("in connection with" requirement properly pled even when plaintiff does not contend that "any particular security [was] purchased" with the funds); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361–63 (S.D.N.Y. 2011) (same).[14]

Courts have also applied this broad interpretation to the identical "in connection with" requirement in Section 4b of the CEA, 7 U.S.C. § 6b, recognizing that it encompasses fraudulent solicitations and misrepresentations even in the absence of actual trading.[15] *See, e.g.*, *CFTC v. JBW Capital, LLC*, 812 F.3d 98, 109 (1st Cir. 2016) (misrepresentations made during solicitations satisfy "in connection with" requirement of § 6b); *CFTC v. Vartuli*, 228 F.3d 94, 102 (2d Cir. 2000) (same); *R&W*

---

[14] Courts apply securities law precedent to claims under § 9(1) because Congress created § 9(1) "by copying [Securities and Exchange Act] § 10(b)'s language and pasting it in the CEA." *See, e.g., CFTC v. Monex Credit Co.*, 931 F.3d 966, 976 (9th Cir. 2019).

[15] 7 U.S.C § 6b(a) prohibits fraud "*in or in connection with* any order to make, or the making of, any [futures contract]." (emphasis added). It is a fundamental principle of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (cleaned up). Thus, the presumption of identical meaning supports the conclusion that the "in connection with" requirement in § 9(1) should be interpreted consistent with the "in connection with" requirement in § 6b of the CEA.

*Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 173 (5th Cir. 2000) (misrepresentations about futures trading software were sufficient to meet "in connection with" requirement in § 6b); *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103 (7th Cir. 1977) (misrepresentations made during solicitation of a commodity trading agreement violated "in connection with" requirement of § 6b).

### 1. Ikkurty and Jafia promised participants they would use their funds to trade bitcoin, ether, and commodity interests

Appellants undisputedly solicited participants for RCIF II by promising to invest in both bitcoin and ether, which Appellants concede are commodities under the CEA. Br. at 23-24. *See CFTC v. Reynold*s, No. 1:19-05631-MKV, 2021 WL 796683, at *5 (S.D.N.Y. Mar. 2, 2021) ("[v]irtual currencies such as Bitcoin are encompassed in the definition of "commodity"); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228-29 (E.D.N.Y. 2018) (same); *see also CFTC v. Laino Grp. Ltd.*, No. 4:20-CV-03317, 2021 WL 4059385, at *6 (S.D. Tex. June 30, 2021) (default judgment) (finding bitcoin, Litecoin, and ether are all commodities under the CEA).

In their marketing materials and presentations to participants, Appellants represented that 15% of RCIF II funds would be invested in bitcoin and that at least another 15% would be invested in other digital assets, including ether. CSA28-30. Appellants also solicited participants for the CSN by marketing the downside protection they offered by trading commodity interests such as put options. CSA28; A451 ¶65.

The very act of soliciting funds under the guise of investing in two digital asset commodities, bitcoin and ether, and commodity interests, including put options,

satisfies the "in connection with" the sale of a commodity requirement under § 9(1) and Regulation 180.1(a) because "it is the representations made by the promoters, *not their actual conduct,*" that matter for jurisdictional purposes. *SEC v. Lauer*, 52 F.3d 667, 669-70 (7th Cir. 1995) (Posner, C.J.) (emphasis added) (rejecting jurisdictional challenge involving charges under § 10(b) and Rule 10b-5, among others, in case where defendant promised, but never did, buy securities for customers, observing that "[i]t would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws.").

### 2. Ikkurty and Jafia used participant funds to purchase ether

In addition, Appellants actually traded the digital asset commodity ether in connection with their fraudulent scheme. Br. at 32. Appellants admit that of the funds invested in RCIF II, roughly 10% were used to purchase ether. Br. at 12. Appellants attempt to downplay these transactions by characterizing their purchases of ether as incidental to their fraud and for "transactional convenience." *Id*. But their own admissions undermine this argument. Ikkurty did not testify that he purchased ether "solely" for transactional purposes. He said that he "generally" purchased ether for transactional convenience (A466 ¶36) and that when a participant sent in funds to invest in RCIF II, part of those funds went into a bank account, and the other part was used to purchase ether. CSA35 at p. 101, L6:15. Moreover, there is no "transactional convenience" exception under the statutory text, regulatory framework, or in case law; fraud "in connection with" the sale of a

commodity, regardless of its scale or purpose, is still commodities fraud under § 9(1) and Regulation 180.1(a).

Appellants' undisputed purchases of ether—a recognized commodity in interstate commerce—also separately satisfy the "in connection with" requirement of § 9(1) and Regulation 180.1(a). *See, e.g., CFTC v. Spence*, No. 21-699, 2022 WL 18461447, at *3 (S.D.N.Y. Nov. 29, 2022) (consent order) (finding a violation of § 9(1) and Regulation 180.1(a) where defendant operated a "Ponzi scheme in which he fraudulently solicited individuals to invest funds in various pools that traded virtual currencies such as bitcoin and ether, each a commodity in interstate commerce.").

