**24-2684**

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

◆◆

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee,*

—v.—

SAM IKKURTY and JAFIA LLC,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
NO. 1:22-CV-02465
HONORABLE MARY M. ROWLAND

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS
## SAM IKKURTY AND JAFIA LLC

JASON P. GOTTLIEB
MICHAEL MIX
MORRISON COHEN LLP
909 Third Avenue, 27th Floor
New York, New York 10022
(212) 735-8600

*Attorneys for Defendants-Appellants
Sam Ikkurty and Jafia LLC*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ............................................................................................................... 5

   I.  Defendants Did Not Waive the Arguments Made in this Appeal ............................. 5

   II. The District Court Erred in Granting Summary Judgment for the CFTC on its Claim Under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) ................................................... 8

     A.  The District Court Erred in Finding that OHM and Klima are Commodities ................ 8

     B.  The District Court Erred in Finding that WBTC Is a Commodity ............................... 11

     C.  The District Court Erred in Finding Commodities Fraud With Respect to ETH .......... 12

     D.  The Stray References to BTC and ETH in Marketing Materials Are Not Sufficient to Meet the "In Connection With" Requirement ................................................. 13

   III. The District Court Erred by Granting Summary Judgment for the CFTC on the Claim for Failure to Register as a CPO Under 7 U.S.C. § 6m(1) ....................................... 18

   IV. The District Court Erred in Granting Summary Judgment for the CFTC on the Claim for Fraud by a CPO Pursuant to 7 U.S.C. § 6o(1)(A)-(B) ........................................... 21

CONCLUSION ........................................................................................................... 22

CERTIFICATE OF COMPLIANCE ................................................................................. 23

CERTIFICATE OF SERVICE ........................................................................................ 24

ADDENDUM FOR CASE NOT AVAILABLE ON WESTLAW OR LEXIS: *CFTC V. HERITAGECAPITAL ADVISORY SERVS., LTD*., NO. 82 C 5955 ¶ 21,627 (N.D. ILL. NOV. 8, 1982) ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Lindgren*,
   856 F.3d 498 (7th Cir. 2017) ..................................................7

*Beatrice Foods Co. v. Fed. Tr. Comm'n*,
   540 F.2d 303 (7th Cir. 1976) ................................................11

*Bew v. City of Chicago*,
   252 F.3d 891 (7th Cir. 2001) ..................................................7

*Boyers v. Texaco Refin. & Mktg., Inc.*,
   848 F.2d 809 (7th Cir. 1988) ..................................................7

*Broaddus v. Shields*,
   665 F.3d 846 (7th Cir. 2011) ..................................................7

*Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*,
   519 U.S. 316 (1997)..............................................................18

*CFTC v. Amerman*,
   645 F. App'x 938 (11th Cir. 2016) .......................................21

*CFTC v. Brockbank*,
   2006 WL 223835 (D. Utah Jan. 30, 2006)...........................21

*CFTC v. Ehrlich*,
   2024 WL 4008205 (S.D.N.Y. Aug. 29, 2024) ......................21

*CFTC v. Equity Fin. Grp LLC*,
   572 F.3d 150 (3d Cir. 2009)..................................................20

*CFTC v. Heritage Capital Advisory Servs., Ltd.*,
   No. 82 C 5955¶ 21,627 (N.D. Ill. Nov. 8, 1982) .................21

*CFTC v. Hunter Wise Commodities, LLC*,
   21 F. Supp. 3d 1317 (S.D. Fla. 2014) .............................14, 15

*CFTC v. JBW Capital, LLC*,
   812 F.3d 98 (1st Cir. 2016)...................................................16

*CFTC v. M25 Invs., Inc.*,
   2010 WL 4269124 (N.D. Tex. Oct. 25, 2010) ......................20

*CFTC v. McDonnell,*
    287 F. Supp. 3d 213 (E.D.N.Y. 2018) .............................................9, 10

*CFTC v. McDonnell,*
    332 F. Supp. 3d 641 (E.D.N.Y. 2018) ...................................................14

*CFTC v. My Big Coin Pay, Inc.,*
    334 F. Supp. 3d 492 (D. Mass. 2018) ......................................................9

*CFTC v. Perkins,*
    2009 U.S. Dist. LEXIS 23580 (D.N.J. Mar. 25, 2009)..........................21

*CFTC v. Perkins,*
    385 F. App'x 251 (3d Cir. 2010) ...........................................................21

*CFTC v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000)......................................................................16

*CFTC v. Wilson,*
    19 F. Supp. 3d 352 (D. Mass. 2014) .......................................................16

*Chadbourne & Parke LLP v. Troice,*
    571 U.S. 377 (2014).........................................................................16, 17

*Chevron U.S.A. Inc. v. NRDC,*
    467 U.S. 837 (1984)................................................................................15

*Grippo v. Perazzo,*
    357 F.3d 1218 (11th Cir. 2004) ..............................................................15

*Hirk v. Agri-Research-Council, Inc.,*
    561 F.2d 96 (7th Cir. 1977) ....................................................................16

*In re J.P. Jeanneret Assocs., Inc.,*
    769 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................15

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024)............................................................................15

*Lopez v. Dean Witter Reynolds, Inc.,*
    805 F.2d 880 (9th Cir. 1986) ...........................................................20, 21

*Maracich v. Spears,*
    570 U.S. 48 (2013)............................................................................17, 18

*Ormond v. Anthem, Inc.,*
    2008 U.S. Dist. LEXIS 30230 (S.D. Ill. Mar. 31, 2008) ........................17

*Pond v. Michelin N. Am., Inc.*,
  183 F.3d 592 (7th Cir. 1999) ...................................................................7

*R&W Tech. Servs. Ltd. v. CFTC*,
  205 F.3d 165 (5th Cir. 2000) .................................................................16

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
  630 F.3d 866 (9th Cir. 2010) .................................................................18

*Risley v. Universal Navigation, Inc.*,
  690 F. Supp. 3d 195 (S.D.N.Y. 2023)....................................................10

*SEC v. Lauer*,
  52 F.3d 667 (7th Cir. 1995) ...................................................................16

*SEC v. Zandford*,
  535 U.S. 813 (2002)................................................................................15

*U.S. v. Billups*,
  536 F.3d 574 (7th Cir. 2008) ...................................................................7

*U.S. v. Brooks*,
  681 F.3d 678 (5th Cir. 2012) .................................................................10

*U.S. v. Futch*,
  278 F. App'x 387 (5th Cir. 2008) ...........................................................10

*U.S. v. Wilkinson*,
  986 F.3d 740 (7th Cir. 2021) .................................................................19

*Williams v. Kucoin*,
  2021 U.S. Dist. LEXIS 204334 (S.D.N.Y. Oct. 21, 2021) ....................10

*Wolf v. Larson*,
  897 F.2d 1409 (7th Cir. 1990) .................................................................7

**Statutes**

7 U.S.C. § 1a(9) ............................................................................................1, 8, 9

7 U.S.C. § 1a(10) ..............................................................................................18

7 U.S.C. § 6m(1) ...............................................................................................18

7 U.S.C. § 6o(1)(A)-(B) ....................................................................................21

7 U.S.C. § 9(1) .......................................................................................7, 13, 14

15 U.S.C. § 78j.................................................................................15, 16, 17, 18

Driver's Privacy Protection Act of 1994 ........................................................................18

Employee Retirement Income Act of 1974 ....................................................................18

Securities Litigation Uniform Standard Act of 1998 (SLUSA)................................16, 17

**Other Authorities**

17 C.F.R. § 180.1(a)........................................................................................................7

*Nathan Reiff, Bitcoin v. Ethereum: What's the Difference ?* Investopedia (June 29,
    2024), https://www.investopedia.com/articles/investing/031416/bitcoin-vs-
    ethereum-driven-different-purposes.asp ................................................................12

Defendants-Appellants Sam Ikkurty and Jafia LLC (together with Ikkurty, "Defendants"[1]) respectfully submit this reply in further support of their appeal of the Judgment entered by the District Court, as well as all orders that merge into it.

## PRELIMINARY STATEMENT

The District Court's order granting summary judgment for the CFTC and subsequent Judgment imposes severe, life-altering penalties against Defendants. But the Judgment is based on a flatly erroneous reading of the CEA, which does not provide the CFTC jurisdiction to bring this case. No matter what anyone thinks of defendants or their actions, this case does not concern "commodities" as defined by the CEA, and the CFTC never was permitted to bring it.

The CFTC's brief (ECF No. 17, "CFTC Br.") tries valiantly to rectify the District Court's errors, but neither the CFTC nor the District Court can rewrite the statute that Congress wrote. Under the statute, "commodities" are defined (in relevant part) as "goods and articles … and all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Thus, unless an item appears on the list of specified commodities – and cryptocurrency does not – that item is only a "commodity" if a futures contract exists for it.

Here, the CFTC alleges fraud in connection with the Funds, which primarily invested in digital asset tokens OHM and Klima, invested in a small amount of WBTC, and acquired a small amount of ETH for transactional convenience, *i.e.*, it was easier to pay for other digital asset tokens in ETH rather than in fiat currency. The District Court held that OHM, Klima, and WBTC are commodities under the CEA because they share similar characteristics to other digital asset tokens for which futures contracts are traded.

---

[1] Unless otherwise specified, all defined terms are used as defined in Defendants initial brief (ECF No. 11, "Defs. Br.").

The CFTC <u>admits</u> that there are <u>no futures contracts for OHM, Klima, and WBTC</u>.  Those digital asset tokens therefore are not commodities.  That concession alone is sufficient to end the analysis:  the Judgment below was fatally infected with this erroneous conclusion, and at a minimum, reversal and remand are necessary for the District Court to grapple with the limits of the CFTC's jurisdiction, and to vacate any findings of liability or damages awards (monetary or injunctive) related to these tokens.

The CFTC echoes the same faulty argument made by the District Court – that those digital assets are commodities because they are in the same class or category as digital assets for which there are futures contracts.  That theory is not the law, and stretches the unambiguous language of the CEA into saying something that it clearly does not say.  Each digital asset token is different, has a different purpose or value, and is used at different times for different reasons.  Just because some digital assets may be commodities (because they have contracts for future delivery) does not mean that they <u>all</u> are.  The CFTC fails to grapple with this argument, and the CFTC's interpretation would lead to absurd results, where literally anything digital could be considered a commodity merely because it is in the same general class or category as digital assets that underlie futures contracts.  Under the CFTC's and the District Court's theory, nearly all goods on earth could be commodities, over which the CFTC has antifraud authority, merely because they could be labeled as in the same category as another good that is a commodity.  The CEA does not give the CFTC that power.

The CFTC tucks that particular atextual argument toward the end of its brief, leading instead with a hard pivot to an argument that is not in the Judgment – the idea that Defendants committed fraud "in connection with" commodities because certain Fund II marketing materials contain a pie chart with a slice showing "15%" over the word "Bitcoin," and obliquely reference

a possible investment into BTC and ETH in the future. The CFTC thus argues that if a (possible) commodity was mentioned as a possibility for some future activity, that tenuous connection is enough to give it jurisdictional authority over anything and everything else a person may do, whether connected to defined commodities or not. Case law (including from the Supreme Court) repeatedly instructs that a statutory "in connection with" requirement is not met by such an attenuated reference. Here, Defendants <u>did</u> invest in digital assets that are unquestionably non-commodities, and the Fund investors (as opposed to the Funds themselves) would not directly invest in any commodities. A reference to BTC and ETH (the two most widely circulating cryptocurrencies) in marketing materials does not provide the jurisdictional basis for the CFTC to regulate anything that the Funds have done, for any moment forward, if those activities are not in connection with a commodity.