### 3. Ikkurty and Jafia misappropriated participant funds

It is undisputed that Appellants misappropriated customer funds when they used new participants' money in RCIF II and the Notes to pay purported returns to earlier participants. A453-55 ¶¶70-76. Courts have repeatedly found that misappropriation of customer funds from investment vehicles linked to commodities satisfies the "in connection with" requirement of § 9(1) and Regulation 180.1(a). *See McDonnell*, 332 F. Supp. 3d at 719 (finding misappropriation of customer funds where no trading occurs constitutes fraud in violation of § 9(1) and Regulation 180.1(a)); *see also CFTC v. Glob. Precious Metals Trading Co.*, No. 1:13-cv-21708, 2013 WL 5212237, at *5 (S.D. Fla. Sept. 12, 2013) (default order) (defendant violated § 9(1) and Regulation 180.1(a) by misappropriating funds and making misrepresentations in connection with the sale of precious metals); *Perazzo*, 357

F.3d at 1223-24 (finding "in connection with" requirement met under § 10(b) and SEC Rule 10b-5 where defendant misappropriated funds and purchased no securities).

Appellants' fraudulent scheme satisfies the "in connection with" requirement under § 9(1) and Regulation 180.1(a) because they undisputedly solicited investments in bitcoin and ether, offered downside protection by promising trading in put options and other commodity interests, purchased digital asset commodities such as ether (as well as OHM, Klima, and wrapped bitcoin), and misappropriated participant funds to sustain their Ponzi scheme.

## II.  Ikkurty and Jafia Committed Fraud as Unregistered Commodity Pool Operators in Violation of the CEA Registration and Anti-Fraud Provisions

Appellants operated as CPOs by soliciting, accepting, and pooling funds for the purpose of trading commodity interests and based on the undisputed facts, also committed fraud as unregistered CPOs.

### A.  Ikkurty and Jafia operated as unregistered commodity pool operators in violation of 7 U.S.C. § 6m(1)

The district court correctly found that Appellants acted as CPOs by soliciting, accepting, and pooling participant funds for the purpose of trading "commodity interests" in violation of the registration requirements in 7 U.S.C. § 6m(1). SA24. To establish this violation, the CFTC had to demonstrate that Appellants operated a commodity pool and, in connection therewith, solicited, accepted, or received participant funds for the purpose of trading in commodity interests (i.e., futures, options, and swaps). *See Wilkinson II*, 986 F.3d 740, 743-44.

The CEA does not impose a minimum trading threshold in commodity interests to qualify as a CPO. *See Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 169 (D.D.C. 2013). A person qualifies as a CPO if they solicit funds for the purpose of trading in commodity interests, even if they do not ultimately engage in trading. *See, e.g., CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 158 (3d Cir. 2009). Under 7 U.S.C. § 6m(1), a CPO must register with the CFTC unless they qualify for and claim a specific exemption in 17 C.F.R. § 4.13(a). *See, e.g., CFTC v. Driver*, 877 F. Supp. 2d 968, 979 (C.D. Cal. 2012).

Here, Appellants clearly met the statutory definition of a CPO. It is undisputed that they solicited, accepted, and pooled funds from RCIF II participants by representing that they would trade a portion of the funds in futures, options, and swaps. A445 ¶49; A477-78 ¶56; A451 ¶65; Br. at 5, 12. This conduct obligated Appellants to register as CPOs with the CFTC unless they qualified for and claimed an exemption. They did neither of these things. Instead, they falsely represented to participants that they would file for an exemption from registration as a CPO. A455 ¶77.

Appellants also acted as CPOs when soliciting participants for the CSN, which they marketed as a safer alternative to RCIF II. Specifically, they promised participants that their investment would be hedged through commodity interests, specifically identified as "put option protection." A451 ¶65.[16] Put options fall within

---

[16] Ikkurty testified that "put option" protection meant options on crypto currencies, but they did not trade options because it was too expensive. CSA36 at p. 159, L3:15. Appellants, however, never changed their solicitation materials to remove this representation that they would hedge customers' funds with put options. A451 ¶65.

the definition of commodity interests because they involve the right to sell an underlying commodity at a specified price. *See* 7 U.S.C. § 1a(10) (commodity interests include futures contracts (or an option on such a contract), securities futures, swaps, commodity options, and leveraged transactions); *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 477 (7th Cir. 2002) ("[a] put option holder has the right, but not the obligation, to sell a futures contract at an established 'strike' price.").