Regardless, because that argument was not adopted by the District Court, the CFTC's argument – even if successful – would still require reversal of the Judgment and remand to the District Court. The Judgment, and the harsh penalties contained therein, were based on the District Court's erroneous conclusion that OHM, Klima, and WBTC are commodities. While full reversal is warranted, at a minimum, remand is appropriate with instructions to the District Court to (1) examine whether any alleged violative activities had a sufficient connection to any statutorily-defined commodities, and (2) reassess damages on that basis.

Separately, the CFTC also has not rebutted Defendants' argument that Defendants did not act as unregistered CPOs. Again, the Funds did not pool investor funds to invest in commodities because OHM, Klima, and WBTC are not commodities, and the Funds only acquired ETH for transactional convenience. The CFTC repeats the District Court's error that Defendants acted as CPOs because fund documents say that Defendants <u>could</u> invest in commodity derivatives, but

adoption of the CFTC's argument would lead to the absurd result that every fund with a reference to a derivative product in its documents would be a commodity pool.

The CSN product also does not turn Defendants into CPOs despite the vague reference in marketing materials to "put option protection." The CSN was a promissory note paying a fixed return to investors; investors did not share pro rata in any profits and losses, a key characteristic of a commodity pool.

A final point on the CFTC's attempt to tar and feather Defendants, even beyond the Judgment: the CFTC evidently hopes that if this Court concludes that Ikkurty is a "bad guy," then this Court will overlook the CFTC's jurisdictional overreach. Needless to say, that approach is improper. If the CFTC does not have jurisdiction (or if its jurisdiction is more limited than it asserted), the Judgment cannot stand. On this appeal, Defendants are not challenging the factual findings in the Judgment, focusing instead on the most obvious, and purely legal, flaw in the Judgment below. But the CFTC goes much too far in asserting that Defendants "concede on appeal that they ran a Ponzi scheme and defrauded customers." Defendants do not "concede" that assertion, or anything else. But the truth or falsity of those accusations is not the issue on appeal. The CFTC is not permitted to be a freelance sheriff, exacting justice on whomever it believes is a wrongdoer. Its power is circumscribed by statute, and here, the CFTC acted outside its statutory authority, leading to penalties that have ruined a man's life. This Court should redress that legal error, and reverse the District Court's opinion and the resulting Judgment.

## ARGUMENT

## I.     Defendants Did Not Waive the Arguments Made in this Appeal

As a threshold matter, the CFTC asserts that Defendants waived their argument that OHM, Klima, and WBTC are not commodities by not making those arguments to the District Court.[2] CFTC Br. at 24-27.  This assertion is incorrect.  Defendants <u>did</u> argue below that they did not transact in commodities, as defined in the CEA.  In particular, before the District Court, Defendants argued:

- "[t]he investments in these assets made by Fund II (and, for that matter, Fund I) are not commodity interests regulable under the CPO provisions of the CEA.  They are not among the specific transactions included within the statutory definition of commodity interest...."  District Court ECF No. 271 at 3.

- "the Complaint fails to properly plead fraud 'in connection with any…contract of sale of any commodity."  *Id.* at 4.

- "There were no 'commodity interests' involved in this case (Counts 1 and II), and any marginal connections to 'commodities' (Count III) are grossly insufficient to support the CFTC's claims."  *Id.* at 12.

- "The CFTC argues that Bitcoin and Ethereum are 'commodities.'  In reality, the Funds did not invest in Bitcoin itself, but did invest in WBTC, a digital asset representing the value of Bitcoin."  CSA46 (internal citation omitted).

- "the conclusive evidence demonstrates the digital assets held by the Funds are not 'commodity interests' as defined in the CEA."  CSA41.[3]

---

[2]     The CFTC does not claim that Defendants waived other arguments.

[3]     "CSA" refers to the CFTC's supplemental appendix.

- "Funds' investments in digital assets are not among of [sic] the specific transaction types included within the definition of 'commodity interest.'"  CSA43.

- "The Funds' digital assets … all fall outside the scope of the 'commodity interest' provisions of the CEA."  CSA44.

- "Defendants do not concede the various crypto currencies or crypto assets are commodities or subject to regulation by the CFTC..."  CSA54.

Moreover, Defendants' argument that the ETH purchased by the Funds was merely for "transactional convenience" was explicitly made before the District Court.  District Court ECF No. 271 at 8, 22.

Indeed, the CFTC responded to these arguments by arguing that they were incorrect, and asserting (though erroneously) its own jurisdiction.  *See* District Court ECF No. 342 at 10-12 (arguing, *inter alia*, that "[o]ther digital assets (*e.g.*, the digital assets that Ikkurty purchased in large volume like Ohm, Klima) may also be classified as commodities").

The District Court engaged on these issues:

> At the outset, Defendants argue that they cannot be held liable under the CEA because they did not engage in the sale of a covered commodity.  In its complaint, the CFTC identified two cryptocurrencies, Bitcoin and [Ether], as commodities that Defendants invested in.  Through discovery, the CFTC also identified two additional cryptocurrencies, OHM and Klima.  Defendants argue that the CFTC's statutory authority does not extend to any cryptocurrencies.

SA10.  The District Court also explained that Defendants argued that "they did not invest in Bitcoin itself, but 'wrapped Bitcoin,' a digital token pegged to the value of Bitcoin."  SA11.  The District Court's recitation of Defendants' argument, and its acceptance of the CFTC's position, undermines the CFTC's argument that these issues were not argued below and waived.

Even if the language below was not word-for-word identical, these defenses were clearly asserted below. In this Court, "when a new argument supports a claim made before the district court, we will usually address it." *Bew v. City of Chicago*, 252 F.3d 891, 895 (7th Cir. 2001), *citing Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below"). This Court thus routinely finds that an issue was not waived even if it was presented somewhat differently below. *See Baker v. Lindgren*, 856 F.3d 498, 506 (7th Cir. 2017) (no waiver where appellant made "essentially" the same argument below); *U.S. v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008) ("Billups's challenge below was sufficient to preserve his current argument, even if he offers a new twist on that argument based on additional authority on appeal").

The cases cited by the CFTC in support of its waiver argument are inapposite. In none of those cases did the district court do what it did here – explicitly reference the argument that the CFTC believes has been waived. *See Broaddus v. Shields*, 665 F.3d 846, 853 (7th Cir. 2011) (appellant conceded that he did not raise a particular issue to the district court); *Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 596-97 (7th Cir. 1999) (appellant only made two vague references to an argument before the district court, which did not consider it); *Wolf v. Larson*, 897 F.2d 1409, 1413 (7th Cir. 1990) (appellant did not contest that she waived an argument) *Boyers v. Texaco Refin. & Mktg., Inc.*, 848 F.2d 809, 812 (7th Cir. 1988) (appellant attempted to raise "substantial new issues, factual and legal, that were not presented to the district court," which was "deprived of the opportunity to fully consider" the argument).

As a result, the Court should consider Defendants' argument on the merits.

## II.     The District Court Erred in Granting Summary Judgment for the CFTC on its Claim Under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)

The CEA's definition of "commodity" is unambiguous, and the definition of "commodity" is a necessary element to the three causes of action in the Complaint.  Defs. Br. at 20-22.  The District Court found that OHM, Klima, and WBTC are commodities as defined in the CEA, and that ETH was traded as a commodity in this case.  *Id.* at 22-38.  As a matter of legal statutory construction, that conclusion was erroneous.  The CFTC has not cited any facts, or legal arguments, for why those digital assets are commodities.

### A.     The District Court Erred in Finding that OHM and Klima are Commodities

OHM and Klima are not "commodities" under the CEA because there are no "contracts for future delivery" for either token.  Defs. Br. at 23-31.  The CFTC concedes that OHM and Klima "do not underlie a futures contract."  CFTC Br. at 52.  That should dispose of the issue.  Instead, the CFTC argues that OHM and Klima are no different from BTC and ETH (digital assets for which futures contracts are traded).  CFTC Br. at 48.  This argument, which was made below and accepted by the District Court, SA10-12, is fundamentally incorrect.

The CFTC contends that "several enumerated categories in the definition of commodity— such as livestock, livestock products, and oils—include items without futures contracts, such as goats, leather, and avocado oil.  This demonstrates that the statutory definition of 'commodity' is not contingent on the existence of futures trading for every item or subset."  CFTC Br. at 48-49.  But, as the CFTC concedes, those items fall under enumerated categories in the statutory definition.  7 U.S.C. § 1a(9).  There is no enumerated category in the definition of "commodity" that would cover the assets at issue here.  Section 1(a)(9) does not mention "digital assets," "software," "cryptocurrency," "tokens," or anything of the like.  Indeed, the other enumerated categories are all physical, tangible, objects, a notable differentiation from cryptocurrency tokens.

8

The CFTC then points to a catch-all reference in 7 U.S.C. § 1a(9) to "all other goods and articles" and "all services, rights, and interests."  Ironically, the CFTC argues that *ejusdem generis*, "the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  CFTC Br. at 49.  But this argument serves to <u>exclude</u> digital assets, which are <u>not</u> similar to the specific commodities listed in § 1a(9):  every other listed commodity is a physical good.[4]

The CFTC's strained interpretation of the statute gets worse:  even if one would consider cryptocurrencies to be "services, rights, [or] interests," the CFTC ignores the limiting language for such services, rights, or interests:  "in which contracts for future delivery are presently or in the future dealt in."  This is a critical limitation on the CFTC's jurisdiction, whose very name – Commodity Futures Trading Commission – invokes the word "futures."

Based on this overreach, the CFTC repeats the District Court's erroneous reliance on *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492 (D. Mass. 2018), asserting that digital assets as a whole are a "class" of commodities, and as a result, all digital assets are CEA-defined commodities.  CFTC Br. at 50-51.  As explained, that definition flies in the face of the plain text of the statute.  And that argument would have no limiting principle – under the CFTC's approach, the fact that one digital asset is a commodity would mean that every single digital asset is a commodity.  And because digital assets are software, every single piece of software would be a commodity.  Defs. Br. at 29.  That is not what the statute says, or even remotely suggests.

---

[4]     To wit:  "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice..."  7 U.S.C. § 1a(9).