Appellants' argument that they were not required to register as CPOs is unavailing. They contend that "the Funds" neither invested in, nor solicited for, "any futures contracts or any other derivatives," citing language from the private placement memorandum for RCIF I, which stated that Jafia would file a claim for exemption on behalf of RCIF I if it began trading commodity interests in the future. Br. at 18, 35. This argument mischaracterizes the evidence and is fundamentally incorrect.[17]

The district court correctly applied this Court's controlling precedent when it found that Appellants violated 7 U.S.C. § 6m(1) by acting as unregistered CPOs through their specific solicitations, regardless of whether they ultimately traded any commodity interests. Overall, the Appellants' cases do no more than restate the general principle that § 6m(1) does not require actual trading in commodity interests to meet the definition of a CPO under the CEA. Under cases such as *Equity Financial Group* and *Wilkinson II*, Appellants' undisputed solicitation of

---

[17] It is undisputed that Appellants neither registered, nor filed for an exemption from registration, with the CFTC. A455-56 ¶77.

participants and receipt of their funds to trade pooled commodity interests brings their conduct within the definition of a CPO.

### 1. *Wilkinson II* controls this appeal

Appellants largely repeat their losing arguments from below; but all of those are foreclosed by *Wilkinson II*. As in this case, the defendant in *Wilkinson II* operated a hedge fund, lost most of his investors' money, covered up those losses, and raised money from new investors to pay off some of those losses. 986 F.3d at 741-43. Wilkinson pled guilty to wire fraud but argued on appeal that the district court improperly added a sentencing guideline enhancement that applies to "commodity pool operators" who violate the commodities laws. *Id.* at 743. Among other arguments, Wilkinson claimed that he did not actually trade commodity futures and therefore did not qualify as a CPO. *Id.* at 745.

This Court rejected Wilkinson's argument and affirmed. It held that that whether Wilkinson actually traded commodity interests was irrelevant because "[t]he definition of a commodity pool operator hinges on whether the person solicits funds for the purpose of trading in commodity interests. Actual trading of futures is not required." *Wilkinson II*, 986 F.3d at 745 (cleaned up).

The Court relied on three statements in Wilkinson's private placement memorandum ("PM") to conclude that he solicited funds for the purpose of trading commodity interests. First, the PM stated that the fund intended to "'trade a variety of stock indexes and options, futures, and options on futures on such stock indexes.'" *Id.* at 742. Second, the PM disclosed that "'[t]he Partnership is authorized to act as

an investor or trader in . . . futures and options thereon.'" *Id.* at 744. Finally, the PM

identified some futures products that "could be traded, and that could possibly

'cause [the Wilkinson . . . Fund] to become a Commodity Pool.'" *Id.* The Court found

these provisions determinative, even though the fund's partnership agreement

stated that "'the Partnership does not presently intend to operate as a commodity

pool.'" *Id.* The Court held that the PM was "sufficient evidence that the fraudulent

funds were operated, at least in part, 'for the purpose of trading in'" commodity

interests. *Id.* (quoting 7 U.S.C. § 1a(11)(A)).

### 2. Application of *Wilkinson II* to this case

*Wilkinson II* directly forecloses Appellants' primary argument that they cannot

be liable because "the Funds did not invest in commodities under the CEA." Br. at

33; *see also*, *e.g.*, Br. at 16 ("[i]f the CFTC cannot establish that Defendants invested

in commodities, then all three causes of action fail"). This Court in *Wilkinson II*

made clear that it does not matter whether the defendant traded commodity

interests. The focus is on whether the defendant solicited funds "at least in part" to

trade commodity interests.

Here, as in *Wilkinson II*, Appellants' solicitation materials confirm that they

operated, "at least in part," for the purpose of trading commodity interests. A431-32

¶¶11-12; A455 ¶77. Appellants argue that the language in their PPM and LPA was

"conditional" and "permissive" with "disclaimers" that "authorized [but did not

obligate]" them to trade futures. Br. at 36. However, the relevant language in

*Wilkinson II* was similarly conditional and permissive. There, the PM authorized

Wilkinson to trade futures and stated that trading futures "could possibly cause" the fund "to become a Commodity Pool." *Wilkinson II*, 986 F.3d at 744.

Here, Appellants' LPA and PPM are even more conclusive than those in *Wilkinson II*. The LPA stated that the purpose of the fund was to "invest, hold and trade . . . cryptocurrencies," (A311 § 1.03) and explicitly authorized Jafia to trade commodity interests, including "put and call options . . . commodity futures . . . [and] swap contracts." A313 § 3.02; A431-32 ¶11. The RCIF II PPM specifically stated that Jafia would file an exemption from registration as a CPO with the CFTC. A126 ¶44; A455 ¶77. It further stated that Appellants would "at all times" trade "no more than 5% of its assets . . . to establish commodity interests positions," including "through the use of derivatives." A216; A432 ¶12. The PPM further provided: "[t]he Fund's investment in derivatives and other commodity interests will be limited such that the General Partner will remain exempt from registering as a commodity pool operator." A222 ¶3. But Appellants never filed for an exemption as promised, despite soliciting customers to trade commodity interests. A455-56 ¶77.

The PPM also provided risk disclosures specific to trading in commodity interests. A432 ¶12; *Digital Currency Derivatives Markets* (A235), *Derivatives* (A239), *Futures and Swaps* (A240), and *Options* (*Id.*).