The CFTC does not refute that each digital asset token is inherently different from the rest – they perform different functions and are bought and sold for different reasons. *Id.* at 29. The CFTC cites to *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 229 (E.D.N.Y. 2018), but *McDonnell* did not analyze whether a specific digital asset could be a commodity even without an associated futures contract (as explained in Defendants' initial brief, the *McDonnell* court analyzed BTC and Litecoin, two digital assets for which futures contracts are sold). Defs. Br. at 28.[5]

The CFTC's citation to the Fifth Circuit natural gas cases cited by the District Court, CFTC Br. at 52-53, fails for similar reasons. Those cases found that even though only natural gas traded at Henry Hub was the subject of futures contracts, natural gas flowing elsewhere could be commodities. Defs. Br. at 24-28; *see U.S. v. Brooks*, 681 F.3d 678, 694-95 (5th Cir. 2012); *U.S. v. Futch*, 278 F. App'x 387, 395 (5th Cir. 2008). The CFTC argues that OHM and Klima are the same as natural gas at issue in *Brooks* and *Futch* because OHM and Klima "are ERC-20 assets on the Ethereum blockchain, adhering to the same technical standard as [ETH]." CFTC Br. at 53. But ERC-20 is merely "an application standard that allows for smart contract tokens to be created on [the] Ethereum [blockchain], each of which creates 'ERC-20 tokens.'" *Risley v. Universal Navigation, Inc.*, 690 F. Supp. 3d 195, 203 (S.D.N.Y. 2023). The code underlying each token is different, even two tokens utilizing the ERC-20 standard. As other courts have noted, tokens utilizing the ERC-20 protocol "differ … from crypto-currencies like Bitcoin and Ether that operate on their own blockchains and restrict the number of tokens available at any time." *Williams v. Kucoin*, 2021 U.S. Dist. LEXIS 204334, at *2 (S.D.N.Y. Oct. 21, 2021). In any event, that fact that multiple tokens are ERC-20 assets does not make them fungible, unlike the natural gas at issue

---

[5]     To the extent *McDonnell* or *My Big Coin* stand for the proposition that all digital tokens are commodities, those cases are erroneously decided, for the reasons detailed on this appeal.

in *Brooks* or *Futch*.  As explained by Defendants – and not refuted by the CFTC – different digital asset tokens are different from each other and are utilized for different reasons.  Defs. Br. at 26-28.  Unlike natural gas, a digital asset like OHM or Klima obviously cannot "flow" through a blockchain and become another token like ETH.  "Natural gas that happens to come from different locations" is thus a poor analogy.

Finally, the CFTC's citation to two consent decrees, CFTC Br. at 53 n. 26, is irrelevant.  Consent decrees have no precedential value; the courts did not actually adjudicate whether a specific digital asset was a commodity.  *See Beatrice Foods Co. v. Fed. Tr. Comm'n*, 540 F.2d 303, 312 (7th Cir. 1976) ("The entering of a consent decree, however, is not a decision on the merits and therefore does not adjudicate the legality of any action by a party thereto.  Nor is a consent decree a controlling precedent for later Commission action").[6]

### B.    The District Court Erred in Finding that WBTC Is a Commodity

WBTC is not BTC; it is a "digital token pegged to the value of" BTC and "represent[s] Bitcoin" on the Ethereum blockchain.  SA11; A466 ¶ 36.  The CFTC concedes that WBTC does not underlie a futures contract.  CFTC Br. at 52.  WBTC thus is not a commodity as defined in the CEA.  Defs. Br. at 31-32.

The CFTC argues that "wrapped bitcoin is still bitcoin; its essential nature as a commodity does not change simply because it is located on the Ethereum blockchain."  CFTC Br. at 52-53.

---

[6]     For similar reasons, the "in connection with" requirement is not met even though certain marketing materials for the CSN product referenced "put option protection."  CFTC Br. at 29-30.  Specifically, a wedge of a pie chart for CSN in a pitch deck states "8%" over the words "put option protection."  As explained *infra*, it is disputed whether this vague reference is supposed to mean a commodity option.  In any event, CSN funds allegedly were used to purchase OHM and Klima, which are not commodities.  A451 § 64.  The CFTC also references the Carbon Offset Bond product, which was allegedly backed by the base carbon tonne ("BCT") digital asset.  CFTC Br. at 10-11.  The CFTC does not explicitly argue that BCT is a commodity, and in any event does not cite any evidence that any BCT futures contracts exist.

The CFTC cites no authority for that contention, and the CFTC's *ipse dixit* assertion that "it's basically the same thing" is not supported by the record. To the contrary, because WBTC can be used on the Ethereum Blockchain, it can be utilized on Ethereum-based protocols, in different ways and for different reasons than BTC.[7] Statutory jurisdiction is not horseshoes or hand grenades; the CFTC cannot get "close enough" by simply asserting it is close enough. It was an error of law to conclude that WBTC, a product with no future contract, was "close enough" under the statutory strictures of Section 1(a)(9).

### C.     The District Court Erred in Finding Commodities Fraud With Respect to ETH

The Funds purchased a small amount of assets in ETH. However, it is undisputed that Defendants made these purchases not for investment purposes, but only for "transactional convenience" – the Funds exchanged U.S. dollars into ETH, and then used that ETH to make spot transactions in other digital assets. Defs. Br. at 32-33; A466 ¶ 36.

The CFTC argues that Ikkurty's testimony below stated that he "generally" purchased ETH for transactional convenience and "generally" does not mean "solely." CFTC Br. at 30. But the word "generally" plainly is meant to connote that it was defendants' general practice. A466 ¶ 36. The CFTC cannot point to any evidence where Defendants ever purchased ETH for investment purposes. The CFTC also cites deposition testimony in which Ikkurty testified that when investors sent funds to Fund II, some of those monies would be deposited into a bank account and other monies would be used to purchased ETH, CFTC Br. at 30, but it is unclear what the significance

---

[7]     *See* Nathan Reiff, *Bitcoin v. Ethereum: What's the Difference?*, Investopedia (June 29, 2024), https://www.investopedia.com/articles/investing/031416/bitcoin-vs-ethereum-driven-different-purposes.asp ("Overall, Bitcoin focuses on being a digital currency and store of value, while Ethereum provides a robust platform for creating and executing transactions that facilitate the movement of value").

of this fact is or why it supports the CFTC's argument.  To the contrary, in the next question after the cited testimony, Ikkurty explained that "[ETH] might be used to purchase some other cryptocurrency depending on what the fund was invested in at the time."  CSA35 at 101:16-19.

The CFTC asserts that there is no "transactional convenience" exception under the CEA. CFTC Br. at 30-31.  But the CFTC ignores that any alleged fraud was completely incidental to any purchase of ETH.  The CFTC also fails to grapple with Defendants' analogy to using gasoline to drive a car to the store to purchase non-commodity goods.  Defs. Br. at 32-33.

### D.    The Stray References to BTC and ETH in Marketing Materials Are Not Sufficient to Meet the "In Connection With" Requirement

Tellingly, the CFTC's argument that OHM, Klima, and WBTC are commodities is buried at the very end of the CFTC's brief.  CFTC Br. at 44-53. The CFTC makes a different principal argument that was not adopted by the District Court – that Defendants' conduct "satisfies the 'in connection with' requirement under § 9(1) and Regulation 180.1(a)" because Defendants allegedly made "material misrepresentations and omissions in their solicitations of [Fund II] participants, including marketing that fund as investing in bitcoin and ether, which [Defendants] agree are commodities under the CEA."  CFTC Br. at 27.  In other words, the CFTC argues that even if OHM, Klima, and BTC are not commodities under the CEA, Defendants are still liable because "[t]he very act of soliciting funds under the guise of investing in two commodities—bitcoin and ether—satisfies the 'in connection with' the sale of a commodity requirement."  CFTC Br. at 27-28.  The CFTC is incorrect factually and legally.

As an initial matter, the CFTC only points to marketing materials involving Fund II.  CFTC Br. at 27-30.  The CFTC does not point to any record evidence that Fund I ever marketed to investors that it would invest in BTC and ETH.  Given that the Court's order granting summary judgment concerned alleged fraud at both Funds, and the resulting Judgment was entered against

13

Fund I (and others), the CFTC's argument implicitly concedes that the District Court erred. At a minimum, reversal is appropriate for the District Court to amend any findings concerning Fund I.

Moreover, the CFTC has not presented undisputed facts showing that Defendants misrepresented to investors that they would invest 15% in BTC and ETH. Indeed, that was not one of the purported misrepresentations found by the District Court, SA12-19. The pages of the marketing slide deck cited by the CFTC show a pie chart where one slice is labeled "15%" over the word "Bitcoin." CSA 28-30. There are no cited facts as to whether a putative investor would understand that "Bitcoin" was a shorthand for "cryptocurrency tokens," or whether the mere possibility that Fund II would invest 15% in BTC was material. The CFTC's arguments also lack context; anyone receiving those materials would also understand that Jafia would be making investment decisions notwithstanding what was written on those materials. *See* A312-13 §§ 3.01-3.02 (the limited partnership agreement for Fund II, providing that Jafia "shall have the sole discretion of making investments on behalf of the partnership" and granting Jafia broad power to "direct the formulation of investment policies and strategies for the Partnership").

The cited pages further reference the possibility to "diversify into other assets like bitcoin, Ethereum [sic]." CSA30. The deck does not state that Fund II definitively would invest in those digital assets, and again, the District Court did not make any findings regarding those statements.

Those stray references do not meet the "in connection with" requirement. The CFTC does not point to a single case meeting the "in connection with" requirement of § 9(1) and Regulation 180.1(a) where, like here, the defendants invested assets in non-commodities like OHM, Klima, and WBTC. In *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 667-70 (E.D.N.Y. 2018), decided after a bench trial and not at summary judgment, certain investors transferred digital assets that are commodities to the defendants for trading advice and to purchase other digital assets on their

behalf, and the defendants allegedly misappropriated those assets and never provided those services.  In *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1338 (S.D. Fla. 2014), the defendants did transact in precious metals that were deemed commodities – the fraud (again, after a bench trial) involved, among things, misrepresentations about those metals transactions.[8]

The other cases relied upon by the CFTC, interpreting an "in connection with" requirement of a different statute – Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j) – are equally inapposite because they do not involve a similar situation where the Funds did in fact make investments in non-commodities (or non-securities, in the 10(b) cases). In *SEC v. Zandford*, 535 U.S. 813 (2002), the investors did transact in securities; the "in connection with" requirement of Section 10(b) was satisfied because the defendant broker engaged in a scheme in which he sold a customer's securities and used the proceeds himself.[9]  And contrary to the CFTC's argument, the Supreme Court in *Zandford* warned that "the statute [the Exchange Act] must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *Id.* at 820 (citation omitted).  The CFTC cites *Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004), but there, the Eleventh Circuit found that the "in connection with" requirement of Section 10(b) was satisfied because the plaintiff believed that the defendant had accepted and deposited the plaintiff's funds as payment for securities when the defendant actually pocketed the money.  *Id.* at 1220-21.  Likewise, in *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, (S.D.N.Y. 2011), plaintiff investors who entrusted funds to defendants

---

[8]     *Hunter Wise* applied *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984) in deferring to the CFTC's interpretation.  21 F. Supp. at 1346 n.32.  However, the Supreme Court recently overturned *Chevron*.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).  Thus, that portion of *Hunter Wise* should no longer be considered good law.

[9]     The Supreme Court also deferred to the SEC's interpretation of the "in connection with" requirement, which is no longer permissible under *Loper Bright*.

to, in turn, invest such funds with fraudster Bernie Madoff, satisfied "in connection with" requirement of Section 10(b) because they invested money believing that Madoff would invest it in securities. In *SEC v. Lauer*, 52 F.3d 667, 669-71 (7th Cir. 1995), this Court did not analyze the "in connection with" requirement of 10(b); it instead found that there was an "investment contract" and thus a security even where fraud was "so pure" that the defendants never intended to pool investor money to purchase a (nonexistent) high-yield security.