Appellants' argument fails as a matter of law because a CPO need not *actually trade* in commodity interests to qualify as a CPO nor must he be obligated to trade commodity interests. Rather, the undisputed facts show that Appellants were CPOs

37

because they solicited participants by *saying* they would trade commodity interests and therefore accepted and received funds, "at least in part," for the purpose of trading commodity interests. *Wilkinson II*, 986 F.3d at 744. Otherwise, there would have been no need for language addressing the promised CPO exemption filing or their discretion to trade commodity interests. That Appellants solicited to trade commodity interests *at all* brought them within the statute, regardless of whether they actually traded such products. The presence of similar provisions regarding trading securities indexes and options did not negate a finding of CPO status in *Wilkinson II*, nor should it here.

### 3. Ikkurty and Jafia's attempts to distinguish *Wilkinson II* fail

Appellants have also taken several quotes from *Wilkinson II* out of context to argue that it applies only when a defendant conclusively promises to trade commodity interests. This argument mischaracterizes *Wilkinson II*, which makes no distinction between conclusive and conditional statements, and applied its holding equally to both such types of statements made in that case. As in *Wilkinson II*, Appellants' PPM and LPA disclosed that RCIF II "may" trade commodity interests—futures, options, and swaps—conditional statements sufficient to demonstrate that their funds were operated, "at least in part," for the purpose of trading commodity interests.

Appellants also argue that their funds primarily traded spot cryptocurrencies and therefore fall outside the CEA's jurisdiction. Br. at 33-38. This claim misrepresents both the law and the record. The CEA does not require that a fund

trade exclusively in commodity interests to qualify as a commodity pool. *See supra,* § II.A. Instead, it requires only that the fund solicit and accept pooled funds "at least in part . . . for the purpose of trading" commodity interests. *Wilkinson II*, 986 F.3d at 744. The PPM, LPA, and other solicitation materials here repeatedly reference trading commodity interests, which places Appellants squarely within the CPO framework.

Appellants do not contest any of this evidence in the record, and the district court reasonably relied upon this information in finding that Appellants acted as CPOs by operating RCIF II and the CSN as unregistered CPOs to trade commodity interests. Appellants therefore fell squarely within the statutory definition of a CPO.

### 4. There is no pro-rata distribution requirement

Appellants argue, based on *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 884 (9th Cir. 1986), that the CSN does not constitute a commodity pool (and they cannot be CPOs) because it was merely a promissory note offering a fixed rate of return instead of a pro-rata distribution. Br. at 37-38. This is wrong for three reasons.

First, a commodity pool may receive pool contributions in the form of debt instruments, whether fixed rate or variable, or other property, in any combination. *See* 7 U.S.C. § 1a(10).[18] Therefore, the fact that Appellants promised to pay CSN

---

[18] Indeed, fraudulently operated commodity pools often offer fixed returns and otherwise may make non-pro rata distribution of profits and losses to pool participants. *See*, *e.g.*, *CFTC v. M25 Invs., Inc.*, No. 3-09-CV-1831-M, 2010 WL 4269124, at *2 (N.D. Tex. Oct. 25,

participants some guaranteed arbitrary returns as part of their Ponzi scheme has nothing to do with whether they were CPOs.

Second, the *Lopez* court examined whether an investment structure consisting of individual trading accounts with their own account number and trading strategy qualified as a CPO despite the lack of a pro-rata distribution of profits and losses. 805 F.2d at 882 n.2. The court held it did not, highlighting the individualized treatment and trading strategy of each account. 805 F.2d at 882 n.2 & 884. That is not the case here and therefore *Lopez* does not control the outcome here. To establish that Appellants were unregistered CPOs requires only that the CFTC prove they operated an investment vehicle and in connection therewith solicited, accepted, or received funds for the purpose of trading in commodity interests. *See* 7 U.S.C. § 1a(11).

Third, the *Lopez* standard is inapplicable to civil enforcement actions brought by the CFTC.[19] *See CFTC v. Amerman*, 645 F. App'x 938, 942 n.4 (11th Cir. 2016) (rejecting defendant's application of *Lopez* and holding that its four-factor test "would be inconsistent with the language of 7 U.S.C. § 1a(11)(A)(1)"); *Equity Fin. Grp., LLC*, 572 F.3d at 158 (rejecting *Lopez* test as limited to its own facts); *see*

---

2010) (consent order) (commodity pool participants received unsecured promissory notes guaranteeing interest payments of 2% per month).

[19] To the extent *Lopez* can be understood as referring to the ordinary meaning of the term "commodity pool," it is not persuasive because the statute is broader. *See* 7 U.S.C. § 1a(10). "When a statute includes an explicit definition, [a court] must follow that definition, even if it varies from a term's ordinary meaning." *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (cleaned up).

*also CFTC v. Perkins*, 385 F. App'x 251, 253 (3d Cir. 2010) (declining to revisit holding in *Equity*).