The CFTC's citations to cases interpreting the "in connection with" requirement in a different section of the CEA fare no better. CFTC Br. at 28-29. The CFTC cites *CFTC v. JBW Capital, LLC*, 812 F.3d 98, 109 (1st Cir. 2016), but the district court opinion affirmed by the First Circuit makes clear that the defendants there did use investor funds to transact in commodity futures, *CFTC v. Wilson*, 19 F. Supp. 3d 352, 355 (D. Mass. 2014). In *CFTC v. Vartuli*, 228 F.3d 94, 102 (2d Cir. 2000), the defendant made misrepresentations in connection with a software system that would provide users with advice as to how to trade currency futures contracts profitably; when users did trade commodity futures on the program's advice, they suffered losses. *R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 173 (5th Cir. 2000), likewise concerned misrepresentations about the efficacy of a software product to trade commodity futures. And *Hirk v. Agri-Research-Council, Inc.*, 561 F.2d 96, 103 (7th Cir. 1977) concerned misrepresentations made to plaintiff prior to plaintiff opening a futures trading account with defendants.

In construing the phrase "in connection with," this case is much closer to *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014), where the Supreme Court more narrowly interpreted the "in connection with" requirement of the Securities Litigation Uniform Standard Act of 1998 ("SLUSA"). SLUSA prevents a plaintiff from bringing a state law securities class action involving a misrepresentation or omission "in connection with the purchase or sale of a covered security."

16

The defendants there perpetrated a scheme where they issued "uncovered securities" to plaintiffs (which would not be precluded by SLUSA) but misrepresented that those uncovered securities were backed by covered securities, which would make plaintiffs' investments in uncovered securities more secure. The Supreme Court held that the "in connection with" requirement of SLUSA was <u>not</u> met because, *inter alia*, "every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, tried to take, who divested themselves of, who tried to divest themselves of, or who maintained an ownership in financial instruments that fall within the relevant statutory definition." *Id.* at 388. The plaintiffs did not fall within that list because they did not directly own any covered securities. In the prototypical "in connection with" case, "the relevant statements or omissions were material to a transaction in the relevant securities by or on behalf of someone other than the fraudster." *Id.* at 393.

Here, similar to *Chadbourne*, the Funds' investors purchased limited partnership interests akin to the uncovered securities in *Chadbourne*. The investors did not think that they were directly purchasing BTC, ETH, or any other digital assets. The CFTC's allegations as to what Defendants purportedly stated the Funds would invest in are akin to the "covered" securities in *Chadbourne*. For the same reasons as set forth in *Chadbourne*, the "in connection with" requirement has not been met. *See also Ormond v. Anthem, Inc.*, 2008 U.S. Dist. LEXIS 30230, at *38-39 (S.D. Ill. Mar. 31, 2008) (allegations that insurance company limited the number of policyholders who became shareholders and kept the price of shares low were not "in connection with" a security under Section 10(b) because the plaintiffs never believed that they had purchased or sold a security).

The CFTC also cites cases providing that the "in connection with" requirement must be interpreted broadly.  CFTC Br. at 28-29.  But as *Chadbourne* demonstrates, even a broad interpretation does not mean limitless.  *See Maracich v. Spears*, 570 U.S. 48, 60 (2013) ("The phrase 'in connection with' [in the Driver's Privacy Protection Act of 1994] is essentially indeterminate because connections, like relations, stop nowhere.  So the phrase 'in connection with' provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions.") (internal citation, quotation marks, and brackets omitted); *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 335 (1997) ("applying the 'relate to' provision [in ERISA] according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.") (Scalia, J. concurring).  *See also Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 872 (9th Cir. 2010) ("in connection with" requirement of Section 10(b) not satisfied where "securities were merely a happenstance cog in the scheme").[10]

## III.   The District Court Erred by Granting Summary Judgment for the CFTC on the Claim for Failure to Register as a CPO Under 7 U.S.C. § 6m(1)

As explained above and in Defendants' initial brief, because the Funds did not invest in any "commodities" as defined under the CEA, they did not operate a "commodity pool" as defined in 7 U.S.C. § 1a(10).  Defs. Br. at 33-38.

The CFTC repeats the District Court's conclusion that even though the Funds did not invest in derivatives, Defendants operated an unregistered commodity pool because they marketed that they had the ability to invest in commodity derivatives.  CFTC Br. at 32-43.  The CFTC is incorrect.

---

[10]     For the same reasons set forth above, the CFTC's contention that they meet the "in connection with" requirement due to alleged misappropriation of funds fails.  CFTC Br. at 31-32.

The CFTC relies heavily on *U.S. v. Wilkinson*, 986 F.3d 740 (7th Cir. 2021). CFTC Br. at 35-39. But *Wilkinson* was not decided on summary judgment; the *Wilkinson* defendant pleaded guilty to one count of wire fraud and this Court analyzed whether the defendant was subject to sentencing enhancement because he acted as a CPO. Given the differing procedural postures, it certainly was error to find that the undisputed facts show that Defendants were operating as CPOs as a matter of law.

Moreover, contrary to the CFTC's contention, CFTC Br. at 36-37, the PPM at issue in *Wilkinson* "listed S&P 500 futures as a <u>specific futures product that could be traded</u>, and that could possibly cause [the relevant fund] to become a Commodity Pool." 986 F.3d at 744 (emphasis added, quotation marks and brackets omitted). By contrast, the Funds' documents did not reference specific futures products that it would trade akin to the reference to S&P 500 futures in *Wilkinson*. The CFTC's argument would lead to the absurd result that any fund whose documents contain <u>any</u> reference whatsoever to commodity derivatives is a commodity pool, no matter the context or the stated purpose of the fund, and no matter what other language is contained in those documents.

Indeed, Fund II's documents were drafted by the venerable law firm Seward & Kissel, which structured Fund II as an exempt securities offering, and Fund II filed a Form D with the SEC. Defs. Br. at 8-9. Seward's David Nangle testified that because the Funds "did not trade commodity interests," it "would not have triggered a registration obligation for the general partner." *Id.* at 8.

For similar reasons, the District Court should not have found that the CSN constituted a commodity pool. Both the CFTC and the District Court focused on a deck containing a pie chart for the CSN in which one slice states "8%" over "[p]ut option protection." But there is no

undisputed evidence showing that reference is to "commodity interests."  The CFTC claims that Ikkurty testified "the 'put option' protection meant options on crypto currencies."  CFTC Br. at 33 n.16.  In actuality, Ikkurty testified that the Funds did not buy put options with money received from the CSN "[b]ecause we tried to do that in crypto world, like buying options, and we realized that the cost of the production is extremely high compared to what we are getting out of it."  CSA 159:7-12.  Given the ambiguity of that testimony, the CFTC cannot definitively say that the reference to "put option" protection meant options on digital assets that are commodities.

The District Court's conclusion regarding the CSN also was wrong because investors did not share in any pro rata profits and loss; the CSN was a promissory note paying 18% interest.  Defs. Br. at 37-38.  Both *CFTC v. Equity Fin. Grp LLC*, 572 F.3d 150 (3d Cir. 2009), relied upon by the District Court, SA20-21, and *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880 (9th Cir. 1986), heavily cited in *Equity Fin.*, make clear that a key characteristic of a commodity pool is the pro rata sharing of profits.  *See Equity Fin.*, 572 F.3d at 158 ("a business falls within this category [of a commodity pool] when," *inter alia* "participants share pro rata in any profits and losses"); *Lopez*, 805 F.2d at 884 (finding that a certain program was not a commodity pool because "not all accounts shared a pro rata profit or loss").

The CFTC argues that a "commodity pool may receive pool contributions in the form of debt instruments."  CFTC Br. at 39.  But the CFTC's only authority for that contention is the statutory definition of "commodity pool" itself, which does not mention debt instruments.  The CFTC cites *CFTC v. M25 Invs., Inc.*, 2010 WL 4269124, at *7 (N.D. Tex. Oct. 25, 2010), but that was a consent order that, as explained above, has no precedential value.

The CFTC attempts to distinguish *Lopez* by arguing that the pool there contained an "individualized treatment and trading strategy of each account."  CFTC Br. at 40.  The lack of

20

identical facts is irrelevant; *Lopez* states that pro rata sharing of profits and losses is crucial to a commodity pool, and here the CSN contained no such sharing.

The CFTC next argues that the "*Lopez* standard is inapplicable to civil enforcement actions brought by the CFTC." CFTC Br. at 40. But the test has been applied in civil enforcement actions. Indeed, *Equity Fin.* expressly examined whether or not the structure there contained pro rata sharing of profits and losses. 572 F.3d at 158. *See also CFTC v. Perkins*, 2009 U.S. Dist. LEXIS 23580, at *13 (D.N.J. Mar. 25, 2009) (analyzing *Lopez* test). *Lopez* itself cites *CFTC v. Heritage Capital Advisory Servs., Ltd.*, No. 82 C 5955 ¶ 21,627, at 9 (N.D. Ill. Nov. 8, 1982),[11] which states that "[i]n a commodity pool, participants share in accrued profits from the commodity futures trading on a pro rata basis; that is, to the extent that they contributed funds, they get the same percentage of the profits and the losses charged to them." The CFTC's citation to *CFTC v. Amerman*, 645 F. App'x 938, 942 n.4 (11th Cir. 2016) is misleading. There, the Eleventh Circuit recognized the pro rata requirement but found that it did not apply to that case; it did not say that *Lopez* was inapplicable to enforcement actions. In *CFTC v. Perkins*, 385 F. App'x 251 (3d Cir. 2010), the Third Circuit did not even mention the pro rata element of *Lopez*. The CFTC further cites *CFTC v. Brockbank*, 2006 WL 223835, at *3 (D. Utah Jan. 30, 2006) and *CFTC v. Ehrlich*, 2024 WL 4008205, at *7 (S.D.N.Y. Aug. 29, 2024), but those cases found that at least at the pleading stage, the CFTC had indeed alleged pro rata distribution of profits and losses.

## IV. The District Court Erred in Granting Summary Judgment for the CFTC on the Claim for Fraud by a CPO Pursuant to 7 U.S.C. § 6o(1)(A)-(B).

For the same reasons that the CFTC has not refuted that the District Court erred in granting summary judgment for the CFTC on the first and third causes of action, the CFTC also has not

---

[11]    *Heritage*, not available on Lexis or Westlaw, is attached hereto.

refuted that the District Court erred in granting summary judgment for the CFTC on the second cause of action, for fraud by a CPO.

## **<u>CONCLUSION</u>**

This Court should reverse the summary judgment decision below and the resulting Judgment, and order the District Court to grant summary judgment in favor of Defendants on all three causes of action, as well as to grant an award of attorneys' fees and costs.

Dated:  New York, New York
      January 22, 2025           MORRISON COHEN LLP


By: /s/ *Jason Gottlieb*
     Jason Gottlieb
     Michael Mix
     909 Third Avenue
     New York, New York 10022
     (212) 735-8600
     jgottlieb@morrisoncohen.com
     mmix@morrisoncohen.com

*Attorneys for Defendants-Appellants Sam Ikkurty and Jafia LLC*

**<u>CERTIFICATE OF COMPLIANCE</u>**

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 37(a)(B) and Circuit Rule 32(c) because this brief contains 6,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface of 12 points or larger using Microsoft Word 2021 in Times New Roman font.