It is well-established that the commodity pool definition contains no pro-rata distribution requirement. Courts recognize that an investment trust, syndicate or similar form of enterprise cannot avoid being a commodity pool merely by promising fixed rate returns or differing returns to different investors. *See, e.g., CFTC v. Brockbank*, No. 2:00-CV-622TS, 2006 WL 223835, at *3 (D. Utah Jan. 30, 2006) (finding that distributing fixed interest payments did not exempt defendants from CPO definition); *see also CFTC v. Ehrlich*, No. 23-CV-08962 (LAK), 2024 WL 4008205, at *7 (S.D.N.Y. Aug. 29, 2024) (denying motion to dismiss complaint alleging defendant operated as unregistered CPO because "an entity may be a CPO despite promising a fixed rate of return or even operating as a Ponzi scheme that engages in no commodity trading and thus generates no return to distribute, *pro rata* or otherwise.").

### 5. Ikkurty and Jafia's other arguments are unsupported

Appellants' citation to statements made by former and current CFTC personnel regarding the CFTC's jurisdiction are similarly misplaced. Br. at 33. These statements address the CFTC's regulatory authority over digital asset commodities in spot markets, not its enforcement authority under the CEA's registration provisions.

Appellants also misinterpret *Equity Financial Group* and two district court cases—*CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1103 (C.D. Cal. 2003) and *CFTC v.*

*Wilkinson*, No. 16-cv-6738, 2016 WL 8256406, at *2 (N.D. Ill. Nov. 22, 2016)
("*Wilkinson I*")—to argue that "disseminating fund documents that merely permit
trading in commodity interests precludes CPO liability. This argument is wrong.

In *Equity Financial Group*, defendants argued that their feeder fund could not
qualify as a commodity pool because it did not directly trade futures contracts. The
Third Circuit rejected this claim, holding that § 6m(1) requires only that an entity
"solicit, accept, or receive" funds for the purpose of trading commodity interests—it
does not require direct trading in the entity's name. 572 F.3d at 156. The court
relied on defendants' collection and pooling of investor funds to conclude that they
fell "squarely within" the definition of a CPO. *Id.* at 159. That fact pattern is
inapposite to the present case. And far from supporting Appellants' position, *Equity
Financial Group* bolsters the district court's ruling that Appellants acted as
unregistered CPOs by soliciting and accepting funds intended, at least in part, for
trading commodity interests.

Appellants' reliance on *Weinberg* and *Wilkinson I* is similarly flawed. In
*Weinberg*, the defendant was not charged with violating 7 U.S.C. § 6m(1) and the
district court below did not rely on *Weinberg* to specifically rule on that charge in
this case. SA20 (citing 287 F. Supp. 2d at 1108). Instead, it cited *Weinberg* to
emphasize that the actual trading of commodity interests is irrelevant to determine
liability. *Id.* Similarly, *Wilkinson I* is inapposite because unlike *Wilkinson II*, it did
not address the precise nature of the solicitation at issue. 2016 WL 8256406, at *2.

Appellants' PPM for RCIF II disclosed that the fund would trade no more than 5% of its assets in commodity interests and explicitly stated that Jafia would file for an exemption from registration as a CPO. A126 ¶44; A455 ¶77. This language alone, like in *Wilkinson II*, constitutes sufficient evidence that RCIF II was operated "at least in part" for the purpose of trading commodity interests. *Wilkinson II*, 986 F.3d at 744.

The other two cases on which Appellants rely (Br. at 35) likewise fail to support their argument.[20] The language in RCIF II's documents about trading other digital assets or asset classes does not change the relevant language in those same documents about trading commodity interests. The CFTC need not show that Appellants operated RCIF II and the CSN solely for the purpose of trading commodity interests. It only had to demonstrate that these pools were operated, "at least in part," for the purpose of trading in commodity interests.

## B. Ikkurty and Jafia committed fraud as CPOs

The district court correctly held that Appellants committed CPO fraud in violation of 7 U.S.C. § 6*o*(1)(A)-(B). This finding was based on the same undisputed evidence that established Appellants' violations of § 9(1) and Regulation 180.1(a). SA22-23.

The elements required to prove a violation of §6*o*(1)(A) are coextensive with the elements of § 9(1) and Regulation 180.1(a). All require proof of the same three elements: (1) a misrepresentation that is (2) material and (3) made with scienter.

---

[20] *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005); *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 762 (7th Cir. 2015).

*See CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1014 (N.D. Ill. 2015) (noting Regulation 180.1 requires proof of intentional or reckless conduct to establish scienter); *CFTC v. Driver*, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) (finding the same intentional or reckless misappropriations, misrepresentations, and omissions of material fact violate § 6*o*(1)(A)-(B)); *CFTC v. Emini Experts, LLC*, No. 614CV1766, 2016 WL 7666148, at *4 (M.D. Fla. Mar. 29, 2016), report and recommendation adopted, No. 614CV1766, 2016 WL 3098199 (M.D. Fla. June 3, 2016) (evaluating same elements for §§ 6b, 6*o*(1)(A), and 9(1) and Regulation 180.1).