Dated: January 22, 2025                                   */s/ Jason Gottlieb*
                                                          Jason Gottlieb

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of January, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the appeal are registered CM/ECF users and will be served by the CM/ECF system.

Dated: January 22, 2025                    _/s/ Jason Gottlieb___
                                           Jason Gottlieb

**ADDENDUM FOR CASE NOT AVAILABLE ON WESTLAW OR LEXIS:** ***CFTC V.***
***HERITAGECAPITAL ADVISORY SERVS., LTD.*, NO. 82 C 5955 ¶ 21,627 (N.D. ILL. NOV. 8, 1982)**

VitalLaw®



# Commodity Futures Archive - Selected materials, CFTC v. Heritage Capital Advisory Services, Ltd., et al., U.S. District Court, N.D. Illinois, ¶21,627, (Nov. 8, 1982)

Commodity Futures Archive - Selected materials
No. 82 C 5955
Commodity Futures Archive - Selected materials ¶21,627

Click to open document in a browser

CFTC v. Heritage Capital Advisory Services, Ltd., et al.

¶21,627. U.S. District Court, N.D. Illinois, No. 82 C 5955. November 8, 1982. Opinion in full text.

---

> **Headnote**

---

**Futures Trading: Positions: Stop-Loss Orders..–**
There are no guarantees that a stop-loss order, placed in order to limit losses on a futures position, will be executed at a specified price or at all. If the futures market moves against an investor's position, a stop-loss order may not be executable, thus leaving the investor locked into his futures position. The court added that the inability to stop-loss also exists in spread positions.
See ¶8085, "Reports—Records" division, Volume 1.

---

> **Headnote**

---

**Commodity Pool Operators: Preliminary Injunctions: Entitlement to Relief..–**
In an action alleging that a company operated as a commodity pool operator without registering as such, a motion for a preliminary injunction was granted. Technical requirements for the issuance of an injunction existed because the registration violation was established and it was likely that the company would in the future have to disperse funds back to existing customers which would technically be a continuance of some operations without the benefit of registration. Traditional requirements for the issuance of an injunction were also met according to the court. First, irreparable injury could occur if the court did not free the assets, since the company and those related to it could dissipate the assets and render any potential final relief of disgorgement and recision meaningless. Second, absent the injunction, several hundred investors would be threatened with the risk of being unable to recover any portion of their investments. This threatened injury far outweighed any inconveniences which might be suffered by the company and its associated persons. Third, there was a reasonable likelihood of the investors succeeding on the merits, since the company and related parties admitted that they did not register as commodity pool operators with the Commodity Futures Trading Commission. The injunction would not disserve any public interest because it would serve to protect investors, which has been recognized as paramount.
See ¶7760, "Registration" division Volume 1.

---

> **Headnote**

---

**Commodity Pool Operators: Definitions: Investment of Funds..–**
A company and its associated persons acted as commodity pool operators since they solicited many investors for investment in the commodities markets, combined the funds of over 15 investors in bank and other accounts, and distributed the profits to investors based on the investors' pro rata share of the pooled money. According to the court, the parties represented to those investors that the investor's funds would be combined with the funds

© 2025 CCH Incorporated and its affiliates and licensors.     1     Jan 14, 2025 from VitalLaw®
All rights reserved.



of other investors for the purpose of investment in the futures market and commissions were received for these activities.

See ¶4400, "Definitions" division, Volume 1.

---

**Headnote**

---

**Commodity Pool Operators: Definitions: Investment Trust or Syndicate..–**
The terms "investment trust, syndicate, or similar form of enterprise," as used in Section 2(a)(1) of the Commodity Exchange Act should be construed broadly to protect the investing public. Therefore, even though an investment program in which customers' funds were combined by a company acting as a corporate sales agent and transmitted to another investment company for investment, may not have been in the nature of an investment trust or syndicate, it was sufficiently similar to fall within the statute's reach.
See ¶4400, "Definitions" division, Volume 1.

---

**Headnote**

---

**Commodity Pool Operators: Definitions: Ultimate Investment Control..–**
A company functioned as a commodity pool operator even though it only solicited and pooled customer funds and had no control over the ultimate investment decisions. The definition of commodity pool has not been interpreted to require the operator to have ultimate control of the investment decision. The court added that since the company had sufficient control to pool the funds into a single investment, it was a commodity pool operator.
See ¶4400, "Definitions" division, Volume 1.

---

**Headnote**

---

**Registration: Commodity Pool Operators: "Technical Violation"..–**
A federal court may freeze the assets of a commodity pool operator for its failure to register. The failure to register is not a "technical violation" of the Commodity Exchange Act. The court stated that had there been proper registration, the Commission may have uncovered fraud long before customers invested significant amounts of money.
See ¶7760, "Registration" division, Volume 1.

Before the court is the plaintiffs' motion for a preliminary injunction. For the reasons stated herein, the motion is granted.

Jurisdiction of the court is properly invoked pursuant to 7 U.S.C. §§13a-1. 13a-2 and pursuant to the principles of pendent jurisdiction as enunciated in *United Mineworkers v. Gibb,* 383 U.S. 715, 86 S.Ct. 1130 (1966). The history of the litigation to this point is as follows.

The Commodity Futures Trading Commission ("CFTC") and the State of Illinois filed this action against the defendants, Heritage Capital Advisory Services, Ltd. ("Heritage"), Jeffrey W. Weaver, and Ward A. Weaver. The plaintiffs alleged that the defendants operated as "commodity pool operators" without registering with the CFTC as is required under the Commodity Exchange Act, 7 U.S.C. §6M.

On the same day the suit was filed, the plaintiffs sought and obtained a temporary restraining order freezing the assets of the defendants. The temporary restraining order was then extended until a hearing could be had on plaintiff's motion for a preliminary injunction.

Prior to the preliminary injunction hearing, plaintiffs amended their complaint to add two additional counts based upon Illinois state law. Count II of the Amended Complaint alleges that the defendants unlawfully sold unregistered securities in violation of the Illinois Securities Law of 1953, Ill.Rev.Stat., ch. 121 1/2, ¶137.5 (1981). Count III of the Amended Complaint alleges that the defendants acted as a dealers or salespersons without registration as required under Ill.Rev.Stat., ch. 121 1/2, ¶137.8 (1981).

© 2025 CCH Incorporated and its affiliates and licensors. All rights reserved.



A hearing on plaintiffs' motion for a preliminary injunction was held on October 21 and 22, 1982. After carefully evaluating the testimony, exhibits, and stipulations, the court hereby enters the following Findings of Fact and Conclusions of Law.

### Findings of Fact

The Commodity Future Trading Commission is an independent federal regulatory agency which, since April 21, 1975, has been charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. Sec. 1 *et seq.,* and the Regulations promulgated thereunder, 17 C.F.R. Sec. 1.0 *et seq.*

Tyrone C. Fahner is the Attorney General of Illinois and exercises such powers and prerogatives granted him by virtue of his Office as created under article 5, section 15 of the 1970 Illinois Constitution. Fahner brings this action for the benefit and on behalf of those residents of the State of Illinois, whose interests have been or may be adversely affected by the acts and practices of the defendants as set forth herein.

Jim Edgar is the Illinois Secretary of State and exercises such powers and prerogatives granted him by virtue of his office as created under article 5, section 16 of the 1970 Illinois Constitution, including therein the statutory duty to enforce the provisions of the Securities Law. Edgar brings this action through the office of the Attorney General in the name and on behalf of the State of Illinois as provided by Section 13F of the Securities Law, Ill.Rev.Stat., ch. 121 1/2, par. 137.13F.

Heritage Capital Advisory Services, Ltd. ("Heritage") is an Illinois corporation, organized and incorporated on or about October 14, 1981. The principal place of business of Heritage and the location of its business records is 342 West Higgins Road, Schaumburg, Illinois 60195. Heritage is not now and has never been registered with the Commission in any capacity. The records of the Office of the Illinois Secretary of State, covering the period from January 1, 1979 to and including the close of business of September 24, 1982, do not disclose any registration under Section 8 of the Securities Law, Ill.Rev.Stat., ch. 121 1/2, par. 137.8, for Heritage as a dealer or investment adviser in securities.

Jeffrey W. Weaver, Harris Road, Williams Bay, Wisconsin 53191, is president and a shareholder and one of the chief operating officers of Heritage. He has been registered with the Commission as an associated person pursuant to Section 4k of the Act, 7 U.S.C. Sec. 6k, since February 11, 1981. The records of the Office of the Illinois Secretary of State, covering the period from January 1, 1979 to and including the close of business on September 24, 1982, do not disclose any registration pursuant to Section 8 of the Securities Law, Ill.Rev.Stat., ch. 121 1/2, par. 137.8, for Jeffrey W. Weaver as a dealer, salesperson or investment adviser in securities.

Ward A. Weaver, an Illinois resident, is secretary and one of the chief operating officers of Heritage. He has been registered with the Commission as an associated person, pursuant to Section 4k of the Act, 7 U.S.C. 6k, since May 12, 1982. The records of the Office of the Illinois Secretary of State, covering the period from January 1, 1979 to and including the close of business on September 24, 1982, do not disclose any registration pursuant to Section 8 of the Securities Law, Ill.Rev.Stat., ch. 121 1/2, par. 137.8, for Ward A. Weaver as a dealer, salesperson or investment adviser in securities.

The Amended Complaint alleges, and this court takes judicial notice that:

a.  On September 23, 1982, the Commission filed in this court a civil injunctive action against two residents of this district, Financial Partners Brokerage, Ltd. ("FPB") and Robert B. Serhant ("Serhant") (C.A. No. 82 C 5851, N.D. Ill.). The complaint in that action alleged in two counts cheating and defrauding in violation of Section 4b of the Act, 7 U.S.C. Sec. 6b.

b.  On September 23, 1982, a temporary restraining order was issued by the Honorable Prentice Marshall, United States District Judge, restraining FPB and Serhant from the alleged violations of the Act, and imposing a freeze over all assets of those defendants.

c.  On September 27, 1982, a preliminary injunction was entered by the Honorable George Leighton by consent of the parties, continuing the freeze on the assets of FPB and Serhant and the injunction



against continued violations of the Act, and granting other equitable relief. That same day Judge
Leighton placed FPB in receivership and appointed a Temporary Equity Receiver to conduct its affairs.

d.  The basis of that action was the fraudulent activities of FPB and Serhant in connection with the
purchase of United States Treasury Bills and commodity futures contracts.

e.  That Complaint alleged that FPB offered three types of investment accounts. The first type is a
regular futures trading account in which an investor deposits a sum of money to be invested soley
in the futures markets for speculative purposes. The second type is an account in which an investor
deposits funds, most of which is then used by FPB to purchase a United States Treasury Bill at the
current discount rate. The additional amount of customer funds representing the difference between
the face value of the United States Treasury Bill and its actual purchase price is then traded in the
futures market. In the third type of account approximately two thirds of the customer funds are used to
purchase a United States Treasury Bill and the remaining one third is used to speculate in the futures
marke.

f.  That Complaint further alleged that as to all types of accounts offered, FPB and Serhant had complete
discretion in and control over the assets and funds of its customers.

g.  Since at least September, 1981, however, Serhant and FPB have not been treating customer funds
and other assets in accordance with the agreed types of investment accounts. Serhant has failed to
maintain the investor funds in the United States Treasury Bills as required by his representations,
but instead has been committing those T-Bills or cash obtained from the sale of those United States
Treasury Bills to speculation in the futures markets. In addition, Serhant has been using the principal
investment of some investors merely to pay small interest payments to others.