The elements of §6*o*(1)(A) are the same as those of § 6*o*(1)(B), except that §6*o*(1)(A) requires proof of scienter while § 6*o*(1)(B) does not. *See Commodity Trend Serv., Inc., v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). It is a violation of § 6*o*(1) when a CPO misappropriates participant funds and makes material misrepresentations or omissions to prospective and actual participants. *CFTC v. Magee*, No: 2:16-cv-00186–LA, 2016 WL 5231834, at *3 (E.D. Wis. June 15, 2016).

As applied to the facts of this case, the district court correctly concluded that the same conduct establishing Appellants' liability under § 9(1) and Regulation 180.1 also constituted CPO fraud under §6*o*(1)(A)-(B). The district court's judgment should be affirmed.

### III. This Court Does Not Need to Reach the Issue of Whether the Definition of "Commodity" Encompasses OHM, Klima, and wrapped bitcoin to Affirm the District Court's Ruling

As discussed above in section I, *supra*, Appellants waived their argument on appeal that the definition of a "commodity" is limited to assets that underlie a

futures contract by not raising it before the district court. Appellants argue for the first time on appeal that OHM, Klima, and wrapped bitcoin are not commodities under the CEA because they do not underlie any futures contract. Br. at 23-31.

Resolution of this issue is unnecessary here, as it would not affect the court's finding that Appellants' fraudulent scheme also involved bitcoin and ether—both of which Appellants admit are commodities—in violation of the anti-fraud and registration provisions of the CEA and its regulations. Thus, this Court may (and should) affirm the district court's ruling on that basis without reaching Appellants' waived arguments about whether OHM, Klima, and wrapped bitcoin also qualify as "commodities." *See Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 951 (7th Cir. 2006) (court of appeals can affirm summary judgment on any ground found in the record).

This Court can affirm the judgment without resolving this issue and wait to address this issue if it arises in a case where the district court has had the opportunity to consider it. Even if this Court chooses to address this issue, the CFTC should still prevail for the reasons described below.

Notwithstanding Appellants' waiver of this argument and the fact that their fraud was absolutely "in connection with" the sale of a commodity sufficient to affirm liability for the reasons discussed in section I, *supra*, if this Court should choose to consider this argument, it should affirm.

### A. The District Court's interpretation of "commodity" is correct

Appellants' argument incorrectly overlooks the CEA's remedial purpose and structure, ignores the plain language of the statutory text at issue, and misinterprets federal case law interpreting the same definition.

#### 1. The CEA's broad definition of "commodity" and remedial purpose

The CEA defines "commodity" broadly, encompassing a list of specifically enumerated tangible products and catchall provisions for "all other goods and articles, . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Based on the plain language, the modifier concerning futures contracts "presently or in the future dealt in" applies as a matter of syntax, punctuation, and grammar, only to "services, rights, and interests." *See, e.g., United States v. Foy*, 50 F.4th 616, 622-23 (7th Cir. 2022) (holding that a modifier did not modify an earlier clause because it was separated by a comma). Regardless, based on the language and purpose of the CEA, and the established case law, the digital assets at issue are "commodities" within the statutory definition.

The CEA's broad definition of "commodity" serves its remedial purpose of protecting market participants from fraud and manipulation, particularly in emerging and speculative markets. *See, e.g., CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002) (describing the CEA as a "remedial statute" aimed at protecting investors from deception in the commodities markets); *see also*

*Monieson v. CFTC,* 996 F.2d 852, 859 (7th Cir.1993) (stating that remedial statutes like the CEA are to be construed broadly).

This broad definition reflects Congress's intent to regulate evolving markets and to protect investors from fraud, regardless of the specific type of commodity involved.[21] Courts interpreting the CEA have consistently recognized this flexible application, particularly when evaluating digital assets. *See, e.g.*, *McDonnell*, 287 F. Supp. 3d at 229; *see also Laino Grp. Ltd.,* 2021 WL 4059385, at *6.

### 2. The plain meaning of the statutory text supports the court's interpretation of the definition of "commodity"

"Courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Where a statute is unambiguous, the Court's analysis "begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 127 (2018).

Appellants do not contend that the CEA's definition of "commodity" is ambiguous, so this is where their argument should meet is logical conclusion. Br. at 19. Appellants' misguided reliance on statutory interpretation principles analyzing other statutes does not support their restrictive reading of the CEA.[22] Appellants'

---

[21] The "Findings" clause in the CEA shows that the statute is a remedial one, animated by the need to serve the public interest while ensuring the integrity of the markets and promoting "responsible" innovation. *See* 7 U.S.C. § 5(b).