Since at least February, 1981, the defendants herein, Heritage, Jeffrey W. Weaver and Ward A. Weaver, have
been affiliated with FPB and Serhant as sales agents for the FPB investment programs. From February, 1981,
until October, 1981, Jeffrey W. Weaver was an employee of FPB and Serhant. From October, 1981, until the
present, the two Weavers were sole owners and officers of Heritage which was a corporate sales agent for the
FPB and Serhant investment programs.

Three customer witnesses, Patricia Smith, Robert Udell and William Fleter testified that Ward and Jeffrey
Weaver solicited them to invest in the investment program involving United States Treasury Bills ("T-Bills") and
commodity futures contracts on such T-Bills. These customers were solicited orally by Ward and/or Jeffrey
Weaver. Furthermore, all three customers received similar packets of written materials which indicated that the
funds invested with Heritage and the Weavers would be managed by FPB and Serhant.

Those investment packets indicated that the bulk of the customers' funds (from 75% to 97%) would be used to
purchase actual T-Bills, and that the remainder of the funds would be used to invest in the futures market.

Further, the defendants represented both orally and in writing that the rate of return to the investor would range
between 2.95 and 4.50 per month for an annual rate of between 35 And 55 percent.

The defendants described the investment program as one in which the customer's funds would be combined
with the funds of other investors into one investment account. The explanation was typically that the funds of
one customer were insufficient to purchase a T-Bill, so that the funds of customers would be combined for that
purpose. The typical example involved the combination of several customers' funds to purchase one $100,000 T-
Bill at a discount, with the remainder invested in the futures market.

Further, the defendants represented to investors that the defendants would combine the investors' funds and
transmit them to FPB and Serhant for investment. The defendants further explained that interest payments and
returns of capital would be funneled from FPB and Serhant to the defendants who would then return the funds to
customers.

Smith, who resides in Bollingbrook, Illinois, invested in the defendants' program in March, 1981 by issuing
three checks to Financial Partners, Ltd. totaling $14,000. In May, 1981, Jeffrey Weaver informed his investors
that his investment program account would be titled "Jeffrey Weaver Omnibus." In July, 1981, Smith invested



an additional $16,000 with the defendants by remitting checks to Jeffrey Weaver made payable to the Jeffrey Weaver Omnibus account.

In October and November, 1981, Jeffrey and Ward Weaver formed Heritage to manage the customer investments. During this period the defendants transferred the customer accounts from the Jeffrey Weaver Omnibus account to an account entitled the "Heritage Capital Advisory Services, Ltd." account.

In April and July, 1982, Smith invested an additional $11, 287.03 in the Heritage program by means of two checks made payable to Heritage. Smith's total principal investment with the Weavers, net withdrawals, was about $35,000. The interest accrued but not paid on this investment totals about $22,000.

After her initial investment, Smith received statements first from Jeffrey Weaver and thereafter from Heritage, which reflected high rates of return as advertised by defendants.

Mr. Udell, who resides in Glenview, Illinois, was initially solicited to invest in Heritage by Ward Weaver at a meeting at the Heritage offices in Schaumburg, Illinois during January, 1982. Also present at this meeting was Jeff Weaver, one Heritage investor, and two prospective Heritage investors. At this meeting Jeff Weaver gave Udell a packet of written information concerning the Heritage program.

Based on the January 1982 meeting with the Weavers and the written information distributed by them, Udell understood that Heritage would transfer funds invested with it to FPB and Serhant to purchase T-Bills and to speculate in the futures market. The Weavers explained that the maximum risk to the investor was from 2 to 4 percent and that Heritage received a commission of 1 percent per month on funds invested with it.

On the day of the January 1982 meeting with the Weavers and others, Udell invested $10,000 with Heritage. Udell wrote four post dated checks payable to Heriage for $2,500 each so that his investment would be spread out over four separate T-Bill maturity dates.

Udell received statements concerning his investment and interest checks by mail from Heritage about once a week. These statements showed rates of return from 3.2% to 4.05% per month.

In March, 1982, Udell requested a prospectus from Heritage but never received such a document.

Udell never attempted to withdraw any principal from his account at Heritage.

Ward Weaver initially solicited Mr. Fleter, who resides in Algonquin, Illinois, to invest in Heritage during October or November, 1981. Ward Weaver described the Heritage program that the was involved with and recommended that Fleter contact Jeff Weaver if the had an interest in the program.

Subsequently, Fleter met with Jeff Weaver at the Heritage offices in December, 1981. At this meeting Jeff Weaver explained the Heritage program to Fleter and gave him a packet of documents pertaining to the program. Jeff Weaver explained to Fleter that the program pooled funds from different investors to purchase $100,000 T-Bills and used the 3 percent T-Bill discount to speculate in the futures market. Weaver further explained that the program's risks were limited to the rate of return and that the principal invested was not subject to risk.

Fleter initially invested $10,000 with Heritage in December, 1981. Subsequently, he added a total of $5,500 to his investment and withdrew $2,000, for a total net investment of $13,500.

Fleter received statements from Heritage about once a month showing rates of return ranging from 3.2% to 4.05% per month. The statements showed Fleter's account had accrued about $2,300 in interest which he had not received.

Fleter telephoned Jeff Weaver on the day he read about Robert Serhant's financial fall in the newspaper. Jeff Weaver told Fleter that the Heritage funds had been invested with Serhant and FPB.

Frank Zimmerle and Fred Kozlowski, two Commission auditors, examined the books and records of Heritage and FPB to determine how customer funds came into Heritage, how Heritage accounted for the funds, how funds went between Heritage and FPB, and how funds were disbursed back to the customers of Heritage.

© 2025 CCH Incorporated and its affiliates and licensors.
All rights reserved.



Mr. Zimmerle testified that Heritage maintained two accouns into which funds from customers were deposited. The accounts were titled the "Jeff Weaver Omnibus" ("JWO") account and the "Heritage Capital Advisory Services" ("HCAS") account. Both accounts were sub-divided on the firm's books and records into four groups designated as Week A, Week B, Week C, and Week D. For each subgroup, Heritage maintained customer ledger cards and summary sheets of customer balances. Using the ledger cards and summary sheets as source documents, Mr. Zimmerle prepared a summary sheet showing the total amount of funds on deposit with Heritage in the JWO and HCAS accounts.

The JWO account consisted of 38 individuals who had invested approximately $1.5 million of principal with Heritage. Of the $1.5 million invested, customers received approximately $800,000 back as interest and principal. In addition, the firm's books showed that customers had been credited with $600,000 in accrued interest on their principal. Therefore, the firm's books showed the customers' balance in the JWO accounts to be approximately $1.30 million.

The HCAS account consisted of approximately 150-200 individuals who had invested total principal of $4.0 million with Heritage. Of the $4.0 million invested in the HCAS account, approximately $1.2 million was disbursed to customers as payments of either interest or been credited with $700,000 in accrued interest on their principal. Therefore, the firm's books showed total customer balances in the HCAS account to be approximately $3.5 million.

Therefore, between the JWO account and the HCAS account, Heritage had taken in approximately $5.5 million in customer funds, had credited customers with $1.30 million of accrued interest and had disbursed $2.0 million of principal and interest back to customers. Thus, the total balance for the JWO and HCAS accounts as of the last entries on Heritage's books was approximately $4.8 million.

To verify that customer funds were in fact being deposited into the JWO and the HCAS accounts, Mr. Zimmerle and Mr. Kozlowski traced a sample number of customer deposits into the bank accounts for those two accounts. That tracing analysis showed that in most cases customer funds could be traced directly into one of the two accounts.

Further analysis by the Commission's accountants showed that funds were withdrawn by Heritage from both the JWO and HCAS accounts and sent to FPB in blocks with no distinction between the funds of individual customers. These funds were then deposited by Financial Partners into its account at the Berwyn National Bank.

The accountants also analyzed the disbursement of funds back to Heritage from FPB and Serhant. Based on an analysis of Heritage's billings to FPB for commissions earned, the accountants concluded that approximately $117,000 in commissions had been billed to FPB for the eleven month period from October, 1981 until August, 1982. The accountants' analysis showed that the part of these funds which was actually paid to Heritage by FPB, about $73,000, was traceable into the Heritage Operating account.

Furthermore, funds were being sent from FPB to Heritage for the payment of principal and interest. A sampling of bank statements for six of the weeks from May, 1982 through August, 1982 showed 19 checks totalling approximately $400,000, made payable to either the JWO or the HCAS accounts, were sent to Heritage by FPB. These checks were subsequently deposited into one of the two bank accounts of the same name maintained by Heritage at the Independence Bank of Elkhorn.

By examining Heritage's cancelled checks, the accountants determined that Heritage was paying funds back to customers out of the JWO and HCAS accounts.

Based on their analysis, the Commission's accountants concluded that customer funds which were received by Heritage were commingled into common accounts, the JWO and HCAS. Further, the analysis showed that customer moneys received fom FPB by Heritage were deposited generally into either of the two customer accounts of Heritage, and the commissions were received by Heritage for deposit into the Heritage operating account. Finally, the analysis showed that Heritage made payments to customers from the JWO and HCAS accounts.



The evidence establishes that the defendants were soliciting members of the investment public for investment in the futures market. In many instances the customers apparently understood that while the bulk of their funds would be invested in actual United States Treasury Bills, the remaining portion of their funds would be used for investment in the futures market. The typical example given to customers by defendants both verbally and in the distributed written materials was that 97 percent of their funds would be used to purchase T-Bills and the remaining 3 percent, representing the discount for the purchase of a T-Bill, would be invested in futures.

Further, the customers were assured that the full extent of their risk would be limited to 3 percent of their funds, since the remaining 97 percent was to be invested in a T-Bill which would eventually mature at its full face value.

The defendants represented, both verbally and in their written promotional materials, that the amount of money invested in the futures market would be invested only in T-Bill futures in "hedges" or "spreads." Both terms were used abundantly in the promotional materials distributed by defendants, although the potential investors were assured that the defendants' "customary involvement in the T-Bill futures market is done on a spread basis, whereby one particular maturity is purchased and another maturity is sold simultaneously."

Further, defendants represented, verbally and in their distributed written promotional materials, that the limitation of risk to 3 percent would be further ensured by "specific price liquidation points" which would supposedly close out a futures position so that a "loss would not exceed an accrued gain … on the cash Treasury bill."

However, none of the assurances of the defendants were correct and none of the techniques described by them would have protected an investor from the loss of his total investment.