[22] *See* Br. at 19—*Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (addressing limitation period in Antiterrorism and Effective Death Penalty Act); *Groff v. DeJoy*, 600 U.S. 447, 473 (2023) (describing definition of "undue hardship" as "context-specific standard" under Title VII); *Nat'l Ass'n of Mfrs.*, 583 U.S. at 117 (addressing challenge to Environmental Protection Agency rule defining "water of the United States"); *Food Mktg. Inst. v. Argus*

argument selectively narrows the text of 7 U.S.C. § 1a(9) by asserting that the district court's ruling renders the phrase "presently or in the future dealt in" meaningless, contradicting the principle that courts must give meaning to every word and phrase in the statute. *See Schneider Nat'l Leasing, Inc. v. United States,* 11 F.4th 548, 559 (7th Cir. 2021) (noting that courts "must give effect, if possible, to every clause and word of a statute") (cleaned up).[23]

But Appellants' argument misses the point. It is undisputed that some virtual currencies (e.g. bitcoin and ether) are commodities because they share key characteristics with the enumerated commodities: they are fungible, traded in markets, and capable of being standardized for contracts. Appellants do not dispute that bitcoin and ether are commodities and do not argue that the OHM, Klima, and wrapped bitcoin are fundamentally different from bitcoin and ether, and there is no record evidence to support such a claim. Under these principles, Appellants' restrictive reading of the statute collapses.

Moreover, several enumerated categories in the definition of commodity—such as livestock, livestock products, and oils—include items without futures contracts,

---

*Leader Media,* 588 U.S. 427, 436 (2019) (addressing standard of confidentiality under Freedom of Information Act).

[23] *See, e.g,* Br. at 19-20—*United States v. Patel,* 778 F.3d 607, 613 (7th Cir. 2015) (rejecting narrow definition of the term "referral" under Anti-Kickback Statute in favor of expansive definition consistent with Congress's broad objectives in that statute of preventing Medicare and Medicaid fraud and protecting patient choice); *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (analyzing definition of "procedure" under Fed. R. Crim. P. 41 in the context of a search warrant under 18 U.S.C. § 2703); *Jenkins v. Heintz,* 25 F.3d 536, 539 (7th Cir. 1994), *aff'd* 514 U.S. 291 (1995) (finding Fair Debt Collection Practices Act to be a "broad statute"); *In re Witkowski,* 16 F.3d 739, 744-45 (7th Cir. 1994) (analyzing principle of *res judicata* vis-à-vis Bankruptcy Code).

such as goats, leather, and avocado oil. This demonstrates that the statutory definition of "commodity" is not contingent on the existence of futures trading for every item or subset. *See CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 497-99 (D. Mass. 2018) (noting the existence of brands, grades, or variations within a commodity does not undermine its classification as a commodity under the Act).

The statute does not provide a finite list of commodities but instead enumerates specific items followed by broad, catchall categories—"all other goods and articles," and "all services, rights, and interests." *Ejusdem generis* requires that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001) (cleaned up). Appellants' argument that the definition of "commodity" would have no limit ignores this principle, as it stretches the statutory language beyond the similarity required by *ejusdem generis*.

### B. Federal case law correctly interprets the definition of "commodity"

Appellants further argue that prior court decisions applying the CEA's definition of "commodity" to digital assets (Br. at 28) were incorrect "District Court" cases while selectively pointing to a handful of decisions involving natural gas (Br. at 23-25), where courts found such assets to be commodities, as supposedly getting it right. *Id.* at 23-25. Appellants incorrectly attempt to distinguish digital assets like OHM, Klima, and wrapped bitcoin by asserting that they do not fit into a recognizable "class" of commodities, unlike natural gas, because each digital asset is

as unique as the next one. *Id.* at 26-27. This piecemeal argument is unpersuasive because it arbitrarily picks and chooses which decisions and reasoning to endorse while failing to present a coherent framework for interpreting the definition of "commodity" under the CEA.

Appellants' reasoning breaks down when they claim that digital assets are not a "class" of commodities, while natural gas is, despite the CEA itself defining "commodity" broadly to encompass "all other goods and articles, . . . and services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). There is no basis in the statute for requiring assets to belong to a pre-existing "class" to qualify as commodities and Appellants cite no authority for this proposition.

For example, in *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492 (D. Mass. 2018), the court rejected a similar argument that the virtual currency at issue in that case, "My Big Coin," was not a commodity because the "specific item in question" did not "underlie a futures contract." *Id.* at 496-97. The court found support in the statutory text noting that "Congress' approach to defining 'commodity' signals an intent that courts focus on categories—not specific items— when determining whether the 'dealt in' requirement is met." *Id.* at 497. The Court further explained that this broad approach aligns with Congress's goal of ensuring that the CEA's anti-fraud provision, 7 U.S.C. § 9(1), protects the markets and is consistent with Supreme Court precedent that statutes should be "construed not

technically and restrictively, but flexibly to effectuate it remedial purposes." *Id.* (cleaned up).