A commodity futures contract is a contractual obligation to make or take delivery of a specified quantity and quality of a commodity at a particular time or date in the future. A person who enters a futures contract to *make* delivery of the commodity on the future date is said to have a "short" position; a person who enters a futures contract to *take* delivery of the commodity on the future date is said to have a "long" position. Such futures contracts are traded on contract markets which are designated by the Commission for that purpose.

There are only two ways to extinguish the obligation that a person assumes in a futures contract. One way is to offset such a transaction by entering into a futures contract exactly opposite to that he has previously assumed. For example, a person with a short position (to make delivery) will offset that position by entering a futures trade that establishes a long position. Thus, his positions cancel out and he can calculate his profit or loss based on the difference in the prices of his two offsetting positions.

The other way to extinguish an obligation assumed in a futures contract is to actually make or take delivery of a commodity on the delivery date specified in the futures contract. Thus, on that date a holder of a long position will be required to take delivery of the commodity (and pay for that delivery) and conversely a holder of a short position will be required to make such delivery (and receive such payment).

Trading of futures contracts is done by traders in an area of a futures exchange known as the "pit." A member of the investing public invests in the futures market by opening an account with a commodity brokerage house, known in the parlance of the Commodity Exchange Act as a "futures commission merchant." The investor can then trade in futures contracts by entering an order wih a sales representative who relays the instructions to the trading floor. These instructions are then relayed to the trader who executes that order in the pit.

When an investor opens a futures trading account with a futures commission merchant, he or she must deposit money which is known as "margin" before the futures commission merchant can enter a futures transactions on behalf of the investor. Margin is not for payment of a futures transaction, but is "good-faith" or "earnest" money, put up to ensure performance on the obligations which the investor assumes when he or she enters into a futures trade. As a general matter, the amount of margin required is quite small in relation to the value of the particular futures contract being traded. Generally margin is only between five and ten percent of that value. Therefore, with a small amount of money deposited as margin, a commodity futures investor can assume obligations in a futures contract of a much larger value.

There are three futures exchanges in Chicago, one being the Chicago Mercantile Exchange on which futures contracts for 90 day T-Bills are traded. The futures contracts for 90 day T-Bills are for the delivery of T-Bills



with a face value of $1 million. The delivery months presently being traded include January, March, April, May, June, July, September, October and December. The margin for the futures contract in 90 day T-Bills is $2,500, between five and ten percent of the discount rate on such T-Bills. Thus, with an investment of only $2,500 an investor can "lock-in" an almost $1 million value of T-Bills, whether to deliver that value of actual T-Bills (as a holder of a "short" position) or to pay in cash that value and take delivery of T-Bills (as holder of a "long" position).

"Hedging" is a method by which a person who either owns an actual commodity or who needs to purchase it in the future can use the futures market to offset the risk he or she has in owning or needing to own that commodity. An owner of a 90 day T-Bill could "hedge" against the fluctuation of the interest rate affecting the value of that T-Bill upon maturation by purchasing a T-Bill futures contract of equivalent value for delivery at the time of the cash T-Bill's maturation. In that way such a hedger would protect himself against the change in value of the cash T-Bill at the time it matures when he may desire to reinvest those funds.

"Spreading" is a futures trading strategy whereby a futures trader enters into two futures trades simultaneously, the first to take delivery ("long") in one month, and the second to make delivery ("short") in another. The margin required for a spread position in T-Bills is substantially less than that for a single position, being only $500.

In all three types of futures trading, single position hedging and spreading, an investor stands the risk of being unable to extinguish his futures' position(s) by offset because of market moves against him. Such an inability to offset might occur because the market would move o a certain limit (known as a "price limit") at which futures trading would stop in that contract. Because of such limit move situations, it is frequently impossible for a trader to execute an order to get out of a futures position. That is, a trader would not have the opportunity to get out of that position, and that inability might continue for several days. If, in such a situation, an investor is forced to hold a futures contract until it expires on the delivery date, he or she would be obligated on that delivery date to fulfill his obligations under the futures contract. A holder of a long position in a T-Bill contract would be required to produce almost $1 million and take delivery of an equivalent amount of T-Bills; a holder of a short position would be required to produce T-Bills with a face value at maturity of $1 million.

Thus, the risk of a futures investor is not limited to the small margin which he has posted. In a T-Bill futures contract, that risk far exceeds the $2,500 margin which an investor might have posted; it approaches $1 million.

Thus, in this case the risk to the funds of the defendants' investors far exceeded the 3 percent discount which was supposedly to be committed to the futures market. Indeed, by operation of the futures market, the investors' risk would have been equivalent to the full extent of the customer's investment, including that amount of the investment which was supposedly committed to cash T-Bills. Even if only a small portion of the investors' funds was actually invested in the futures market in hedge or spread positions, should the market experience an unexpected move against those positions, the entire amount of the investors' funds would be at risk. Thus, the combination of the effects of the futures market and the investment program of the defendants placed all of the investors' funds at risk.

This risk could not be limited by the techniques of "price liquidation points" as represented to investors by defendants. A price liquidation point is apparently the defendants' reference to what is known in the futures industry as a "stop-loss order." A stop loss order is an effort by a trader to place a limit on the loss that he can suffer on a futures position. A stop loss order is an instruction to the trader in the pit to execute a futures order when the market price moves a specified point beyond which an investor desires to stop any further loss.

However, contrary to the representations of the defendants and their promotional materials, there is no guarantee that a stop loss order will be executed at all, let alone at the price specified. For if the market moves against an investor's position, even a stop loss order may not be executable, thus leaving an investor locked in to his futures position. This inability to stop loss also exists in spread positions. Moreover, the Commission has specific regulations pertaining to regular futures trading which provide that potential investors be specifically informed that such stop loss orders do not ensure that loss will be limited, and that spread positions may not be less risky than outright positions.

© 2025 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Jan 14, 2025 from VitalLaw®



A commodity pool is an investment organization in which funds of various investors are solicited by a person or entity for the purpose of combining those funds into a common fund and then using those common funds for the purpose of investing in commodity futures contracts.

In a commodity pool, participants share in accrued profits from the commodity futures trading on a pro rata basis; that is, to the extent that they contributed funds, they get the same percentage of the profits and the losses charged to them.

In usual practice, a commodity pool operator solicits funds generally from members of the investing public, puts them into a common fund in a bank account, opens up a commodity futures trading account with a commodity brokerage house in the name of the pool, and deposits the pool's funds into that account prior to the commencement of tradings.

In usual practice, the trading for a commodity pool can be done by the pool operator himself or by a commodity trading adviser (a commodity professional registered with the Commission who either sells market information or manages other people's funds). Other types of persons registered with the Commission may also do the trading for a commodity pool, including an associated person (a registered account executive or salesman employed by a commodiy brokerage house) or a floor broker. The identity of whomever does the trading must be disclosed to the participants in the commodity pool.

Based on all the evidence adduced herein, therefore, the Court finds and concludes as a matter of fact that the defendants operated a commodity pool. They solicited, accepted and received funds from the public, deposited those funds into two separate entities in which the funds of various individual investors were commingled, and they gave those funds to Robert Serhant, at least in part, for the purpose of investing in the futures market. The defendants received commissions from those activities and had in excess of 15 investors. The defendants' investors expected to profit or lose on a pro rata basis according to the amounts of money that they initially invested with defendants.

The defendants are not now and have never been registered with the Commission as commodity pool operators.

The evidence establishes that the pool operated by defendants was capitalized through an oral agreement with investors, including numerous Illinois residents, whereby each individual participant gave various sums of money to defendants for the purpose of aggregating a larger sum of money needed to gain entry into an otherwise unavailable FPB and Serhant investment program. The investment intendment of the oral contract included both purchases in cash United States Treasury Bills and futures contracts in United States Treasury Bills. The evidence shows that funds from the pool were forwarded to FPB and Serhant without regard to the distinct investment positions taken by Heritage customers. Defendants thereupon instructed, either expressly or implicitly, FPB and Serhant to divide the forwarded sums of money and thereafter used a portion of the funds to purchase cash United States Treasury Bills, and then apply the difference between the face value of the bills and the actual cost paid for the bills (discount), to futures trades cleared or executed on the Chicago Mercantile Exchange.

Interest earned on the cash United States Treasury Bills and the gain or loss derived from the futures contracts executed by FPB and Serhant on behalf of defendants was paid to Heritage in a similar, albeit reversed fashion. FPB and Serhant would transmit earnings as a lump sum to defendants. After receipt of this lump sum from FPB and Serhant, defendants attributed a proportionate share, directly measured by the size of their participation, to individual investors in the pool.

Even though pool participants expected profits solely from the efforts and skills of FPB and Serhant, the pool operations itself completely depended upon defendants for its success. The defendants exerted considerable marketing efforts in order to reach, maintain, and increase the corpus of the pool. They also provided the administrative skills necessary to keep the pool an ongoing and successful venture. The participation of the individual investors in the pool was entirely passive. Based upon the record, there is no evidence to suggest that the success of the pool was independent of the defendants' conduct.



The records of the Office of the Illinois Secretary of State, for the period of January 1, 1979 to and including the close of business on September 24, 1982, do not disclose any registration of any type or class of securities issued or issuable by Heritage.

The evidence further establishes that defendants offered for sale and routinely sold in the State of Illinois the aforementioned agreements to participate in the pool; and that the individual defendants regularly engaged in the sales activities of Heritage.

The Amended Complaint did not allege and no proof was offered to show that defendants committed fraud of any kind.

There is no proof that since inception of this litigation any of the defendants have sought, in a general manner, to continue the business complained of, have asserted any right to continue such business, have converted or concealed assets or otherwise attempted to dissipate any assets. Unrebutted proof shows that when the fact of wrongdoing by FPB and Serhant was brought to the attention of the defendants, they initiated a call to the U.S. Attorney's Office through their then counsel and voluntarily effected a transfer of all remaining funds of Heritage to such counsel to be held in behalf of Heritage, where such funds still remain.

There is a likelihood, however, that defendants will continue to engage in some aspects of operating a commodity pool. Even if no funds are solicited from investors in the future, disbursing funds back to existing investors is a function of a commodity pool. For this reason, it is likely that the defendants will engage in future operations of a commodity pool.

Defendants did use the United States mails in conducting their business and at least one defendant did draw a salary and commission from the business.

***Conclusions of Law***

In an action alleging violations of the Commodity Exchange Act, the plaintiffs generally are not required to establish the elements traditionally required for the issuance of a preliminary injunction. Instead, the plaintiffs need only show a *prima facie* violation of the Commodity Exchange Act and a reasonable likelihood of future violations to establish entitlement to injunctive relied. *CFTC v. Co-Petro Marketing Group, Inc.,* 680 F.2d 573, 582, n. 16; *CFTC v. Hunt,* 591 F.2d 1211 (7th Cir.1979), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848 (1979); *CFTC v. Muller,* 570 F.2d 1296 (5th Cir. 1978); *CFTC v. British American Commodity Options Corp.,* 560 F.2d 135 (2d Cir. 1978), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123 (1978). Moreover, once unlawful conduct is established, the law will presume a likelihood of future violations absent proof to the contrary. *CFCT v. Hunt, supra; CFTC v. British American Commodity Options Corp., supra; SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975).

In the present case, a past violation has been established and it is likely that the defendants will continue at least some operations without benefit of registration. Thus, the technical requirements for the issuance of an injunction have been met.