Applying the "broad approach," the court found that the existence of futures trading in other digital assets, such as a bitcoin, sufficient to find that "My Big Coin" was a commodity. *Id.* Similarly, in *CFTC v. McDonnell*, the court held that virtual currencies "fall well-within . . . the [Act's] definition" of a commodity and that the Commission "has standing to exercise its enforcement power over fraud related to virtual currencies sold in interstate commerce." 287 F. Supp. 3d at 228, 230. The court went to great lengths to describe and define bitcoin, and virtual currency generally, identifying common characteristics including that they are digital assets used as a medium of exchange, stored electronically in wallets, exchanged online through a peer-to-peer system, and use cryptographic protocols to secure transactions recorded on publicly available decentralized ledgers. *Id.* at 218, 225. Thus, the court's analysis in *McDonnell* extends beyond bitcoin to other blockchain-based digital assets, like OHM, Klima, and wrapped bitcoin, that share these characteristics.[24] There was no indication in *McDonnell* supporting that the existence of futures contracts on the virtual currency at issue—bitcoin—was central to the court's holding. *See id.* at 228.

The district court's finding that the CEA provides jurisdiction over OHM, Klima, and wrapped bitcoin is consistent with the level of generality at which the courts in

---

[24] Digital currencies are "encrypted, decentralized digital money based on blockchain technology" that "is created by developers and traded over the internet." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1007 (9th Cir. 2023).

each of the above cases applied the definition of commodity. This Court should affirm.

### C. Application of federal case law to OHM, Klima, and wrapped bitcoin

Wrapped bitcoin is particularly illustrative of why it, as well as OHM and Klima, all qualify as commodities even though they do not underlie a futures contract. This is because "[w]rapped tokens are tokenized versions of cryptocurrencies that may exist on other blockchains and are pegged to the value of the original coin." *Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 217 n.12 (S.D.N.Y. 2023) (cleaned up); *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 458 n.2 (S.D.N.Y. 2023) ("Terraform launched a platform allowing LUNA holders to create a 'wrapped' version of LUNA, named wLUNA, that could be traded on non-Terraform blockchains but was otherwise identical to LUNA."). Although wrapped bitcoin functions on the Ethereum blockchain, it is fully backed 1:1 by bitcoin, making it a fungible representation of bitcoin on the Ethereum blockchain. Br. at 17; A121 ¶36.

Contrary to Appellants' argument, the Fifth Circuit has repeatedly rejected similar arguments that a commodity ceases to be a commodity based on its location. *See United States v. Brooks*, 681 F.3d 678, 694 (5th Cir. 2012) (rejecting argument that "only natural gas traded at Henry Hub is a commodity under the CEA because only natural gas traded at Henry Hub underlies the natural gas futures contracts traded on NYMEX."); *United States v. Futch*, 278 F. App'x 387, 395 (5th Cir. 2008) (rejecting argument that natural gas ceased being a commodity because it was delivered at a location other than the specified hub). Likewise, wrapped bitcoin is

still bitcoin; its essential nature as a commodity does not change simply because it is located on the Ethereum blockchain.

Similarly, both OHM and Klima are ERC-20[25] assets on the Ethereum blockchain, adhering to the same technical standard as ether.[26] The "core characteristics" that unite this category are thus far narrower than Appellants argue and certainly could allow for futures to be dealt in any of these tokens in the future, even if they do not exist in the present.

The district court did not err in its interpretation of the term commodity under the CEA to include digital assets such as wrapped Bitcoin, OHM, and KLIMA.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's grant of summary judgment to the CFTC on all counts of the complaint.

Dated: December 17, 2024                    Respectfully submitted,

                                            Robert A. Schwartz,
                                               *General Counsel*
                                            Anne W. Stukes,
                                               *Deputy General Counsel*
                                            Brigitte Weyls,
                                               *Senior Assistant General*
                                               *Counsel*

---

[25] An ERC-20 token is "designed on the Ethereum blockchain with a programming language called the ERC-20 protocol." *Williams v. Binance*, 96 F.4th 129, 134 (2d Cir. 2024).
[26] The CFTC has resolved a number of actions related to other ERC-20 tokens, including *In the Matter of: Tether Holdings Limited, et al.,* CFTC Docket No. 22-04 (Oct. 15, 2021) (ordering Tether to pay $41 million for misrepresentations and omissions regarding its USDt asset, which it claimed was backed one-to-one by dollars); *CFTC v. McAfee*, No. 21-cv-1919, 2022 WL 3969757, at *2 (S.D.N.Y. July 14, 2022) (entering consent order where "[d]igital assets, such as bitcoin, ether, and other virtual currencies such as verge, dogecoin, and reddcoin, identified in the Complaint are encompassed by the definition of "commodity" under 7 U.S.C. § 1a(9)).

COMMODITY FUTURES
TRADING COMMISSION
77 W. Jackson Blvd., Suite 800
Chicago, Illinois 60604
bweyls@cftc.gov
(312) 596-0547

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32 (a)(1)-(4) and Circuit Rule 32(c) because it contains 13,847 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and Circuit Rule 32(b) because it was prepared using Microsoft Word version 2024 in Century 12-point font, a proportionally spaced typeface.

Dated: December 17, 2024                                     s/ Brigitte Weyls
                                                            Brigitte Weyls

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of December, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the appeal are registered CM/ECF users and will be served by the CM/ECF system.

Dated: December 17, 2024                      <u>s/ Brigitte Weyls</u>
                                                Brigitte Weyls