The court must admit, however, that the satisfaction of the technical requirements in this case does not form the strongest ground for relief under the circumstances. In the vast majority of cases this court has reviewed, the future violations which were foreseen related to new solicitations of investment which, it was feared, would be carried out in a fraudulent manner. Fear of future fraudulent activity is indeed more serious than a business disbursing funds back to investors without benefit of registration. For this reason, the court also chooses to premise its injunctive relief upon an additional ground, namely, that equitable principles traditionally applied also weigh in favor of issuing an injunction.

The four factors traditionally considered for the issuance of an injunction are as follows:

(1)  whether the movant will suffer irreparable harm for which there is no adequate remedy at law if the injunction does not issue;

(2)  whether the threatened injury to the plaintiff outweighs any harm the injunction may inflict on the defendant;


Wolters Kluwer

(3)    whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4)    whether granting the injunction will not disserve the public interest.

*Citizens Energy Coalition of Indiana V. Sendak,* 594 F.2d 1158, 1162-63 (7th Cir. 1979), *cert. denied,* 444 U.S. 842 (1979); *Local Div. 519, Amalgamated Transit Union, AFL-CIO v. LaCrosse Municipal Transit Authority,* 585 F.2d 1340, 1351 (7th Cir. 1978). The relative weight given each of these factors will vary from case to case. *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 293 (7th Cir. 1974). The court finds that the plaintiffs have satisfied the traditional requirements for the issuance of a preliminary injunction.

First, irreparable injury will occur if the court fails to issue an injunction. Plaintiffs contend that they are entitled to disgorge the profits defendants have obtained from their illegal activity and are further entitled to rescind the investment contracts to permit refunding of the investment amounts to investors. If the court fails to freeze the assets, the defendants could dissipate the assets and render the potential final relief of disgorgement and recission meaningless.

Second, the threatened injury to the investors far outweighs any harm inflicted on the defendants. Absent an injunction, several hundred investors would be threatened with the risk of being unable to recover any portion of their investments. Issuance of the injunction, on the other hand, inconveniences only the three defendants—Heritage, which no longer conducts business, and the two individual defendants. Furthermore, the injury to the two individual defendants is minimized by the order's allowances for ordinary living expenses. On balance, the threatened injury to the investors is far more significant than the inconveniences which will be suffered by the two individual defendants. *See SEC v. Culpepper,* 270 F.2d 241, 250 (2d Cir. 1959) ("The public interest, when in conflict with private interest, is paramount").

Third, the plaintiffs have demonstrated at least a reasonable likelihood of success on the merits. As to the federal claim, the defendants admit that they did not register as commodity pool operators with the CFTC. Section 4M of the Commodity Exchange Act provides in relevant part that

> It shall be unlawful for any … commodity pool operators, *unless registered under this Act,* to make use of the mails or any means or instrumentality of interstate commerce in connection with this business as such … commodity pool operator….

7 U.S.C. §6M (Emphasis supplied).

The significance of the registration requirement is set forth in Section 4L of the Act, 7 U.S.C. §6L, which acknowledges that

> the activities of … commodity pool operators are affected with a national public interest in that, among other things—
>
> (1)    their advice, counsel, publications, writings, analyses, and reports are furnished and distributed, and their contracts, solicitations, subscriptions, agreements, and other arrangements with clients take place and are negotiated and performed by the use of the mails and other means and instrumentalities of interstate commerce;
>
> (2)    their advice, counsel, publications, writings, analyses, and reports customarily relate to and their operations are directed toward and cause the purchase and sale of commodities for future delivery on or subject to the rules of contract markets; and
>
> (3)    the foregoing transactions occur in such volume as to affect substantially transactions on contract markets.

The importance of this registration requirement has been emphasized by the Courts which have considered the operation of unregistered commodity businesses to be of the most serious nature. As the Second Circuit has



noted, the intent of the Congressional design is clear: persons engaged in defined regulated activities are not to operate as such without registration because "registration is the 'kingpin in this statutory machinery.'" *CFTC v. British American Commodity Options Corp.,* 560 F.2d 135, 139-140 (2d Cir. 1977), *cert. denied,* 438 U.S. 905 (1978). It is registration which "gives the Commission the information about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the Act." *Id.*

The evidence at the hearing established that the defendants acted as commodity pool operators and were therefore subject to the registration requirement. Section 2(a)(1) of the Act defines a commodity pool operator as:

> … any person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market.

7 U.S.C. §2(a)(1).

Expert testimony, as well as judicial construction of the term "commodity pool," established that a commodity pool involves the combined investment of the funds of several investors in the commodities futures market. The saliet features of a commodity pool are: 1) all investors funds are placed in a single account; 2) transactions are executed on behalf of the entire account without allocation to any particular investor; 3) investors' profits and losses are then allocated by shares to individual investors based on their *pro rata* contribution to the fund. *Meridith v. ContiCommodity Services, Inc.,* 2 Comm.Fut.L.Rep. (CCH) Par. 21,107 (D.D.C. 1980).

These same features are present in defendants' business activities. Here the defendants solicited many investors for investment in the commodities markets. The defendants represented to those investors that the investor's funds would be combined with the funds of other investors for the purpose of investment in the futures market. The defendants did in fact combine the funds of such investors in bank and other accounts. Further, defendants transmitted those funds to FPB and Serhant in blocks with no distinction beween investors. Those funds were transmitted to FPB and Serhant for the pupose, at least in part, of investment in the futures market. The defendants distributed profits to investors based on the investors' *pro rata* share of the pooled money just as the defendants had informed the investors that those profits would be distributed. Therefore, defendants were commodity pool operators within the meaning of the Act.

The statute defining a commodity pool operator specifically includes "any person … who *solicits, accepts, or receives from others,* funds … for the purpose of trading in any commodity for future delivery." 7 U.S.C. Sec. 2(a)(1). *See also* 17 C.F.R. Sec. 4.1 *et seq.* The evidence establishes that the defendants solicited, accepted and received funds for that purpose. Thus, under the terms of the statute, the defendants' transfer of funds to Serhant and his trading control does not remove them from the coverage of the statute.

Defendants reasons for claiming that they are not commodity pool investors are unpersuasive. First defendants contend that their business was not in the "nature of an investment trust, syndicate, or similar form of enterprise," as that term is used in the statute. The court believes, however, that the term should be construed broadly to protect the investing public. Defendants' enterprise is sufficiently similar to an investment trust or syndicate to fall within the statute's reach.

Second, defendants lack of control over the ultimate investment decisions does not mean that they were not commodity pool operators. As the expert testimony at the hearing established, in a *traditional* commodity pool the operator usually exercises complete control over the investment decisions. The investment arrangement in the present case was therefore somewhat unique, in that the entity which solicited and pooled funds had no control over the ultimate investment decisions. In a sense, the defendants served as a conduit between the investors and FPB, who ultimately made the investment decisions.



The definition of a commodity pool set forth in *Meridith, supra,* it should be noted, does not require the operator to have ultimate control of the investment decision. The operator need only have sufficient control to pool the funds into a single account for investment. This much control the defendants had, and for this reason, they were commodity pool operators.

Now that it has been preliminarily established that defendants acted as commodity pool operators without benefit of registration, it is clear that this court has the inherent authority to fashion appropriate equitable relief including the appointment of a receiver, a freeze of assets, and disgorgement. [1] *SEC v. First Financial Group of Texas,* 645 F.2d 429, 438 (5th Cir. 1981); *CFTC v. Muller, supra; SEC v. Wencke,* 577 F.2d 619 (9th Cir. 1978), *cert. denied,* 439 U.S. 964 (1978); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir. 1972). The freezing of assets, in particular, has been recognized as an especially appropriate interim relief. *CFTC v. Muller, supra; CFTC v. Co-Petro Marketing Group, Inc.,* 2 Comm.Fut.L.Rep. (CCH) ¶21,086 (C.D. Cal. 1980), *aff'd,* 2 Comm.Fut.L.Rep. (CCH) ¶21,420)9h Cir. 1982); *CFTC v. Buterin* 2 Comm.Fut.L.Rep. (CCH) ¶21,133 (D.Kan. 1980); *CFTC v. Trending Cycles for Commodities, Inc.,* 2 Comm.Fut.L.Rep. (CCH) ¶21,013 (S.D. Fla. 1980); *CFTC v. Morgan, Harris & Scott, Ltd.,* 2 Comm.Fut.L.Rep. (CCH) ¶30,901 (S.D.N.Y. 1979). In cases such as this, a freeze of the assets of both the corporate defendant and the individual defendants has been permitted. *E.g., Muller, supra.*

The court acknowledges that, as defendant argues, there are very few reported cases which freeze assets solely because of a failure to register. The court does not agree, however, with the defendant's characterization of the failure to register as a "technical violation." To the contrary, the Second Circuit has emphasized that "registration is the Kingpin in this statutory machinery." *CFTC v. British American Commodity Options Corp.,* 560 F.2d 135 (2d Cir. 1977), *cert. denied,* 438 U.S. 905 (1978). It is entirely possible that, had defendants been properly registered, the CFTC may have uncovered the fraud long before individuals invested millions of dollars. It is precisely because of the registration requirement's significance, that courts have frozen assets in cases involving the failure to register. In *CFTC v. Buterin,* 2 Comm.Fut.L.Rep. (CCH) ¶21,133 (D.Kan. 1980), a case involving allegations nearly identical to those involved herein, the District Court issued an order freezing assets of the defendant to ensure that those assets would be available for disgorgement. Moreover, in *CFTC v. Co Petro Marketing Group, Inc.,* 502 F.Supp. 806 (C.D. Cal. 1980), *aff'd,* 680 F.2d 573 (9th Cir. 1982); the District Court granted a disgorgement order against the defendants, including the individual defendants, when the only violation alleged therein was the sale of futures contracts other than on a designated contract market.

Because the plaintiffs have established a violation and a potential entitlement to broad relief under the federal claim, it is unnecessary for the court to consider the state based claims at this time. The federal claim alone is sufficient to establish a likelihood of success on the merits.

The final factor, the public interest, is served by the issuance of an injunction. The injunction will serve to protect investors, a public interest which has been recognized as "paramount." *Culpepper, supra.*

For these reasons, the court grants plaintiffs' motion for a preliminary injunction.

It is so ordered.

---

**Footnotes**

1    Contrary to defendants assertion that this court may only disgorge *profits,* where third party investors have invested funds with a business the court may disgorge the "*proceeds*" the unlawful business takes in, *SEC v. Manor Nursing Ceners, Inc.,* 458 F.2d 1082 (2d Cir. 1972) ( "Clearly the provisions requiring the disgorging of proceeds received … was a proper exercise of the district court's equity power"). *CFTC v. Hunt,* 591 F.2d 1211 (7th Cir. 1979), *cert. denied,* 442 U.S. 921 (1979), which refers to *profits,* is distinguishable because *Hunt* did not involve wronged investors. In *Hunt,* the wrongdoers invested their own funds in a manner that exceeded speculative limits. No third party was harassed. Where a third party's funds are involved, the court believes that disgorgement of *proceeds* can be appropriate remedy.

---

© 2025 CCH Incorporated and its affiliates and licensors.
All rights reserved.